**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | CIVIL ACTION |
| | : | (habeas corpus) |
| Petitioner | : | |
| | : | NO. 18-5269 |
| v. | : | |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| | : | |
| Respondents | : | |

<u>**AMENDED PETITION FOR WRIT OF HABEAS CORPUS**</u>
<u>**PURSUANT TO 28 U.S.C. § 2254**</u>

**STATEMENT OF THE CASE**

<u>**Introduction**</u>

This habeas case arises from a homicide that occurred just after midnight on June 26, 2011, when someone shot Dwayne "Shank" Isaacs multiple times in a small park at 2600 Jackson Street in the Wilson Park housing project in Philadelphia. Isaacs was pronounced dead at the scene by responding paramedics.

The Commonwealth's theory of the case was that Isaacs had been the victim of a revenge killing because he was the uncle of Rashul Isaacs, who was considered, at the time, to be the principal suspect in the then-recent Wilson Park shooting that had wounded Lekkir "Le-Le" Young, the son of a man named Leroy "Kamac"[1] Brown.

At trial, held before the Honorable Barbara McDermott and a jury, Petitioner Christopher Goodwin was convicted of first-degree murder and weapons offenses even though no witness identified Dwayne Isaacs' killer from the stand. Two witnesses – Andre Cunningham and Aaron Respes – had previously identified Mr. Goodwin as the shooter in statements to police, and those

---

[1] The alternate spelling "Camac" is also used in some of the state-court records.

statements were admitted at trial, but both men recanted on the witness stand. Each had been subjected to long periods of detention at police headquarters before those statements had been given. Cunningham even testified that Detective James Pitts had choked and threatened him during that detention. As detailed in the Claims section below, the Commonwealth made a decision to supplement its otherwise weak case with other inadmissible material, and trial defense counsel, W. Fred Harrison, Esq., provided ineffective assistance of counsel when he failed to lodge objections to *any* of that inadmissible evidence or argument. Additionally, the Commonwealth failed to disclose significant evidence of Detective Pitts' misconduct in other cases which would have both impeached the Commonwealth case and supported Andre Cunningham's testimony that Pitts assaulted and threatened him to give a statement against Mr. Goodwin.

### The Commonwealth's Case at Trial

Dwayne Isaacs died of multiple gunshot wounds, from five or six bullets, according to the Commonwealth's forensic expert. He was pronounced dead by medics at the scene at 12:31 a.m. on June 26, 2011.  5/20/13 NT 74-87, 97. Bullets that were recovered were from either a 9-mm. or .38-caliber gun, but the gun itself was never recovered. 5/21/13 NT 237-249.

Andre Cunningham testified at trial that he was on nearby Taney Terrace when he heard six or seven shots in the park, and ran. He did not see the shooting occur. At the time, Cunningham testified, he saw Christopher Goodwin sitting on steps at a house "across from" Taney Terrace – on, "like, Jackson [Street], over there" – with two women named Tika and Anara. 5/20/13 NT 153-155, 246.

Cunningham testified that weeks later, on July 20, 2011, at about 6 p.m., police picked him up and took him to Homicide headquarters, where he was placed in a locked room, and

seated at a table for approximately the next 18 hours until he gave a statement inculpating Christopher Goodwin. 5/20/13 NT 156, 261-265. At trial, Cunningham testified that, during his time at Homicide headquarters, a detective, whom Cunningham described as "a black guy" – and whom both the defense and the Commonwealth assumed to be Detective James Pitts – asked Cunningham something about the case, and when Cunningham said he did not know, the detective choked him. Later, the same man came into the room and woke Cunningham up by slamming phone books down on the table where he was napping. 5/20/13 NT 267-269; 5/21/13 NT 6-8.

Cunningham testified that he was "high" on Xanax the entire time that he was at Homicide and that he was the victim of police harassment for "[b]asically two days" in order to compel him to give a statement. Eventually, at about 1:30 p.m. the next day, July 21, he gave a statement that was not audio- or video-recorded, inculpating Mr. Goodwin as the shooter, which included signing a photo of Mr. Goodwin and writing, "Shot Shank," on it. 5/20/13 NT 160-163. Cunningham testified at trial that he does not remember writing that phrase on the photograph. 5/20/13 NT 160-163. He eventually gave in to police demands because he "wanted to get out of there." 5/21/13 NT 12.

In that statement, which was read to the jury, Cunningham said that he had been in a local speakeasy on the night of the shooting, and seen Mr. Goodwin there. When he left the speakeasy, Cunningham stated, he saw Mr. Goodwin ahead of him on the street; Cunningham had been unaware that Mr. Goodwin had left the speakeasy. Cunningham claimed that he saw Mr. Goodwin hop a fence and walk into the park, and, after asking a couple of people if they had any Xanax, Mr. Goodwin shot Dwayne Isaacs multiple times as Isaacs walked past. 5/22/13 NT 18-

19. According to the statement, after the shooting Cunningham walked to the nearby home of a woman named Theresa. 5/22/13 NT 21.

Cunningham testified at trial that once he was out of police custody, his "high went down" and he realized that he had given in to police demands and given a statement inculpating Mr. Goodwin. 5/20/13 NT 195. He agreed on cross-examination that he has been "trying to make amends" ever since falsely implicating Mr. Goodwin. 5/20/13 NT 238. Those "amends" included going to Mr. Goodwin's mother to see how he could help, and she gave him the name of her son's attorney. 5/21/13 NT 15-16.

Aaron Respes was the other purported eyewitness who testified for the Commonwealth. But he also could not ultimately identify Mr. Goodwin as the shooter. At first, he testified: that he was walking by the park, heard a gunshot, and started running; that the people he saw were Isaacs and Mr. Goodwin; and that Goodwin was holding a gun. 5/21/13 NT 86-91. But almost immediately, Respes then testified that he could *not* see a gun, and that when he inculpated Mr. Goodwin in a statement that he gave to police after they picked him up for questioning on July 21, 2011, he merely "told them what they wanted me to say." 5/21/13 NT 93, 98.

Respes claimed that police told him that if he did not identify Mr. Goodwin as the shooter, he was going to go to prison "for conspiracy to a murder." 5/21/13 NT 101. When he was shown a photo array and told to pick out the shooter, Respes told police he was not sure. But then police threatened him with prosecution, so he chose Mr. Goodwin's photo because the shooter had a beard and so did Goodwin. He also did not recognize anyone else from his neighborhood in the photos. 5/21/13 NT 102-104. Respes agreed at trial that his statement to police does not appear to be unsure or ambiguous, but he testified that that is because the statement is just the end result of the process of the police telling him what to say. 5/21/13 NT

4

112-113. "I just know the pictures they showed me, they said it was him and they said they

needed me to say it was him," Respes testified. 5/21/13 NT 154. Police told him that they already

knew the shooter was Mr. Goodwin and they just needed his help. 5/21/13 NT 181-182.

In the statement, which was read to the jury, Respes told police that Isaacs was "just

walking" and "[t]his boy they call Gunna" – referring to Mr. Goodwin – "just shot" Isaacs.

According to the statement, Respes "took off" after the first shot and "heard more shots" as he

ran. 5/22/13 NT 37-39.

Respes agreed at trial that Detective Gaul was "browbeating" him to identify Mr.

Goodwin as the shooter. 5/21/13 NT 168-169. At one point before the statement, Respes even

asked to leave and was told that he could not, and was going to be charged with conspiracy.

5/21/13 NT 170. He was nervous and scared, and complied when police told him to write

"Gunna" and the word "shooter" on the photo. 5/21/13 NT 171-172. He testified at trial that he is

not sure who shot Dwayne Isaacs. 5/21/13 NT 152.

The Commonwealth argued to the jury that Respes and Cunningham were both fearful

that they would be retaliated against as "snitches" for testifying. 5/28/13/NT 63-79. Respes

admitted that he skipped the first preliminary hearing in the case, but said that he did not do so

because he was scared. 5/21/13 NT 120-124. However, Respes testified at trial that police picked

him up for the next preliminary hearing, at which he testified, and they told him that if he did not

testify in accordance with his statement to police, he would remain in custody. 5/21/13 NT 180.

At that preliminary hearing where he testified, Respes claimed that he only saw the beard, not the

shooter's face, and he explained at trial that he had also told police the same thing when they

took his statement, but police did not write that down. 5/21/13 NT 127-136. Respes admitted that

his mother was eventually relocated with help from the Commonwealth, but he also testified that

he personally was *not* relocated and that he does not recall anyone yelling, "Snitch," at him outside the courtroom after the preliminary hearing. He testified at trial that he was never threatened and was not labeled a snitch. 5/21/13 NT 138-146. Respes also admitted that early in May 2013 he was arrested for attempted murder, but he claimed that he had made no deal with the Commonwealth on that case. 5/21/13 NT 153.

Lisa Hall, sister of Dwayne Isaacs, testified that rumors in the neighborhood were that her nephew Rashul Isaacs had shot Le-Le Young. Hall was aware that Kamac and her brother had "had words" the night before when Isaacs had asked how Le-Le was, and Kamac had angrily responded, "Why would you ask me how my son doing? Your effing nephew did it." 5/21/13 NT 263. Hall also testified that Isaacs told her that Kamac said to him that "he was going to fuck him up and that he better watch his back." 5/21/13 NT 270. She spoke to Dwayne Isaacs at about 10:30 p.m. on the night that he was shot. Hall also testified to Dwayne Isaacs' *state of mind*: that he expressed to her that he was "kind of leery about going out to the project because of what Leroy [*i.e.*, Kamac] had said to him *and [because of] the young guys that was out there*." 5/21/13 NT 260-265 (emphasis added). In case there was any doubt that Isaacs meant not only that he was afraid of Kamac, but of Christopher Goodwin, in summation the DA argued to the jury that the "young guys" referred to in the statement included Mr. Goodwin. 5/28/13 NT 55. Despite the fact that a victim's state of mind is ordinarily irrelevant in a homicide prosecution, no objection was lodged by defense counsel to Hall's testimony about Isaacs' state of mind or to the prosecutor's summation in that regard.

6

Hall's testimony was also used as part of a larger effort by the Commonwealth to portray the defense – without any actual factual underpinning[2] – as having organized to fill the courtroom with supporters of Christopher Goodwin *in order to intimidate witnesses*. Hall was asked by the district attorney how many people in the courtroom were there in support of Mr. Goodwin and Hall replied, "Just about every last one of them." 5/21/13 NT 267. Then, because Aaron Respes had testified that he did not recall being called a "snitch," and because the Commonwealth's Relocation Coordinator Tobi Downing had testified that Respes was "fearful" and "wanted to get assistance" in relocation, on cross-examination defense counsel asked Downing what Respes had actually told her about intimidation, but Downing instead read from a memo *that the prosecutor trying the case had prepared regarding the preliminary hearing*: "The defendant had multiple friends in the courtroom today, all of whom were clearly there to intimidate any witnesses. They were so menacingly staring at the witness and the detectives." 5/21/13 NT 211-212. In fact, what Respes had told Downing was only "that he was afraid if he came forward" – with no specifics about Christopher Goodwin. *Id.* But Downing volunteered the assessment of the prosecutor trying the case that there was a coordinated effort by the defense to intimidate. *Id.* Then, on direct examination, Detective Thomas Gaul testified, generically, that Commonwealth witnesses in criminal cases are sometimes killed. 5/22/13 NT 145. The prosecutor also made sure in her summation to mention how many supporters of Christopher

---

[2] Andre Cunningham and Aaron Respes had been asked by the Commonwealth about a *specific* threat against Respes from Christopher Goodwin's brother, "Ish." Both denied that such a threat had been made. 5/20/13 NT 227-228; 5/21/13 NT 138, 147. Whether the jury believed that Ish had made such a threat at all, and, if he had, whether defendant had anything to do with it, was a fair question for the jury to resolve because it dealt with a specific threat. But the witnesses discussed in the above paragraph were not dealing with specific threats at all. Instead, the Commonwealth was improperly turning the act of attending a public trial into a concerted effort to intimidate, with no actual proof that that was what was going on – an entirely different matter from the specificity of the inquiries made of Cunningham and Respes.

Goodwin were "packed" into the courtroom each day, and argued to the jury in summation that that was an intimidation strategy. 5/26/13 NT 58. No defense objections were lodged to *any* of those transgressions.

On direct examination, Detective Gaul testified that he had received "[a] lot of information" through "anonymous tips" from "people who were out there" during the shooting. He learned of Andre Cunningham's name through those tips. 5/22/13 NT 8. Gaul testified that Cunningham was brought to Homicide headquarters at 8:15 p.m. on July 20, 2011, and "kept in an interior room." Gaul guessed that he was the first detective to speak to Cunningham thereafter, and that would have happened after midnight, because Gaul's shift did not begin until then. 5/22/13 NT 10, 95-96. Gaul denied that anyone had threatened Cunningham in order to make him cooperate, but he admitted that Detective James Pitts likely had contact with Cunningham at some point during Cunningham's approximately 18-hour stay at Homicide. 5/22/13 NT 14-15, 85-88. Gaul testified that Cunningham would have been allowed to leave the room if he wanted during those 18 hours, but he could not say how many detectives spoke to Cunningham before Cunningham finally agreed to give a statement inculpating Christopher Goodwin. Indeed, he could not say how long *he* had spent with Cunningham in order to get him to talk, but estimated that it "was hours." 5/22/13 NT 83-84, 99.

Likewise, Gaul claimed that Aaron Respes was not threatened by police with being charged with conspiracy if he did not talk. 5/22/13 NT 34. Gaul also claimed that Respes never told him that he only saw the shooter's beard, not his face. 5/22/13 NT 36. Gaul noted that someone called out, "Snitch," to Respes when he left court after the preliminary hearing, and Respes was "visibly shaken." However, other than the relocation efforts regarding Respes and his mother, Gaul had no other record or documentation of any threats against Cunningham or

Respes.  5/22/13 NT 48. Gaul also denied that anyone had mentioned Kamac as the person who shot Dwayne Isaacs, and defense counsel failed to impeach him with a statement from a woman named Yvette Morris, who *had told Gaul and Detective James Pitts* in an interview that "word on the street" is that "[K]amac shot Dwayne." Exhibit A at 2; 5/22/13 NT 113. The prosecutor then argued to the jury in summation, "No one" in the case "said that Kamac did it," when in fact Yvette Morris had said exactly that, but defense counsel did not use that statement to impeach Gaul. 5/28/13 T 54, 59.

Gaul's testimony was part of an improper effort by the Commonwealth – with no objections lodged by defense counsel – to portray the taking of statements from Cunningham and Respes as just a formality to prove what police already claimed to know from anonymous tips: that Christopher Goodwin was the shooter. Gaul testified that "it was *never a question as to whodunit*. It was just a matter of [Andre Cunningham] having the courage to help us." 5/22/13 NT 13 (emphasis added). He similarly stated with respect to Aaron Respes' statement: "[I]t was never a whodunit. . . There was never a doubt as to who done it. It was just a matter of getting the document." 5/22/13 NT 35. When defense counsel asked what investigative steps Gaul took, Gaul responded that a "lot of calls were coming in of people wanting to remain anonymous *as far as who the shooter was* almost immediately" – and defense counsel failed to strike the statement as improper. 5/22/13 NT 50. Gaul then repeated that the crime was not "a whodunit." 5/22/13 NT 52. He further told the jury that while he could not really specify what his investigative steps were between the shooting and the taking of Cunningham's and Respes' statements almost a month later, "the main information that came in" during that time "was that Christopher Goodwin had the nickname of Gunna, and he was the one that shot Dwayne Isaacs."

5/22/13 NT 50-55, 68, 71 (emphasis added). Again, no objection or motion to strike was made by defense counsel.

Gaul and another detective also testified that police had taken a statement from a man named Raheem Zachary, who did not testify. When defense counsel asked Detective Gaul on cross-examination whether Gaul had tried to find "Theresa," to whose house Andre Cunningham supposedly went around the time of the incident, Gaul went off on a tangent: "That may have been attempted. I know we did – the main person that I know that we contacted to try to corroborate was Raheem Zachary. . . . [H]e was brought into the Homicide Unit on July 27. He refused to go on paper, *but he also supplied information*." 5/22/13 NT 72-73 (emphasis added). Then, Gaul was asked by the prosecutor to clarify why a police activity sheet would list Raheem Zachary, and Gaul says that's because he "*did come in and give information*." 5/22/13 NT 147-148 (emphasis added). Then, on cross-examination, when asked a question about Andre Cunningham's statement, Detective John Verrecchio volunteered that Raheem Zachary *told police that he was present at the shooting* – which supported the notion that he "did come in and give information" as Gaul had claimed. Again, there was no objection made and no motion to strike. 5/22/13 NT 180-181 (emphasis added).

On redirect examination, Gaul also identified police activity sheets, Exhibit B (Commonwealth trial exhibit C-16), which documented some of the investigation in the case. 5/22/13 NT 147-148 Those sheets were then *admitted into evidence* with no objection from defense counsel despite the fact that they contained summaries of damaging statements by *two* witnesses – Raheem Zachary and 12-year-old T.M. – neither of whom testified, thereby further violating Christopher Goodwin's confrontation rights under the Sixth Amendment. 5/22/13 NT 236. Those activity sheets detailed that Zachary told police that he was in the "circle" in the park

10

when Dwayne Isaacs was shot and that, while Zachary did not see the identity of the shooter, he "heard that Chris [Goodwin] shot Shank." Exhibit B at 6. Similarly, those activity sheets stated that 12-year-old T.M. told police that earlier on the day of the shooting he saw Christopher Goodwin "pull[] out a black handgun during an argument." Exhibit B at 7. The activity sheets also indicated that both T.M.'s mother and Raheem Zachary also expressed fear to police that they would be retaliated against if word got out that they spoke to police. *Id.*

Detective Verrecchio testified at trial that no one choked Andre Cunningham at Homicide headquarters and he also denied that Cunningham was high at the time he gave a statement. 5/22/13 NT 152. Similarly to Detective Gaul, Verrecchio answered a question that asked merely whether anonymous tips had been received by improperly stating the *content* of those tips: "[W]e heard the name Gunna [*i.e.*, Christopher Goodwin] right away." 5/22/13 NT 166. Again, despite the obvious Confrontation Clause violation, defense counsel did not object or move to strike. Verrecchio also testified that Cunningham's and Respes' last names both appeared on a Facebook page called Wilson Park Rats. 5/22/13 NT 215-216.

**The Defense Case at Trial**

The defense presented only one witness. Anara Brown, cousin of Le-Le and niece of Kamac, testified that Christopher Goodwin was "sitting right next to me" on the front steps of a house at 2620 Jackson Street during the shooting – testimony that confirmed Andre Cunningham's testimony at trial – and that the street was crowded with people that night. 5/20/13 NT 246; 5/22/13 NT 248. Anara Brown also testified that she never went to the police with that information, but instead told it to both Christopher Goodwin's mother and Mr. Goodwin's attorney's investigator. 5/22/13 NT 253-256.

11

**Closing Arguments**

Defense counsel's closing argument focused on: (1) the Commonwealth's burden of proof; (2) Mr. Goodwin's alibi; (3) the recanting testimony of the two identification witnesses; and (4) the fact that Kamac, not Mr. Goodwin, had the motive to kill Dwayne Isaacs. 5/28/13 NT 10-51. The Commonwealth's summation focused on: (1) Gaul's assertion that the crime "was never a whodunit"; (2) that "no one" ever "said that Kamac did it"; (3) that the motive for the shooting of Dwayne Isaacs was the shooting of Le-Le; (4) that on the night he was shot, Dwayne Isaacs expressed fear of both Kamac and Christopher Goodwin; (5) that witness intimidation is a big problem in these cases and that witnesses were afraid to come forward; (6) that the jury should believe Cunningham's and Respes' statements to police; (7) that Anara Brown was lying; (8) that the evidence supports a first-degree murder conviction; and (9) that if other people were in the street that night and could support the alibi defense, they would have been called as witnesses;  5/28/13 NT 51-90

**Verdict**

The jury returned verdicts of guilty on all three charges: first-degree murder, carrying a firearm in public in Philadelphia, and possession of an instrument of crime. 5/28/13 NT 139-142. The Common Pleas Court judge sentenced Mr. Goodwin to serve a prison term of life without parole with two concurrent terms of one to two years for the other two convictions. 5/28/13 NT 151-152.

**Direct Appeal and PCRA**

The only issues raised by counsel David Rudenstein, Esq. on a timely direct appeal were sufficiency and weight of the evidence, and, on July 14, 2014, the Superior Court issued an opinion affirming the convictions. *Commonwealth v. Goodwin,* 2014 Pa. Super. Unpub. LEXIS

12

2899 (Pa. Super. Ct. 2014). On January 21, 2015, the Supreme Court of Pennsylvania denied a petition for allowance of appeal. *Commonwealth v. Goodwin,* 108 A.3d 34 (Pa. 2015).

On June 15, 2015, Mr. Goodwin filed a timely *pro se* PCRA petition in Pennsylvania Court of Common Pleas alleging numerous claims of ineffective assistance of trial counsel. On April 11, 2016, James F. Berardinelli, Esq. entered his appearance as Mr. Goodwin's attorney, and on August 10, 2016, Berardinelli filed a "no merit" letter with the court asking to withdraw from the case. On September 6, 2016, Mr. Goodwin filed a letter objecting to counsel's withdrawal, and on September 22, 2016, the court filed a notice of intent to dismiss, to which Mr. Goodwin filed an objection on October, 11, 2016. On October 24, 2016, Judge McDermott issued an opinion denying the PCRA petition and allowing Attorney Berardinelli to withdraw from the case. *Goodwin v. Wetzel, et al.*, Civil No. 18-5269, ECF Doc. 2 at 50-72. Mr. Goodwin took a timely *pro se* appeal to the Superior Court, and that court affirmed the denial of the PCRA petition in an opinion filed on June 28, 2018. *Commonwealth v. Goodwin*, 2018 Pa. Super. Unpub. LEXIS 2304 (Pa. Super. Ct. 2018). Mr. Goodwin did not pursue a petition for allowance of appeal to the Supreme Court of Pennsylvania.

On December 6, 2018, Mr. Goodwin filed a timely *pro se* petition for habeas corpus under 28 U.S.C. § 2254. *Goodwin v. Wetzel, et al.*, Civil No. 18-5269, ECF Doc. 2. The Federal Community Defender's Office was appointed to represent Mr. Goodwin on January 15, 2019.

### CLAIMS FOR RELIEF

I.     **Trial counsel was unconstitutionally ineffective for failing to object to multiple instances where the Commonwealth introduced highly damaging and prejudicial evidence that violated Petitioner's rights under the Confrontation Clause of the Sixth Amendment.**

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to object to, or otherwise move to strike, evidence of "testimonial" statements that violated Mr. Goodwin's Sixth Amendment right to confrontation.

That evidence included: (1) repeated references by Detective Thomas Gaul to the content of anonymous tips that implied from those references that the tips inculpated Mr. Goodwin, thereby making the investigation not a "whodunit" in Gaul's estimation, 5/22/13 NT 8, 13, 35; (2) testimony of Gaul that stated that "the main information that came in" from tips during the police investigation "was that Christopher Goodwin had the nickname of Gunna, and he was the one that shot Dwayne Isaacs." 5/22/13 NT 68-69, 71; (3) testimony from Detective Verrecchio that similarly stated that the anonymous tips that police received were that Mr. Goodwin was the shooter, 5/22/13 NT 166; and (4) testimony (of Gaul and Verecchio) and documentary evidence (police activity sheets) that put before the jury statements of Raheem Zachary and T.M. – neither of whom testified – that inculpated Mr. Goodwin. Exhibit B at 6-7; 5/22 NT 72-73, 147-148, 180-181, 236.

Trial counsel's failure to object -- or otherwise move to strike this evidence -- fell below prevailing professional norms. Trial counsel could have had no reasonable strategy for failing to object to this damaging evidence that could not be confronted. The failure was also prejudicial, because the evidence that violated Mr. Goodwin's confrontation rights served to significantly

bolster the Commonwealth's otherwise weak case. There is a reasonable probability that a jury not subjected to this improper evidence would have reached a different verdict.

The claim of ineffective assistance of trial counsel for the failure to object to the above evidence on Sixth Amendment Confrontation Clause grounds was never litigated in state court, but the failure to raise this claim in state post-conviction proceedings was due to the ineffective assistance of post-conviction counsel, which establishes cause and prejudice to overcome the procedural default. *Martinez v. Ryan*, 566 U.S. 1 (2012).

**II.     Trial counsel was unconstitutionally ineffective for failing to object to: (1) testimony of Lisa Hall that repeated a hearsay statement of the homicide victim on the day of his death regarding his fear of Christopher Goodwin and others, and (2) subsequent prosecutorial argument in summation regarding that testimony.**

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to object to inadmissible hearsay evidence testified to by Lisa Hall, and also failed to object to prosecutorial summation regarding that testimony.

Lisa Hall, sister of Dwayne Isaacs, testified to an inadmissible matter: Dwayne Isaacs' state of mind on the day he was shot and killed – *i.e.*, that he was afraid of both Kamac and Christopher Goodwin. Hall claimed that Isaacs expressed to her that he was "kind of leery about going out to the project because of what Leroy [*i.e.*, Kamac] had said to him *and [because of] the young guys that was out there*." 5/21/13 NT 260-265 (emphasis added). In case there was any doubt that Isaacs meant not only that he was afraid of Kamac but also of Christopher Goodwin, in summation the prosecutor argued to the jury that the "young guys" referred to in Isaacs' statement to Hall included Mr. Goodwin. 5/28/13 NT 55. No objection was lodged by trial counsel to Hall's testimony or to the prosecutor's summation.

15

Trial counsel's failure to object fell below prevailing professional norms. Trial counsel could have had no reasonable strategy for failing to object this damaging evidence. The failure was also prejudicial, because the hearsay evidence of Isaacs' state of mind – which the Superior Court agreed was inadmissible, *Commonwealth v. Goodwin*, 2018 Pa. Super. Unpub. LEXIS 2304. *18-*19 (Pa. Super. Ct. 2018) – not only inculpated defendant on the date of the shooting, but also specifically linked him to Kamac, the only person in the case with a motive to kill Isaacs. There is a reasonable probability that a jury that was not subjected to this improper evidence – that could not be confronted – would have reached a different verdict in a case where the Commonwealth's evidence was otherwise weak.

Trial counsel's failure to object fell below prevailing professional norms.  Trial counsel could have had no reasonable strategy for failing to object this damaging evidence. The failure was also prejudicial, because the hearsay evidence of Isaacs' state of mind – which the Superior Court agreed was inadmissible, *Commonwealth v. Goodwin*, 2018 Pa. Super. Unpub. LEXIS 2304. *18-*19 (Pa. Super. Ct. 2018) – not only inculpated defendant on the date of the shooting, but also specifically linked him to Kamac, the only person in the case with a motive to kill Isaacs. There is a reasonable probability that a jury that was not subjected to this improper evidence – that could not be confronted – would have reached a different verdict in a case where the Commonwealth's evidence was otherwise weak.

The claim of ineffective assistance of trial counsel for the failure to object to the above testimony on hearsay grounds was litigated previously in this case on PCRA in the state courts, and the result reached there was unreasonable. 28 U.S.C. § 2254(d).

Alternatively, to the extent that the aspect of this claim that addresses the prosecutor's summation is deemed not to have been fully exhausted in state court, the failure to raise this complete claim in state post-conviction proceedings was due to the ineffective assistance of post-

conviction counsel, which establishes cause and prejudice to overcome the procedural default.

*Martinez v. Ryan*, 566 U.S. 1 (2012).

**III.    Trial counsel was unconstitutionally ineffective for failing to impeach Detective Thomas Gaul with evidence that, despite Gaul's claim that Kamac's name "never came up" as the suspected shooter, in fact Gaul's name is on a police report which documents that a witness told him and another detective that "word on the street" was that Kamac was the shooter.**

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to impeach Detective Thomas Gaul with evidence that directly contradicted Gaul's claim that he was unaware of any statements that police might have received about Kamac as the suspected shooter in the killing of Dwayne Isaacs.

Trial defense counsel sought to demonstrate to the jury that police did not properly investigate Kamac as the likely shooter, but, when counsel asked Detective Thomas Gaul whether he had investigated that Kamac was the shooter, Gaul responded: "No, sir. That never came up." 5/22/13 NT 113.  Defense counsel then failed to impeach Gaul with a statement from a woman named Yvette Morris, who *had told Gaul and Detective James Pitts* in an interview that "word on the street" is that "[K]amac shot Dwayne." Exhibit A at 2. Defense counsel had that statement in his possession as part of the discovery that the Commonwealth had turned over to him. Because defense counsel failed to impeach Gaul with Morris' statement to him, the prosecutor was then able to argue to the jury in summation that "[n]o one" in the case "said that Kamac did it," when, if defense counsel had impeached Gaul with Morris' statement, the jury would have learned that in fact Yvette Morris had told Gaul himself that "word" was that Kamac was the perpetrator. 5/28/13 NT 54, 59.

Trial counsel's failure to impeach Gaul with the statement that Gaul took from Ms.

Morris fell below prevailing professional norms. Trial counsel could have had no reasonable strategy for failing to impeach Gaul on this subject, especially when such impeachment would have significantly furthered the defense claim that police ignored Kamac as the shooting suspect in favor of focusing exclusively on Christopher Goodwin. Trial counsel's inaction in this regard was also prejudicial, because there is a reasonable probability that, had the jury heard specific evidence that furthered the defense theory that police ignored Kamac as the shooter, that jury would have reached a different verdict in a case where the Commonwealth's evidence was otherwise weak.

The claim of ineffective assistance of trial counsel for the failure to impeach Gaul with Brown's statement was litigated previously in this case on PCRA in the state courts, and the result reached there was unreasonable. 28 U.S.C. § 2254(d).

**IV.   Trial counsel was unconstitutionally ineffective for failing to object to consistent efforts by the Commonwealth to portray witnesses as being threatened by Christopher Goodwin's friends for the mere fact that they were sitting in the courtroom attending the trial; additionally, trial counsel was ineffective for failing to object to generic testimony that prosecution witnesses are sometimes killed.**

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to object, or otherwise move to strike, when the Commonwealth improperly presented testimony and argument to the jury that: (1) Christopher Goodwin's friends had attended trial in large numbers in order to intimidate witnesses, and (2) that Detective Thomas Gaul had previously seen "multiple witnesses killed" in *other* cases "as a result of testifying." 5/22/13 NT 145.

The prosecutor *opened* to the jury on an unsupported generic "intimidation" theory that witnesses were forced to testify "in front of all these people that are here in the courtroom." 5/20/13 NT 52. Lisa Hall was asked by the district attorney how many people in the courtroom

were there in support of Mr. Goodwin, and Hall replied, "Just about every last one of them."
5/21/13 NT 267. Tobi Downing, the Commonwealth's Witness Relocation Coordinator, when
asked what, if anything, Aaron Respes had said to prosecutors about any attempt to intimidate
him, instead quoted from a memo the inadmissible assessment *of the prosecutor trying the case*
that there was a coordinated effort by the defense to intimidate: "The defendant had multiple
friends in the courtroom [at the preliminary hearing], all of who were clearly there to intimidate
any witnesses. They were so menacingly staring at the witness and the detectives." 5/21/13 NT
211-212. Then, on direct examination, Detective Thomas Gaul testified, generically, that
Commonwealth witnesses in criminal cases are sometimes killed and that he has seen "multiple"
Commonwealth witnesses killed in other cases. 5/22/13 NT 145. The prosecutor also made sure
in her summation to mention how many supporters of Christopher Goodwin were "packed" into
the courtroom each day, and argued to the jury in summation that that exercise of their right to
attend a trial was, in fact, an intimidation strategy. 5/26/13 NT 58. But no defense objections
were lodged to any of those transgressions.

Trial counsel's failure to object or move to strike fell below prevailing professional
norms. Trial counsel could have had no reasonable strategy for failing to object to this damaging
evidence and argument. Counsel's failure to object was prejudicial, because the
Commonwealth's improper evidence and argument in that regard served to significantly bolster
the Commonwealth's otherwise weak case. There is a reasonable probability that a jury not
subjected to this improper evidence and argument would have reached a different verdict.

The claim of ineffective assistance of trial counsel presented in this point was never
litigated in state court, but the failure to raise this claim in state post-conviction proceedings was

due to the ineffective assistance of post-conviction counsel, which establishes cause and prejudice to overcome the procedural default. *Martinez v. Ryan*, 566 U.S. 1 (2012).

**V.      Trial counsel was constitutionally ineffective for failing to object to the district attorney's summation argument to the jury where she unconstitutionally shifted the burden of proof by castigating the defense for failing to call additional alibi witnesses.**

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to object to the district attorney's argument in summation that shifted the burden of proof when it castigated the defense for failing to call additional alibi witnesses. 5/28/13 NT 84.

The district attorney first criticized Anara Brown's recall of events, including what the Commonwealth cited as her inability to recall the names of others that she saw on the night of the shooting. That was fair comment on the evidence, but it was burden-shifting of the worst kind to do what the district attorney did next: criticize the defense for not calling more alibi witnesses than Ms. Brown. *Id.* "[W]here is Natika if she was really out there? Where is this Dooler if he was really out there? Where is this Black? Everybody knows each other. You can get these people in. They're not here because it's not true." *Id.*

Trial counsel's failure to object or move to strike fell below prevailing professional norms. Trial counsel could have had no reasonable strategy for failing to object to this damaging burden-shifting argument. Moreover, counsel's failure to object was prejudicial, because the Commonwealth's improper argument in that regard served to significantly bolster the Commonwealth's otherwise weak case by improperly denigrating the absence of more evidence for the defense. There is a reasonable probability that a jury not subjected to this improper argument would have reached a different verdict.

The claim of ineffective assistance of trial counsel for the failure to object to the prosecutor's argument in this regard was litigated previously in this case on PCRA in the state courts, and the result reached there was unreasonable. 28 U.S.C. § 2254(d).

**VI.** **Trial counsel was unconstitutionally ineffective for failing to investigate incidents where Detective James Pitts threatened or assaulted witnesses in order to get inculpatory statements from them, as Andre Cunningham had alleged here; moreover, additional evidence of similar instances of Pitts' misconduct further demonstrates the denial of due process that occurred at Mr. Goodwin's trial with respect to Pitts' misconduct; additionally, the Commonwealth violated Mr. Goodwin's due-process rights by not disclosing evidence of Pitts' misconduct to the defense and by knowingly placing false evidence before the jury.**

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to investigate instances of Detective James Pitts having threatened and attacked witness in other cases in order to influence their statements to police, just as Andre Cunningham had testified to at Mr. Goodwin's trial. Moreover, Mr. Goodwin was denied due process under the Fourteenth Amendment when his convictions were based, in part, on Pitts' misconduct, a claim that was supported by newly-discovered further evidence of Pitts' misconduct toward witnesses in other cases that was presented to the state court on Mr. Goodwin's PCRA appeal, and resulted in an unreasonable ruling by that court. *See* 28 U.S.C. § 2254(d). Additionally, the prosecution violated its Fourteenth Amendment due-process duties under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to disclose evidence of Pitts' misconduct and by knowingly placing false evidence before the jury from Detectives Gaul and Verrecchio that Pitts had not threatened or choked Cunningham..

As noted, Andre Cunningham testified that a black detective, whom the parties presumed to be Detective Pitts, choked and threatened him into giving a statement at Homicide headquarters. 5/20/13 NT 267-269; 5/21/13 NT 6-8. Had trial defense counsel investigated the

matter properly, he would have learned that evidence existed at the time of trial to demonstrate that this alleged behavior by Pitts was not an aberration, but, rather, a fairly commonplace event. On PCRA, Mr. Goodwin presented evidence of Pitts' similar misconduct that defense counsel could have found through investigation before or during trial, and he also presented similar evidence that was only discoverable after trial. *Goodwin v. Wetzel, et al.*, Civil No. 18-5269, ECF Doc. 4 at 84-108. Moreover, the Commonwealth violated due process under *Brady* by failing to disclose to the defense the numerous instances of Pitts' misconduct, and also under *Napue* by placing Detectives Gaul and Verrecchio on the stand to give false testimony regarding the lack of threats and violence toward Andre Cunningham.

With regard to the ineffective-assistance claim and also the due-process violation that was supported by evidence introduced regarding Pitts' misconduct in other cases, both claims were exhausted in the state courts, where the rulings were unreasonable under 28 U.S.C. § 2254(d).

Trial counsel's failure to investigate Pitts' other misconduct that occurred by the time of trial fell below prevailing professional norms. Trial counsel could have had no reasonable strategy for failing to investigate such matters. Additionally, counsel's failure to investigate was prejudicial, because evidence supporting the claim that Pitts abused Cunningham would have seriously undermined the Commonwealth's already weak case. There is a reasonable probability that a jury would have reached a different result after hearing the evidence that counsel would have discovered had he properly investigated. That probability only increased upon the PCRA court's receipt of additional post-trial newly-discovered evidence of more misconduct by Pitts toward witnesses, thereby meeting the heightened "more likely than not" standard for prejudice for newly-discovered evidence.

With regard to the Commonwealth's *Brady* failure to disclose both pretrial and post-trial evidence regarding Pitts' misconduct, and its violation of *Napue* by putting false evidence before the jury, those claims were not previously litigated in state court, but the failure to raise this claim in state post-conviction proceedings was due to the ineffective assistance of post conviction counsel, which establishes cause and prejudice to overcome the procedural default. *Martinez v. Ryan*, 566 U.S. 1 (2012). Moreover, independent of *Martinez*, the prosecution's improper nondisclosure of *Brady* evidence is itself cause to excuse a procedural default. *Strickler v. Greene*, 527 U.S. 263, 283-285 (1999). Additionally, the nondisclosure was material and prejudicial: there is a reasonable probability that a jury would have reached a different verdict after hearing the misconduct evidence that the Commonwealth should have disclosed. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

**VII.   The cumulative prejudicial effect of the errors raised denied petitioner the effective assistance of counsel under the Sixth Amendment and due process under the Fourteenth Amendment.**

Each of the claims raised herein provides Petitioner with a basis for relief from his convictions and sentence.  Should this Court find that Petitioner is not entitled to relief based on any single claim because he has failed to show the prejudicial effect of a single error, he is entitled to relief because of the cumulative prejudicial effect of all of the errors set forth. Collectively, these claims of error denied Petitioner his federal constitutional rights to due process and the effective assistance of counsel under the Sixth and Fourteenth Amendments.

**EXHAUSTION AND TIMELINESS**

 **Exhaustion.** The exhaustion of the individual claims raised herein is discussed in each of those claims. To the extent that claims raised herein have not been reviewed by the state courts, any attempt at exhaustion would presumably be futile, as the claims would be time-barred by 42 Pa. C.S. § 9545(b), as construed by the Pennsylvania Supreme Court. Moreover, as noted, to the extent that claims raised herein have not been reviewed by the state courts, the failure to raise these claims in state post-conviction proceedings was due to the ineffective assistance of post-conviction counsel, which establishes cause and prejudice to overcome the procedural default. *Martinez v. Ryan*, 566 U.S. 1 (2012).

 **Timeliness.** These counseled claims are raised within the one-year statute of limitations set forth in the habeas corpus statute.

 In addition, all claims in this counseled petition relate back to claims raised in the timely-filed *pro se* petition, because they are tied to a common core of operative facts. *Mayle v. Felix*, 545 U.S. 644 (2005).

**REQUEST FOR RELIEF**

For the above reasons, Mr. Goodwin requests that this Court provide the following relief:

(A)     Grant him such discovery as is necessary for full and fair resolution of his claims;

(B)     Grant an evidentiary hearing on all claims involving disputed issues of fact; and

(C)     Vacate Mr. Goodwin's convictions and sentences.

Respectfully submitted,

*/s/ Stephen W. Kirsch*
STEPHEN W. KIRSCH
Assistant Federal Defender
*Counsel for Petitioner, Christopher Goodwin*

Date:   May 30, 2019

25

## **CERTIFICATE OF SERVICE**

I, Stephen W. Kirsch, Assistant Federal Defender, Federal Community Defender Office

for the Eastern District of Pennsylvania, hereby certify that I caused a copy of Amended Petition

for Writ of Habeas Corpus to be filed upon the following person:

Laura Zipin, Esquire
Assistant District Attorney
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

*/s/ Stephen W. Kirsch*
STEPHEN W. KIRSCH

DATE: May 30, 2019

# Exhibit A

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE | | CASE NUMBER: 11-152 | |
|---|---|---|---|---|
| | | | INTERVIEWER: Gaul/Pitts | |
| NAME: Yvette Morris | AGE: 46 | RACE: B | SEX: FEMALE | DOB: 9/15/64 |
| ADDRESS: ■ | APARTMENT #: | HOME TELEPHONE# | OTHER CONTACT# | |
| NAME OF EMPLOYMENT / SCHOOL: | | | SOCIAL SECURITY # | |
| ADDRESS OF EMPLOYMENT / SCHOOL: ■ | | DEPARTMENT: | WORK TELEPHONE# | |
| DATES OF PLANNED VACATIONS: None | | | | |
| DATES OF PLANNED BUSINESS TRIPS: | | | | |
| NAME OF CLOSE RELATIVE OR ALTERNATE CONTACT PERSON: ■ | | | RELATIONSHIP: ■ | |
| ADDRESS: ■ | | | TELEPHONE# ■ | |
| PLACE OF INTERVIEW: Homicide Unit PAB Rm # 104 | | | DATE: 6/26/11 | TIME: 4:05am |
| BROUGHT IN BY: 1st District Police | | | DATE: 6/26/11 | TIME: 2:00am |
| WE ARE QUESTIONING YOU CONCERNING: Shooting/Murder of Dwayne Isaacs which occurred on 6-26-11 | | | | |
| WARNINGS GIVEN BY: N/A | | | DATE: 6/26/11 | TIME: |
| ANSWERS: (1)    (2)    (3)    (4)    (5)    (6)    (7) | | | | |

Q- Ms. Morris, do you go by any other names or nicknames?
A- Nicey. People call me that. Y.M

Q- Ms. Morris, can you read, write and understand the English language?
A- Yes.  Y.M

Q-Ms. Morris, could you tell us how far you went in School?
A- I went to the 11th grade. I completed that grade at Southern High School. I did get my GED though.

Q- Ms. Morris, are you currently under the influence of any drugs or alcohol?
A- No.  Y.M

Q- Ms. Morris, you are being interviewed in reference to the shooting/murder of Dwayne Isaacs. Is this okay?
A- Yes.  Y.M

Q- Ms. Morris, could you tell us if you knew Dwayne Isaacs and if so could you tell us how?
A- I knew Dwayne. He was my boyfriend of over 20 years.  Y.M

Q- Ms. Morris, were you present when he was shot and killed?
A- No. But he just left from the house I was in.  Y.M

*[signature: Yvette Morris]*

COMMONWEALTH'S EXHIBIT
C-12
PENGAD 800-631-6989

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
|---|---|---|---|
| **CONTINUATION SHEET** | | POLICE DEPARTMENT | |
| NAME: | | PAGE# | CASE# |
| Yvette Morris | | 2 | 11-152 |

Q- Ms. Morris, could you tell us what house you were in and who you were with?
A- I was in my girlfriend Angie's house. She lives in the 2700 block of Wolf St. Dwayne just left. He had a couple watches that he was trying to sell. He just left out and like 3-4 minutes after he left I heard a bunch of gunshots. I don't go out there right away. I tried to call him on his phone but he didn't answer. Then someone came to the back door and told me to come on its Dwayne who got shot. She took me over to the circle on Jackson St. By the time I got there the Police were there. There was a sheet over Dwayne. I didn't see Dwayne but everyone was telling me that it was Dwayne underneath the sheet. The Police brought me here once they found out I was Dwayne's Girlfriend.

Q- Ms. Morris, could you tell us the name of the individual who came to the House and told you Dwayne was shot?
A- Her name is Ebony. I am not sure of her last name, but She lives on Etting Terrace. The 2700 block. She is about 33 years old.

Q- Ms. Morris, could you tell us Angie's full name?
A- Her last name is Belcher.

Q- Ms. Morris, could you tell us what your cell phone number is, and what number you called Dwayne on?
A- My number is 267-584-6800, I used that number to call him. I have Dwayne's number on speed dial in my phone. I can see all the D's on my phone and that's Dwayne's number. My screen is cracked and you can't see the numbers on my screen. He should have his phone on him though.

Q- Ms. Morris, has Dwayne been having problems with anyone?
A- Yes, Camac Brown. His actual first name is Leroy Brown. There has been a lot of shooting and fighting going on between guys from Wilson Park Projects and 23rd and Sigel St. There was a shooting on Friday near 28th and Cantrell or Winton St. I know it was the boy Le-Le's house where this shooting happened. Le-Le was shot in the face on Friday and Le-Le is Camac Brown's Son. There were rumors on the Street that Dwayne's nephew Rasul had set up Le-Le and was a part of the shooting. Dwayne had nothing to do with any of that though. He was a lot older and never bothered anybody. Dwayne even went up to Camac out of concern for Le-Le and asked Camac how he was doing. Camac told Dwayne "What the fuck is you asking me that for, your fucking nephew was part of it".

Q- Ms. Morris, were you present when this conversation between Dwayne and Camac took place, or do you know when and where it took place?
A- I wasn't there. Dwayne told me last night about it. It happened out in the projects somewhere. Dwayne told me about it though. Dwayne was feeling nervous and feeling like the boys from Wilson were gonna get him. Dwayne told me this Friday night. We were talking about our day after I got off of work. I know there was more to it though. I don't think Dwayne wanted to tell me everything that Camac said. He didn't want me to worry, and he knew I would have said something to Camac.

Q- Ms. Morris, since the time of the shooting/murder, have you received any information or were you told of any rumors?
A- While I was here. I received a phone from my friend Tiara. Tiara told me that the rumors on the street are that Camac shot Dwayne.

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
|---|---|---|---|
| *CONTINUATION SHEET* | | POLICE DEPARTMENT | |
| NAME:<br>Yvette Morris | | PAGE#<br>3 | CASE#<br>11-152 |

Q- Ms. Morris, could you tell us what number Tiara called you from?
A- I know it was Tiara's number because it is all T's , and I know I know it was Tiara cause I know her voice. I'm sorry but again my screen is cracked so you can't any of the numbers. She called my number though, the 267-584-6800 number.

Q- Ms. Morris, could you tell us Tiara full name or where she lives?
A- Her Full name is Tiara Young she lives on 2100 Marston Terrace.

Q- Ms. Morris, did Tiara tell you who was telling her this, or did she tell you of anyone who was out there and seen the shooting?
A- No, but I'll try and find out. Once I get back out there though I will be able to find out more information. Everyone loved Dwayne. He made everyone laugh and never bothered nobody.

Q- Ms. Morris, the male you know as Rasul, could you tell us how long you have known him?
A- Over 15 years. I watched him grow up.

Q- Ms. Morris, you are being shown a single image photograph. Could you tell us if you recognize this individual?
A- Yes, that's Rasul. (Indicating)

Q- Ms. Morris, to be clear is the Rasul you refer to in your interview?
A- Yes.

Q- Ms. Morris, the male you know as Leroy "Camac" Brown, could you tell us how long you have known him?
A- Like 20 years.

Q- Ms. Morris, you are being shown another single image photograph. Could you tell us if you recognize this individual?
A- Yes, that's Camac. His full name is Leroy Brown. (Indicating)

Q- Ms. Morris, to be clear is this the male Leroy "Camac" Brown you refer to in your interview?
A- Yes.

Q- Ms. Morris, is there anything else you could add to your interview?
A- No, that's all I can remember right now. I will head back and try to find out people who were out there. There are always a bunch of people outside and in that circle.

Q- Ms. Morris, this interview is going to be forwarded to an Assistant District Attorney and used in a Criminal trial where you will be required to testify. Is this okay?
A- Yes.

Q- Ms. Morris, could you please read over this interview. If it is a true and accurate account of what you told us please initial after each response and sign the bottom of each page?
A- Okay.

75-483 (Rev. 7/92)

## STATEMENT  OF  ADOPTION  ATTESTATION

The above statement of _____ pages is a verbatim statement that I have given to Det. _____, who recorded my answers to the questions that Det. _____ asked me.  I hereby adopt this verbatim statement and hereby verify by my signature below that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief.


_____
Signature of Witness

_____
Signature of Detective

# Exhibit B

# ACTIVITY SHEET

**Platoon #** 3

**Date:** 6-26-11

**M / S#** M#11-152

**Suprv:** Lt. Riehl/Coan

**Victim:** ISSACS, Dwayne

**Assigned:** Det. Verrecchio

## ORIGIN:

On Sunday, June 26, 2011, at 12:18 am, 1st district police respond to a radio call of gunshots at 2600 Jackson Street. Upon their arrival, bystanders directed them to the body of a B/M, later identified as Dwayne Issacs, who was lying on the highway and suffering from multiple gunshot wounds to the face, head, and body. Medic #37 responded and pronounced the victim dead on location at 12:31 am.

## BODY:

The body was viewed at the scene. Refer to scene description below.

## SCENE:

The primary scene is located inside Wilson Park Projects in the courtyard/park located in the 2600 blk of Jackson street ,south side of the street, across from the 2100 blk of Etting Terrace. This is the 1st Police District, located in South Philly. A body of a black male , later Ided as Dwayne Isaacs,is observed lying on his right side. The 2600 blk. of Jackson St. runs adjacent to the park and is a Westbound street that dead ends at 27th street and curves around SB and becomes 27th street. The park is bordered by low rise and a high rise apt. buildings to the south and East.

The primary scene consists of the body of the decedent with a large amount of the decedent's blood under and around the body. After rolling the body, there are 3 bullet fragments located under the body. There are 2-3 strike marks observed on the pavement under where the body was found. There is no other ballistic evidence observed or recovered. The body was located between 2 park benches at the end of the path just inside the circular middle of the park.

The path entrance to the park is just east of Etting Terrace, going in a SW direction from the 2600 blk of Jackson Street.

The body is that of a heavy set b/m approximately 50yrs, with a heavy beard. The body is clothed in green cargo shorts, a black T-Shirt, blk Nike low sneakers, a white T-shirt underneath and a brown belt. A cell phone is located in the pants pocket of the decedent. There also is a lighter, cigarettes, 2 home depot receipts and 2 refund cards, There is small change located in the pants pocket along with numerous plastic watches with tags on them.

The body has apparent GSWs to the left and right chest area, right temple , throat, back of neck, right index finger, right forearm, right side of stomach. The amount of GSWs and entrance or exit wounds could not be determined due to amount of blood.

COMMONWEALTH'S
EXHIBIT
C.16
PERIGAO 800-631-6989

**ACTIVITY SHEET**

Platoon#3                                                                    Date: 6-26-11
M# 11-152                                                        Suprv: Lt. Riehl/ Sgt.Coan

---

Victim: ISAACS, DWAYNE                                    Assigned: Det. Verrecchio

---

**CIVILIAN INTERVIEWS:**

Nuyen Henderson 43BF was interviewed by Homicide Detectives inside the Homicide Unit on 6-26-11 and related the following in summary: On 6-26-11 at about 12:18 am, she was inside a friend's house on Taney Street when she heard a series of gunshots. She later came outside and saw her son talking to the police and directing them to a body lying on the highway. When she got closer to the male on the highway, she recognized it as her best friend, Dwayne Isaacs. Through her description, the officers informed her that it was in fact Dwayne Isaacs. Miss Henderson added that she believed this was a retaliatory shooting because Dwayne's nephew, Rasul Isaacs, was supposed to have been involved in the recent shooting of "Lakier Brown". Additionally, Dwayne told her earlier in the evening that he asked "Camac" (Leroy Brown) how his son was doing earlier that day. "Camac" responded by saying, "Get the fuck out my face! How you gonna ask me how my son doing and you know your nephew did it?" Miss Henderson positively identified photos of "Camac" (Leroy Brown PPN-694411), Rasul Isaacs (PPN-985877), as well as other individuals who reside in and around the Wilson Housing Project.

Zachary Hawkins 47BM was interviewed by Homicide Detectives inside the Homicide Unit on 6-26-11 and related the following in summary: On 6-26-11 in the early morning hours, he and his wife Marlene received a telephone call from his sister-in-law, Lisa, who said that Dwayne had been shot and killed. He added that he believed that Dwayne was shot in retaliation for a prior shooting that is related to an ongoing war between the boys from 23rd Street and the boys from the Wilson Projects. He added that the boy who was shot during the prior shooting was named "LeLe" and that his father's name is "Camac." Mr. Hawkins positively identified Rasul Isaacs (PPN-985877), and "Camac" (Leroy Brown PPN-694411).

Yvette Morris 46BF was interviewed by Homicide Detectives inside the Homicide Unit on 6-26-11 and related the following in summary: On 6-26-11 at about 12:18 am, she was inside a friend's house on Taney Street when she heard a bunch of gunshots. Her boyfriend, Dwayne Isaacs, just left, so she called his phone, but he didn't pick up. Somebody came to the house and said that it was Dwayne that got shot. They went outside and the police had a sheet over the body. She later received confirmation that it was Dwayne that had been shot and killed. She added that Dwayne had a problem with a male known as "Camac" whose real name is Leroy Brown. There was a shooting on Friday night at 28th Street and Cantrell where "Camac's" son LeLe was shot. Dwayne had asked "Camac" how his son was doing and "Camac" snapped at him for asking. "Camac" said, "What the fuck you asking me that for? Your nephew was part of it!" She added that while at the Homicide Unit, she received a call from her friend, "Tiara," that the "word on the street" is that "Camac" shot Dwayne. She too positively identified Rasul Isaacs (PPN-985877), and "Camac" (Leroy Brown PPN-694411).

## ACTIVITY SHEET

Platoon#3
M# 11-152

Date: 6-26-11
Suprv: Lt. Riehl/ Sgt.Coan

Victim: ISAACS,Dwayne

Assigned: Det. Verrecchio

### POLICE INTERVIEWS:

P/O Thomas Bimble #3082 was interviewed and related in summary that he responded to a radio call of gunshots at 2725 Daly Terrace in the Wilson Housing Projects. He surveyed the area and was flagged down by a B/M in the 2600 block of Jackson Street, who directed him to a body inside the park. The park is called Circle Park and is located within the Wilson Housing Projects. They secured the crime scene and fire rescue pronounced the victim dead on location at 12:31 am. He also had contact with family members of the victim, who was later identified as Dwayne Isaacs.

P/O Jeremy Hamilton #5174 was interviewed and related in summary that he responded to a radio call of gunshots at 2725 Daly Terrace in the Wilson Housing Projects. Before his arrival, he received additional information that police had located a male down on the highway. Upon his arrival, he was directed by Sgt. Reynolds to secure the scene. He also assisted in placing the body into a patrol wagon. Sgt. Reynolds then directed him to transport two females, Lisa Hall and Marva Brooks, to the Homicide Unit.

# ACTIVITY SHEET

Platoon # 3                         Date:  7-22-11

M / S#  M#11-152                Suprv: Lt. Riehl/Coan

Victim: ISAACS, Dwayne             Assigned:  Det. Verrecchio

## ORIGIN:

On Sunday, June 26, 2011, at 12:18 am, 1st district police respond to a radio call of gunshots at 2600 Jackson Street. Upon their arrival, bystanders directed them to the body of a B/M, later identified as Dwayne Isaacs, who was lying on the highway and suffering from multiple gunshot wounds to the face, head, and body.  Medic #37 responded and pronounced the victim dead on location at 12:31 am.

## UPDATE:

As a result of investigation, and assistance from P/O Troccoli #3919,(1st District Tactical Officer), information was developed in reference to individuals who were present during the murder of Dwayne Isaacs.  2 of these individuals were identified as Andre Cunningham, and Aaron Respes. On Wednesday 7-20-2011 several locations were checked in reference to locating these individuals.

On Thursday 7-21-2011 Andre Cunningham was transported to the Homicide Unit and interviewed in reference to the Murder of Dwayne Isaacs. Mr. Cunningham stated in summary that he was present when Dwayne Isaacs was shot and killed. Mr. Cunningham stated the male who shot and killed Dwayne Isaacs was a male known to him from the neighborhood as "Gunna" and this male "Gunna's" actual first name was Chris. Mr. Cunningham stated he knew this male Gunna for over 12 years. Mr. Cunningham went on to state that Gunna shot Dwayne Isaacs in the head Dwayne Isaacs instantly dropped to the ground. Mr. Cunningham stated Gunna continued to fire as Dwayne Isaacs was on the ground. Mr. Cunningham was shown a photograph in reference to the murder of Dwayne Isaacs and identified the male he knows as Gunna as Chris Goodwin PP# 994091. Mr. Cunningham identified Chris "Gunna" Goodwin PP#994091 as the male he saw shoot and kill Dwayne Isaacs.

On Friday 7-22-2011, Aaron Respes was transported to the Homicide Unit and interviewed in reference to the Murder of Dwayne Isaacs. Mr. Respes stated in summary that he did witness the Murder of Dwayne Isaacs and the person who shot and killed Dwayne Isaacs was a male Mr. Respes knows as Gunna. Mr. Respes stated he has known this male Gunna for over 5 years and Gunna is the nickname of this male and his first name is Chris. Mr. Respes stated that he saw Gunna shoot Dwayne Isaacs and then Mr. Respes ran. Mr. Respes stated he did hear more gunshots as he was fleeing but he just kept running. Mr. Respes was shown a photograph in reference to the Murder of Dwayne Isaacs and Mr. Respes identified the male he knows as Gunna as Chris Goodwin PP#994091. Mr. Respes identified Chris "Gunna" Goodwin PP#994091 as the male he saw shoot and kill Dwayne Isaacs.

ACTIVITY SHEET

PLATOON #3                                         DATE: 7-22-2011

M11-152                                            SUPVR: Riehl / Coan

------------------------------------------------------------------------------------------

Victim: Isaacs, Dwayne                            ASSGN: Verrecchio

UPDATE- (CONTINUED)


    Attempts ongoing and numerous areas and residences checked in reference to other individuals who may have been present during the murder of Dwayne Isaacs. Information distributed among area Officers and Tactical Teams.



    The Family of Dwayne Isaacs updated in reference to the status of the investigation.....

                          Investigation Ongoing.............

# ACTIVITY SHEET

**Platoon #** 3

**Date:** 7-30-11

**M / S#** M#11-152

**Suprv:** Lt. Riehl

---

**Victim:** ISSACS, Dwayne

**Assigned:** Det. Verrecchio

---

## ORIGIN:

On Sunday, June 26, 2011, at 12:18 am, 1st district police respond to a radio call of gunshots at 2600 Jackson Street.  Upon their arrival, bystanders directed them to the body of a B/M, later identified as Dwayne Isaacs, who was lying on the highway and suffering from multiple gunshot wounds to the face, head, and body.  Medic #37 responded and pronounced the victim dead on location at 12:31 am.

## UPDATE:

On 7-27-11, P/O Jayson Trocolli had contact with Raheem Zachary.  Based upon information received from Homicide Detectives, he stopped Zachary and transported him to the Homicide Unit.

Raheem Zachary was interviewed inside the Homicide Unit, but refused to cooperate with police.  Mr. Zachary stated in summary that he was inside the circle when Dwayne Isaacs was shot and killed, but he saw nothing.  Mr. Zachary did say that he heard that Chris shot "Shank" and that people were pissed off.  He added that if he were to give a statement, he knows it would get out and he would be killed.  He also stated that he is on probation and feared being sent back to jail if he were involved in this incident in any way.  Mr. Zachary was released pending further investigation.

# ACTIVITY SHEET

Platoon # 3                                                         **Date**:  8-2-11

**M / S#**  M#11-152                                      **Suprv**: Sgt Gallagher

**Victim**: ISSACS, Dwayne                          **Assigned**: Det. Verrecchio

**ORIGIN**:

On Sunday, June 26, 2011, at 12:18 am, 1st district police respond to a radio call of gunshots at 2600 Jackson Street.  Upon their arrival, bystanders directed them to the body of a B/M, later identified as Dwayne Isaacs, who was lying on the highway and suffering from multiple gunshot wounds to the face, head, and body.  Medic #37 responded and pronounced the victim dead on location at 12:31 am.

On Sunday, June 26th, 2011, Dr. Osbourne of the Philadelphia Medical Examiner's Office conducted a post mortem examination on the remains of Dwayne Isaacs.  The results of her examination were that the cause of death was multiple gunshot wounds and that the manner of death was homicide.

**UPDATE**:

On 8-2-11, witness, T▮▮▮ M▮▮ 12BM and his mother S▮▮▮ M▮▮ were contacted in regards to discrepancies in his initial interview.  Miss M▮▮ expressed fear of retaliation if detectives were to come to her residence, so arrangements were made to meet them at Broad and Snyder.  T▮▮ was re-interviewed in the presence of his mother on 8-2-11 at Broad and Snyder.  In summary, T▮▮ related that he was playing catch with a friend when he saw "Shank" walk from 27th Street and into "the circle."  He then heard gunshots coming from "the circle" and saw people running.  People started coming out of their homes and walking toward "the circle."  He then heard more gunshots coming from Taney Street.  He was asked about seeing males in ski masks and stated that he couldn't be sure about the masks because it was very dark and he just assumed they had masks.  He was shown a photo array consisting of eight males and positively identified Christopher Goodwin as a male he knows from the neighborhood.  The witness added that Goodwin was involved in an argument earlier that day and that he pulled out a black handgun during this argument.

*It should be noted that Ms. M▮▮ expressed a fear of retaliation if word gets out that her son is cooperating with police in this murder investigation.  She has requested assistance in relocating from the project for her and her family's safety.*

Memo prepared and sent to the Philadelphia District Attorney's Office for relocation request.

# ACTIVITY SHEET

**Platoon #** 3                                               **Date:** 8-2-11

**M / S#** M#11-152                                   **Suprv:** Sgt. Gallagher

**Victim:** ISAACS, Dwayne                           **Assigned:** Det. Verrecchio

**ORIGIN:**

On Sunday, June 26, 2011, at 12:18 am, 1st district police respond to a radio call of gunshots at 2600 Jackson Street.  Upon their arrival, bystanders directed them to the body of a B/M, later identified as Dwayne Isaacs, who was lying on the highway and suffering from multiple gunshot wounds to the face, head, and body.  Medic #37 responded and pronounced the victim dead on location at 12:31 am.

**UPDATE:**

On Tuesday 8-2-2011 Sgt. Gallagher did review the facts and circumstances of the investigation with ADA Gail Fairman. ADA Fairman did approve charges of Murder and related offenses against Christopher "Gunna" Goodwin PP#994091, charging him with the murder of Dwayne Isaacs.

Arrest Warrant was obtained and Christopher "Gunna" Goodwin PP#994091 was listed in wanted status. A Fugitive package prepared and forwarded to the Homicide Fugitive Squad. Area Tactical teams alerted as to the Arrest Warrant.

The Family of Dwayne Isaacs was updated as to the status of the investigation.

Investigation Ongoing……………………………….