**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | |
| | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION NO. 18-5269 |
| v. | : | (Habeas Corpus) |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| | : | |
| Respondents. | : | |
| _____ | : | _____ |

**<u>MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS</u>**

ARIANNA J. FREEMAN
Managing Attorney, Non-Capital Habeas Unit
Federal Community Defender Office
 for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540 West
Philadelphia, PA  19106
(215) 928-1100

*Counsel for Petitioner Christopher Goodwin*

October 7, 2019

# TABLE OF CONTENTS

THE STANDARD OF REVIEW UNDER 28 U.S.C. § 2254 ...................................................... 1

THE STANDARD GOVERNING INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS .... 2

CLAIMS FOR RELIEF ........................................................................................................ 3

    A.   Trial counsel was ineffective for failing to object to, and for himself eliciting, inculpatory evidence that violated Mr. Goodwin's rights under the Confrontation Clause .......................... 3

    B.   Trial counsel was ineffective for eliciting prejudicial testimony of Detective Verrecchio and for failing to properly object and seek a mistrial. ................................................................ 11

    C.   Trial counsel was ineffective for failing to object to the inadmissible hearsay testimony from the decedent's sister, Lisa Hall, and the prosecutor's argument based on that testimony ............................................................................................................................................ 16

    D.   Trial counsel was ineffective for failing to object to the prosecutor's improper and prejudicial examination of Andre Cunningham. .................................................................... 21

    E.   Trial counsel was ineffective for failing to object to improper testimony and argument about alleged threats against witnesses. ............................................................................... 25

    F.   Trial counsel was ineffective for failing to impeach Detective Thomas Gaul with evidence that contradicted Detective Gaul's claim that Kamac's name "never came up" as the suspected shooter. ....................................................................................................................... 34

    G.   Trial counsel was ineffective for failing to object to the prosecutor's closing argument that unconstitutionally shifted the burden of proof to the defense and that included the prosecutor's personal opinion that the alibi witness was lying ................................................................... 38

    H.   Trial counsel was ineffective for failing to investigate and present available evidence about Detective James Pitts' misconduct in this case, and Mr. Goodwin's due process rights were violated. ........................................................................................................................ 42

    I.   Mr. Goodwin is entitled to relief from his convictions because of the prejudicial effects of the cumulative errors in this case. ...................................................................................... 47

AN EVIDENTIARY HEARING IS WARRANTED ............................................................. 49

CONCLUSION .................................................................................................................... 50

*i*

## INTRODUCTION

Christopher Goodwin was tried for murder and related offenses for the June 2011 shooting death of Dwayne "Shank" Isaacs.  No physical evidence connected Mr. Goodwin to the crime, and at trial both of the Commonwealth's purported eyewitnesses to the shooting, Andre Cunningham and Aaron Respes, testified that their previous statements implicating Mr. Goodwin were false and were the result of police coercion.  Nonetheless, because of a series of unreasonable errors by defense counsel and due process violations, the jury heard damaging evidence and argument that tipped the scales toward a first-degree murder conviction.  These constitutional violations, individually and cumulatively, undermine confidence in the outcome of Mr. Goodwin's trial.

## THE STANDARD OF REVIEW UNDER 28 U.S.C. § 2254

This Court's review of Mr. Goodwin's habeas claims is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified at 28 U.S.C. § 2254 *et seq*.  Under AEDPA's deferential standard of review, if a claim is "adjudicated on the merits in State court proceedings," a federal court may grant relief only if the state court decision is "contrary to" or "an unreasonable application of" clearly established law, or involves an "unreasonable determination of the facts."  28 U.S.C. § 2254(d).  Courts may grant relief under the "contrary to" standard if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision from a state court "is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule

1

unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 572 U.S. 415, 426 (2014). The decision that gets this deference is the "last reasoned [one] of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (internal quotation marks omitted).

Where the state courts did not reach the merits of a claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.' 28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*." *Cone v. Bell*, 556 U.S. 449, 472 (2009); *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (*de novo* review where state courts did not reach prejudice prong under *Strickland v. Washington*); *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) ("AEDPA's deferential standards of review do not apply unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States" (citations and quotation marks omitted)).

**THE STANDARD GOVERNING**
**INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS**

*Strickland v. Washington*, 466 U.S. 668 (1984), sets forth a two-pronged test for determining whether a defendant's Sixth Amendment right to effective assistance of counsel has been violated. Under *Strickland*, to prevail on a Sixth Amendment claim, a petitioner must prove both (a) "that counsel's representation fell below an objective standard of reasonableness" measured according to "prevailing professional norms," *id.* at 688, and (b) "that the deficient performance prejudiced the defense," *id.* at 687, such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

2

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## CLAIMS FOR RELIEF[1]

### A. Trial counsel was ineffective for failing to object to, and for himself eliciting, inculpatory evidence that violated Mr. Goodwin's rights under the Confrontation Clause.[2]

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to object to evidence that violated Mr. Goodwin's Confrontation Clause rights, and when trial counsel unreasonably elicited additional testimony that further violated Mr. Goodwin's Confrontation Clause rights.

### 1. The Constitutional Violation

The Confrontation Clause of the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI.  Statements made to law-enforcement officials about past events are testimonial statements that can only be admitted into evidence without running afoul of the Confrontation Clause if the declarant is unavailable and the defendant on trial had a previous

---

[1] Each of the claims argued herein was raised in Mr. Goodwin's *pro se* habeas petition (Docket No. 2) and/or his counseled amended petition (Docket No. 23).  The claims raised in those petitions that are not argued in this memorandum of law are withdrawn.

[2] This claim was raised as Ground 3 of the *pro se* petition (Docket No. 2) and Claim 1 of the amended petition (Docket No. 23).

opportunity to cross-examine that declarant.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004);
*see also Davis v. Washington*, 547 U.S. 813, 826 (2006).

"[T]he right of confrontation and cross-examination is an essential and fundamental
requirement for the kind of fair trial which is this country's constitutional goal."  *Pointer v.
Texas*, 380 U.S. 400, 405 (1965).  Here, counsel's failure to protect his client's Confrontation
Clause rights so undermined the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

On direct examination, Commonwealth witness Detective Thomas Gaul testified that he
had received "[a] lot of information . . . through anonymous tips" from "people who were out
there" during the shooting and who provided the police with the identity of the shooter.  NT
5/22/13 at 8.  As a result of that information, Detective Gaul testified that this case was "never,
like, a question of whodunit," NT 5/22/13 at 13; rather, he just needed Andre Cunningham and
Aaron Respes to "hav[e] the courage to help [the police]," *id.* at 13.  *See also id.* at 35 ("No, it
was never a whodunit. . . .  There was never a doubt as to who done it.  It was just a matter of
getting the document.").  Later, the prosecutor twice repeated in her closing argument that this
case was never "a whodunit" because "everybody knows each other."  NT 5/28/13 at 52, 53.

Trial counsel did not object to this testimony or argument, which placed before the jury
the statements of an unknown number of persons who implicated Mr. Goodwin in the shooting
yet were unavailable to be cross-examined by Mr. Goodwin.  Making matters worse, during
cross-examination of Detective Gaul, trial counsel failed to move to strike answers that

repeatedly included the content of the anonymous tips.[3]  *See* NT 5/22/13 at 50 ("A lot of calls were coming in of people wanting to remain anonymous as far as who the shooter was almost immediately."); *id.* at 51 ("[W]ord that we were getting, again, through anonymous tips and things of that nature, was that [a prior shooting] was the motive for the [shooting of Mr. Isaacs]."); *id.* at 52 (the police got information about the alleged motive from anonymous tips and corroborated that information by "sp[eaking] with a number of people.  Not everybody wanted to come and go on paper."); *id.* at 54-56 (rumors were that Cunningham, Respes, and Raheem Zachary saw the shooting and that the motive for the shooting was a prior shooting). Trial counsel even elicited from Detective Gaul further details about the information supplied from anonymous persons, including that the anonymous tips implicated Mr. Goodwin and supplied an alleged motive for Mr. Goodwin to kill the decedent:

> Q    You told the ladies and gentlemen of the jury that immediately there were anonymous tips coming into the police department about who did it and what happened; right?
>
> A    Just anonymous tips coming into the Homicide Unit. . . .  And people would call and say, Look, I know who did that shooting out there.  They wouldn't say how they know who did it, but they would supply a name or nickname.  *And all the consistent tips were Gunna.*  That's what we had at first.

---

[3] In this memorandum, Mr. Goodwin clarifies and corrects the amended petition with regard to which attorney elicited the challenged testimony.

*Id.* at 68-69 (emphasis added)[4]; *id.* at 71 ("[T]he main information that came in was that Christopher Goodwin had the nickname of Gunna, and he was the one that shot Dwayne Isaacs."); *id.* at 63-64 ("Q: Now, you told us that the motive was because an associate of my client was shot, right?  Didn't you tell us that was the motive?  A: Yes, sir, I believe so.").

Additionally, when trial counsel asked Detective Gaul if he tried to corroborate the statement Andre Cunningham had given to police, Detective Gaul responded by saying that Raheem Zachary—a person who did not testify at trial—"refused to go on paper, but [] also supplied information." NT 5/22/13 at 72-73.[5]  Later, trial counsel elicited testimony about the substance of Mr. Zachary's statement from another Commonwealth witness, Detective John Verrecchio, who testified that part of Mr. Cunningham's statement was corroborated by Mr. Zachary.  Detective Verrecchio first testified that there was "a lot of corroboration" of Mr. Cunningham's statement, which "had the ring of truth."  *Id.* at 180.  This exchange with trial counsel followed:

> Q      Definitely had the ring of truth?
>
> A      Yes, sir.
>
> Q      Like Aaron Respes was sitting on a bench at the circle?

---

[4] Mr. Goodwin's nickname was "Gunna"—a nickname given to him because of his days of hogging the ball while playing basketball.  NT 5/22/13 at 239.

[5] The prosecutor introduced into evidence the police activity sheet containing the information Mr. Zachary provided to police.  *Id.* at 147-49, 236 (introducing and admitting Exhibit C-16 into evidence).  Mr. Goodwin withdraws the portion of this claim that contends that the activity sheets and the information contained therein went to the jury room during deliberation.  *See* Am. Pet'n at 10-11, 14.

A       Yes, with Zachary, Raheem Zachary.

Q       Yeah

A       He was sitting on the bench with him.

Q       So he would have been -- both Aaron and Zachary would have been in the circle at the time that Mr. Isaacs was shot?

A       That's correct.

Q       And that had the ring of truth to you?

A       Yes, it did. Raheem Zachary told us he was in the circle with him.

Q       Did you write that down anywhere?

A       I believe it's in an activity sheet.

Q       Did you do a formal interview with Mr. Zachary when he told you that?

A       No. He refused to provide a written interview.

*Id.* at 180-81.  Trial counsel did not move to strike this testimony about what Mr. Zachary purportedly told the police.

During trial counsel's cross-examination of Detective Verrecchio, he also affirmatively opened the line of inquiry about anonymous tips, immediately receiving a response that implicated Mr. Goodwin.

Q       Do you know whether or not that there were anonymous tips received?

A       Information was being received.  I know that people did not want to come forward with the information and be documented on it.  The anonymous tips, I'm sure there was because *we heard the name Gunna right away*.

NT 5/22/13 at 166 (emphasis added).  Upon further inquiry, Detective Verrecchio confirmed that police heard rumors about Mr. Goodwin's alleged involvement and alleged motive:

7

| Q | *So the word was that my client wanted to get to – couldn't get to Rahsul, so he was going to get Shank instead?* |
|---|---|
| A | It was just a rumor, Counsel.  Like I said, it was just word on the street at that time. |

*Id.* at 170-71 (emphasis added).  As Detective Verrecchio confirmed, the information about the motive was not in the statements of Andre Cunningham or Aaron Respes, and it was not otherwise documented in other witness statements.  *Id.* at 171-77.[6]

Trial counsel could have had no reasonable basis for failing to object to, and for himself eliciting, evidence that violated Mr. Goodwin's right to confront his accusers and that further implicated Mr. Goodwin in the homicide.  Defense counsel's strategy involved critiquing the police investigation for focusing on Mr. Goodwin rather than Kamac, who had a strong motive to kill the decedent.  It ran counter to the defense strategy for the jury to hear the inadmissible content of anonymous tips that inculpated Mr. Goodwin and provided him with a motive, and for the jury to hear that Mr. Zachary purportedly corroborated Mr. Cunningham's recanted statement to police.

This inadmissible evidence bolstered a prosecution that otherwise rested almost entirely on the statements of two recanting witnesses, both of whom were detained at police headquarters for a considerable period of time in order to obtain statements that inculpated Mr. Goodwin, and

---

[6] During this line of inquiry, the court *sua sponte* instructed the jury that testimony about information from anonymous sources was being offered not for its truth but to challenge the credibility of certain witnesses and to challenge the detectives' investigation.  NT 5/22/13 at 173-74.  Later, during the final jury charge, the court repeated this instruction with regard to testimony about rumors and anonymous tips implicating Mr. Goodwin.  NT 5/28/13 at 111-12.

one of whom claimed that a detective physically assaulted him to get that statement.  These constitutional violations caused the jury to hear testimony from homicide detectives and argument from the prosecutor that Mr. Cunningham's and Mr. Respes' statements were largely unnecessary to the identification of Mr. Goodwin as the shooter because the police already knew who the shooter was.  The jury also heard that Mr. Cunningham's recanted statement was corroborated by Mr. Zachary.  Making matters worse, the clear implication of Detective Verrecchio's testimony was that Mr. Zachary refused to go on paper but also supplied information that not only corroborated Mr. Cunningham but also implicated Mr. Goodwin as the shooter.  Counsel's errors undermine confidence in the outcome of Mr. Goodwin's trial, thus establishing *Strickland* prejudice.

### 2. The State Court's Decision

Mr. Goodwin exhausted this claim during his PCRA proceedings, and the Superior Court rendered an adjudication on the merits.  With regard to the anonymous tips, the Superior Court held that the evidence was not admitted for the truth of the matter, and it ruled that the trial court's instructions belied Mr. Goodwin's prejudice argument.  *Commonwealth v. Goodwin*, 2018 WL 3153588 (Pa. Super. June 28, 2018) ("Super. Ct. Op."), at 13-14.  The Superior Court's decision about the anonymous tips does not preclude habeas relief because it was based on an unreasonable determination of the facts in the state court record.  During closing argument the prosecutor twice told the jury that this case was never "a whodunit" because "everybody knows each other"—meaning everyone knew Mr. Goodwin was the perpetrator.  NT 5/28/13 at 52, 53.  This demonstrates that, despite the court's cautionary instructions, the prosecutor used the content of the anonymous tips for the truth of the matter, and the jury was likely to do the same.

9

The court's instructions were simply not sufficient to cure the error from the improper admission of the inculpatory anonymous tips.

With regard to the references to Raheem Zachary's oral statements to police, the Superior Court held as follows:

> With respect to Detective Gaul's testimony, the record establishes that Detective Gaul did not testify as to the contents of Raheem Zachary's oral statement to police.  Therefore, [Mr. Goodwin]'s assertion that trial counsel permitted Detective Gaul to present hearsay evidence lacks arguable merit.
>
> Detective Verrecchio, however, testified to a portion of Raheem Zachary's statement.  Even assuming that trial counsel should have stricken or otherwise challenged the detective's testimony, the passing reference to Zachary's statement was not so inflammatory that the jury could not fairly decide [Mr. Goodwin]'s guilt or innocence in this case. . . .  Furthermore, as noted above, although Detective Verrecchio's unsolicited testimony could be read to corroborate Cunningham's testimony, the jury also had Respes' prior statement identifying Appellant as the shooter.  Therefore, we decline to disturb the PCRA court's ruling on this argument.

Super. Ct. Op. at 15; *see also id.* at 15 n.23 ("Raheem Zachary did not place Appellant at the scene of the murder, but asserted he did not see the shooter.").  This prejudice determination does not bar habeas relief because it involved an unreasonable application of *Strickland*.  Cunningham's and Respes' statements were both recanted, so it was unreasonable for the Superior Court to rely on Mr. Respes' statement to excuse the harm from the unconstitutional admission of Mr. Zachary's statement, which improperly corroborated Mr. Cunningham's statement to police and implicated Mr. Goodwin in the shooting.  For the reasons set forth above, habeas relief is warranted on this claim.

10

**B.  Trial counsel was ineffective for eliciting prejudicial testimony of Detective Verrecchio and for failing to properly object and seek a mistrial.**[7]

Trial counsel was ineffective for eliciting prejudicial testimony from Detective Verrecchio about a handgun purportedly connected to this case and about Mr. Goodwin's use of Xanax, and for failing to seek proper remedies when the jury heard that testimony.

**1.  The Constitutional Violation**

In his recanted statement to police, Mr. Cunningham claimed that he saw Mr. Goodwin ask two people in the circle area of the neighborhood park if they had any Xanax just before he saw Mr. Goodwin shoot the decedent.  NT 5/20/13 at 177, 185.  In the statement, Mr. Cunningham identified Raheem Zachary and Aaron Respes as the people whom Mr. Goodwin allegedly asked for Xanax.  *See id.* at 185-88.  The portion of Mr. Cunningham's statement about the alleged request for Xanax was mentioned repeatedly during trial.  *See, e.g.*, *id.* at 187-88; NT 5/21/13 at 39; NT 5/22/13 at 18, 20, 21, 107.  However, Mr. Cunningham testified that he only said that to police because of how they pressured and him over his 18-hour stay at the police station.  NT 5/20/13 at 177-27.  Further, Mr. Respes' statement to police, which was also recanted at trial, says nothing about him being in the circle at the time of the shooting, being with Mr. Zachary, or being asked for Xanax by Goodwin.  *See* NT 5/22/13 at 108-09 (Detective Gaul's testimony regarding these discrepancies between the statements); Super. Ct. Op. at 1 (Respes' statement "did not indicate that there were other people in the area or that Appellant

---

[7] This claim was raised as part of Ground 3 of Mr. Goodwin's *pro se* petition.

11

asked for 'Xannies.'").  At trial, Mr. Respes denied being in the circle and he denied that Mr.

Goodwin asked him for Xanax on the night of the shooting.  NT 5/21/13 at 185.

     While cross-examining Detective Verrecchio, trial counsel elicited the following

testimony about corroboration of Mr. Cunningham's statement:

> A        . . . What I'm saying to you is that there is a lot of corroboration in the
>          interview.  If you give me one second, I'll point all the corroboration out
>          for you.
>
>          [ . . . ]
>
> A        . . . Gunna stopped first and was talking to two boys who were sitting on
>          the bench.  We've identified them as Raheem and Aaron.  He was asking
>          them if they had any Xannies.  We know he uses Xannies.
>
> Q        Who do you know uses Xannies?
>
> A        Gunna, your client.
>
> Q        Oh, did he tell you that?
>
> A        Yes.
>
> Q        When did he tell you that?
>
> A        When he was arrested.

NT 5/22/13 at 183.  Trial counsel then established that the detective did not document Mr.

Goodwin's purported statement about "Xannies" (i.e., Xanax).  *Id.* at 183-84.  Out of the

presence of the jury, trial counsel informed the judge that he had spoken with Mr. Goodwin

many times and that he was "almost positive" that Mr. Goodwin "didn't say that" to the

detective.  NT 5/22/13 at 188-89.  During a colloquy, the detective informed the court that Mr.

Goodwin allegedly made this statement about using Xanax before being read his *Miranda* rights.

*Id.* at 195.  *See also id.* (the court noting that trial counsel could not have known about the

alleged statement before the detective testified to it).  The court then granted trial counsel's motion to strike the testimony about Mr. Goodwin's alleged admission to using Xanax, and the court instructed the jury to disregard that testimony.  *Id.* at 192-98.  Counsel did not move for a mistrial.

Trial counsel could have had no reasonable basis for failing to seek a mistrial after the jury heard damaging testimony about Mr. Goodwin's alleged admission to using drugs.  Although the statement was stricken from the record, the damage could not be undone.  This testimony bolstered the Commonwealth's case because it corroborated Mr. Cunningham's statement to police, which otherwise was likely to be discredited because of Cunningham's recantation and its inconsistencies with Respes' statement to police and trial testimony.

Later in his cross-examination of Detective Verrecchio, trial counsel elicited more damaging evidence—this time about a handgun.  During her direct examination of Detective Verrecchio, the prosecutor had elicited testimony that the detective did not seek a search warrant for the murder weapon at the time of Mr. Goodwin's arrest because Mr. Goodwin would have had a month after the shooting to get rid of the weapon.  NT 5/22/13 at 223-24.  Regarding that testimony, trial counsel asked,

> Q     But let me ask you this.  You wouldn't know whether there was a gun present or not unless you looked; right?
>
> In this case, this case, you wouldn't know whether the defendant is dumb enough to leave a gun someplace unless you look; right?
>
> A     There was information that came to light about a weapon.

NT 5/22/13 at 230.  Trial counsel did not move to strike this testimony.  During a sidebar, the detective revealed that he had been mistaken—the information to which he had referred had no

13

connection to this case.  *Id.* at 232-33.  After the sidebar, the detective testified that the police made no efforts made to locate the weapon used in this case, and that weapon was never found. *Id.* at 231, 235.

Trial counsel could have had no reasonable basis for failing to move to strike and move for a mistrial after Detective Verrecchio testified that information "came to light" about a weapon in this case.  Although the detective later testified that the police did not seek or find the murder weapon, his previous testimony about information that came to light allowed the jury to infer that the police had obtained inculpatory evidence about a weapon connected to Mr. Goodwin.  But for counsel's failures, there is a reasonable probability that the outcome of Mr. Goodwin's trial would have been different.

### 2.  The State Court's Decision

Mr. Goodwin raised this claim during PCRA proceedings.  With regard to the testimony about Mr. Goodwin's alleged admission to using Xanax, the Superior Court first acknowledged that the evidence was improperly admitted, but it concluded that the trial court would not have granted a mistrial because it had already stricken the testimony and given a limiting instruction. Super. Ct. Op. at 18; *see also id.* at 21 (including this error in its cumulative prejudice analysis). It also concluded that, in light of the entire trial record, Mr. Goodwin could not establish prejudice from Detective Verrecchio's testimony about Mr. Goodwin's alleged statement because "even if the reference to Appellant's use of 'Xannies' improperly bolstered Cunningham's statement identifying Appellant as the shooter, the jury was still entitled to credit Respes' prior statement."  *Id.* at 18.

14

This decision does not bar habeas relief because it is based on both an unreasonable application of *Strickland*.  Under *Strickland* the question is whether there is a reasonable probability that the outcome of trial would have been different but for counsel's errors.  Although the jury was "entitled" to credit Mr. Respes' prior statement, there is a reasonable probability that it would not have done so given all of the ways in which that statement was discredited—including by Mr. Respes' trial testimony and the fact that the statement itself was inconsistent with Mr. Cunningham's statement to police.  Notably, the jury was instructed that it *must* use caution when considering the inculpatory statements of both Cunningham and Respes if it determined that those witnesses had given inconsistent statements—a circumstance that unquestionably applied in this case.  NT 5/28/13 at 109-10.  That caution demonstrates the unreasonableness of the Superior Court's reliance on Mr. Respes' statement to disprove prejudice.

With regard to Detective Verrecchio's testimony that information had come to light about a handgun in this case, the Superior Court first acknowledged that the testimony was not based on any evidence relevant to this case:

> [T]he record establishes that Detective Verrecchio mistakenly believed that Appellant had been charged with possessing a firearm between the murder of Decedent and the time of his arrest. However, Appellant was charged with possession of a firearm well before the murder.

Super. Ct. Op. at 16; *see also id.* at 21 (including this error in its cumulative prejudice analysis). Nonetheless, it held that Mr. Goodwin could not establish prejudice from the erroneous admission of irrelevant testimony:

> Even assuming that trial counsel should have moved to strike
> Detective Verrecchio's testimony, Appellant cannot establish
> prejudice as trial counsel subsequently elicited the detective's
> concession that a murder weapon in this case was not found.  N.T.,
> 5/22/13, at 235.  Thus, we discern no basis upon which to conclude
> that this passing reference resulted in prejudice.

*Id.*  This decision also does not bar habeas relief because it is an unreasonable application of

*Strickland*.  As discussed above, the detective's testimony that information came to light about a

weapon in this case allowed the jury to infer that the police had obtained inculpatory evidence

about a weapon connected to Mr. Goodwin.  Particularly given the testimony about inculptatory

statements from anonymous tipsters, it is likely that the jury inferred that some of those tipsters

provided information about a gun connected to Mr. Goodwin.  Habeas relief is warranted on this

claim.

### C.  Trial counsel was ineffective for failing to object to the inadmissible hearsay testimony from the decedent's sister, Lisa Hall, and the prosecutor's argument based on that testimony.[8]

Mr. Goodwin was deprived of his right to the effective assistance of counsel when trial

counsel failed to object to the admission of improper hearsay testimony from Lisa Hall and when

trial counsel failed to object to the prosecutor's closing argument, which exacerbated the harm

from this testimony.

### 1.  The Constitutional Violation

During opening statements, the prosecutor explained the Commonwealth's theory of the

case: that the decedent had been the victim of a revenge killing because he was the uncle of

------

[8] This claim was raised as Ground 2 of the *pro se* petition and Claim 2 of the amended petition.

Rahsul Isaacs, who was believed to be responsible for shooting Lekkir "Le Le" Brown during a home invasion in the neighborhood the previous day. NT 5/20/13 at 46-48. The prosecutor told the jury that Mr. Goodwin and Le Le Brown were friends, and that Mr. Goodwin avenged Le Le Brown's shooting by shooting Rahsul's uncle. *Id.* at 48. The prosecutor also told the jury that, the day before the decedent was killed, the decedent told his sister that he was afraid because everyone in the neighborhood had it out for Rahsul. *Id.* at 47.

During trial, the Commonwealth presented testimony from the decedent's sister, Lisa Hall, about her brother's state of mind on the day he was killed. On direct examination, Ms. Hall testified that the decedent told her he had gotten into an argument with Le Le Brown's father, Kamac:

> He told me that—they call Leroy Brown Kamac, and he told me that him and Kamac got into an argument because he had asked Kamac how was his son doing. And Kamac's response was, Why would you ask me how my son doing? Your effing nephew did it. And my brother said—he just flagged him and walked away.

NT 5/21/13 at 263. The prosecutor went on to ask Hall specific questions about the decedent's state of mind:

> Q   So Dwayne knew that people thought Rahsul did it; right?
>
> A   Yes.
>
> Q   Did Dwayne ever express to you that he was afraid based upon that for himself?
>
> A   *He told me that he was kind of leery about going out to the project because of what Leroy had said to him and the young guys that was out there*.

*Id.* (emphasis added).  Trial counsel lodged no objection to this state-of-mind testimony,[9] which

the Superior Court later ruled was admitted erroneously in violation of the law against hearsay.

Super. Ct. Op. 8 (explaining that the decedent's statement could only be relevant to motive if the

decedent's statement about the confrontation were true, thus the statement was inadmissible

hearsay under *Commonwealth v. Moore*, 927 A.2d 1062, 1072 (Pa. 2007)).

    In her closing argument, the prosecutor told the jury that "the young guys" the decedent

was afraid of included Mr. Goodwin: "And what Dwayne told his sister Lisa was that not only

was he afraid of Kamac, but the young boys in the neighborhood, because remember Le-Le is

20, a young boy.  Rahsul, same thing, a young boy.  *The defendant.  They are the young boys.*"

NT 5/28/13 at 55 (emphasis added).  The argument that Mr. Goodwin was one of "the young

boys" whom the decedent feared had no basis in the evidence.  Again, no objection was lodged

by defense counsel.

---

[9] On cross-examination, trial counsel explored an additional aspect of what the decedent
purportedly told Ms. Hall about his conversation with Kamac:

| | |
|---|---|
| Q | But he said more than that, too, didn't he? |
| A | I wasn't there, sir.  I'm just going by what my brother told me. |
| Q | I'm saying your brother said -- |
| A | Yeah, he did say more than that. |
| Q | When you gave your statement, you told the detectives that Kamac told Dwayne, your brother, that he was going to fuck him up and that he better watch his back? |
| A | Yes. |

*Id.* at 270.

Trial counsel performed deficiently when he failed to object to inadmissible hearsay that the decedent was afraid of "the young boys" in the neighborhood.  *See generally Crawford v. Washington*, 541 U.S. 36, 59 (2004).  This evidence went directly counter to the defense theory: that Mr. Goodwin should be found not guilty because Kamac—an older neighbor—is likely the person who shot and killed the decedent.

Even assuming, arguendo, that Ms. Hall's reference to the decedent's comment about "the young boys" did not require an objection, trial counsel could have had no reasonable basis for failing to object to the prosecutor's argument that Mr. Goodwin was one of the "the young boys" whom the decedent feared.  That argument was not only based on inadmissible hearsay; it also had no evidentiary basis in the record.

Trial counsel was responsible for knowing the relevant law and using it to protect his client's interests.  *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."); *Thomas v. Varner*, 428 F.3d 491, 501 (3d Cir. 2005) ("Courts have routinely declared assistance ineffective when 'the record reveals that counsel failed to make a crucial objection or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles.'") (quotations omitted).  His failure to do so constitutes unreasonable performance.

Trial counsel's failures prejudiced Mr. Goodwin.  As discussed above, the properly-admitted portion of the Commonwealth's case linked Mr. Goodwin to the shooting through the prior statements of two witnesses, both of whom recanted from their identification of Mr.

19

Goodwin.  As a result of trial counsel's failure to object to Ms. Hall's hearsay testimony and the related argument, the jury heard that the decedent was afraid of Mr. Goodwin on the day he was shot, and Mr. Goodwin had no opportunity to contest this evidence through cross-examination. The hearsay testimony from Ms. Hall and the prosecutor's argument that the decedent was afraid of Mr. Goodwin tipped the scales in the Commonwealth's favor with regard to the central issue at trial: the identity of the shooter.  But for counsel's failures, there is a reasonable probability that the outcome of Mr. Goodwin's trial would have been different.

### 2.  The State Court's Decision

Mr. Goodwin raised this ineffective assistance claim in his PCRA proceedings.  In his *pro se* brief to the Superior Court, he argued that trial counsel was ineffective for failing to object to Ms. Hall's hearsay testimony *and* for failing to object to the prosecutor's closing argument referring to that hearsay testimony.  Br. of Appellant, Aug. 25, 2017, at 19.  The Superior Court did not rule on the effect of the prosecutor's closing argument.  Accordingly, this Court applies *de novo* review with regard to that aspect of this claim.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (*de novo* review where state courts did not reach prejudice prong under *Strickland v. Washington*).

With regard to Ms. Hall's testimony about the decedent's statements, the Superior Court concluded that the evidence was inadmissible hearsay and had been erroneously admitted. Super. Ct. Op. at 8.  Nonetheless, it ruled that Mr. Goodwin's ineffective assistance claim failed on prejudice grounds because Ms. Hall's statements "did not directly implicate [Mr. Goodwin] in any prior bad acts or wrongdoing.  Moreover, the fact that Kamac confronted Decedent about the prior shooting of Lekkir Brown was undisputed and was essential to the defense's theory that

20

Kamac had a greater motive to kill Decedent tha[n] [Mr. Goodwin]."  *Id.*  The Superior Court's

prejudice determination with regard to trial counsel's failure to object to Ms. Hall's testimony is

subject to AEDPA deference.  Because the Superior Court did not rule on deficient performance,

this Court reviews that aspect of this claim *de novo.*  *Rompilla*, 545 U.S. at 390.

The Superior Court's prejudice determination with regard to Ms. Hall's hearsay testimony does

not bar habeas relief because that determination is an unreasonable application of *Strickland*.

The identification of Mr. Goodwin as the shooter was based only on the prior statements to two

recanting witnesses, both of whom were detained at police headquarters for a considerable period

of time in order to obtain statements that inculpated Mr. Goodwin, and one of whom claimed that

a detective physically assaulted him to get that statement.  The addition of Ms. Hall's improper

and unchallengeable testimony that on the day of his murder the decedent was fearful of young

boys in the neighborhood—taken alone, and as amplified by the prosecutor's closing argument—

is enough to undermine confidence in the outcome of trial.

> ### D. Trial counsel was ineffective for failing to object to the prosecutor's improper and prejudicial examination of Andre Cunningham.[10]

Trial counsel was ineffective for failing to object to the portion of the prosecutor's

examination of Mr. Cunningham during which the prosecutor argued with the witness,

effectively providing her own testimony regarding events that were not properly admissible.

---

[10] This claim was raised as Ground 5 of Mr. Goodwin's *pro se* petition.

21

### 1. The Constitutional Violation

While examining Mr. Cunningham, the prosecutor asked whether he had provided certain information to her at her office a few days before Mr. Goodwin's trial began.  Mr. Cunningham unequivocally denied having provided that information.  Instead of stopping there, the prosecutor asked a lengthy series of leading questions—questions that were improper on direct examination—and effectively testified to her version of what occurred during her meeting with Mr. Cunningham:

Q     And when you were in my office, do you remember talking with me in front of Detective Verrecchio?

A     Yeah. He was asking me why I didn't come to court and stuff.

Q     And we also went over what happened the night of the murder; right?

A     Yes.

Q     And you told me everything that you saw, and what you told me was consistent with this statement; right?

A     No.  I told you that I was on Taney Terrace.

Q     Are you telling me that in my office with Detective Verrecchio you didn't tell me how this defendant committed this murder?

A     I told you I was on Taney Terrace.

Q     You're not answering my question.

A     You never said nothing about that.  You said, What happened? And I told you I was on Taney Terrace.  And then you started going into the statement and stuff, and that was about it.

Q     Actually, I never showed you your statement when you were there.

A     You didn't show me the statement. You started talking about it.

Q        I asked you what happened, and you told me that the defendant, Gunna, committed the shooting and you saw it; right?

A        I did not say that.

Q        You didn't say that?

A        No.

Q        Well, you sat down, in fact, at my computer and started printing out Facebook pictures of everyone, didn't you?

A        No. You went on my Facebook.

THE COURT:            She went on your Facebook?

THE WITNESS:        Yes. She asked me to log in. And I logged in for her, and she went on my Facebook.

            [. . .]

Q        All right. Well, let me ask you this: You have a Facebook page?

A        Yes.

Q        Is there a password for your Facebook page?

A        Yes.

Q        And on last Thursday, after you repeated the whole murder that you witnessed, you said, I'll even show you some pictures of everyone on Facebook, and you showed them to me, didn't you?

A        No. I gave you my password.  You went through it, and I was sitting in the chair.  And that's when you offered to buy me soup.

Q        To buy you soup?

A        Yes.

Q        Are you saying that you only gave me Facebook pictures because I bought you soup?

A        No.

23

Q      You didn't eat all night overnight, did you?

A      I didn't eat since I was locked up.

Q      You told that your stomach hurt and you didn't want to eat; right?

A      I told you I was cool.  You kept offering to buy me soup.  You said you was going to go get it.

Q      All right.  Am I supposed to let you starve in my office?

A      No.

NT 5/20/13 at 205-08.  This line of questioning continued for several pages of transcript, despite Mr. Cunningham's repeated denials of the prosecutor's characterization of their interaction.  *Id.* at 209-24.  Throughout this entire line of questioning, trial counsel lodged no objections.

Trial counsel could have had no reasonable basis for permitting the prosecutor to put before the jury her own version of a conversation with Mr. Cunningham—a version that strongly implicated Mr. Goodwin in this offense but that was inadmissible because of Mr. Cunningham's denials.  Nor could counsel had had a reasonable basis for failing to object to the prosecutor's arguing with the witness.  Mr. Goodwin was prejudiced by trial counsel's failures, as this improper exchange between the prosecutor and Mr. Cunningham weakened the credibility of Mr. Cunningham's recantation.

### 2.  The State Court's Decision

Mr. Goodwin raised this claim during PCRA proceedings.  The Superior Court acknowledged the improper questioning, but it held that Mr. Goodwin could not establish prejudice:  "Even if trial counsel could have objected to the manner of the prosecutor's questioning of Cunningham, the exchange did not affect a fair consideration of Respes' prior

statements identifying Appellant as the shooter."  Super. Ct. Op. at 12.  *See also id.* at 21
(including this error in its cumulative prejudice analysis).  This prejudice ruling does not bar
habeas relief because the state court's reliance on Respes' statement to police constitutes an
unreasonable application of *Strickland*.  As discussed above, Mr. Respes' statement to police was
undermined by his recantation at trial and its inconsistencies with Mr. Cunningham's statement
to police.  Given this record, it was unreasonable for the Superior Court to rely on Mr. Respes'
statement to disprove prejudice.   Furthermore, the Superior Court unreasonably evaluated the
impact of this exchange, which gave the prosecutor an opportunity to act as a witness for the
Commonwealth and attack Mr. Cunningham's credibility without being subject to cross-
examination.

### E.  Trial counsel was ineffective for failing to object to improper testimony and argument about alleged threats against witnesses.[11]

Mr. Goodwin was deprived of the effective assistance of counsel when trial counsel
failed to object to testimony and argument about alleged threats against witnesses.

### 1.  The Constitutional Violation

During her opening statement, the prosecutor told the jury that the Commonwealth's two
purported eyewitnesses to the shooting, Andre Cunningham and Aaron Respes, had given
truthful statements to police but were expected to recant on the stand at trial because they were
afraid of being deemed snitches.  NT 5/20/13 at 48-53.  The prosecutor also told the jury that
both Cunningham and Respes failed to appear when subpoenaed to testify at various prior

---

[11] This claim was raised as Ground 10 of the *pro se* petition and Claim 4 of the amended petition.

25

proceedings in this case because of their fear of testifying. *Id.* at 53-57. She told the jury that it could accept the truth of Cunningham's and Respes' statements to police if it decides that the men are recanting out of fear, and she noted that the men "have to do their testimony in front of all these people that are here in the courtroom, all these people that live in these same projects where they live. And, unfortunately, we can't protect witnesses when they go back out on that street, so that fear is a very powerful thing." NT 5/20/13 at 52.

Both men did recant on the witness stand, but they both denied being afraid of testifying for the Commonwealth. Mr. Cunningham explained that he falsely implicated Mr. Goodwin to police when he was high on Xanax and was kept in a locked room for 18 hours, during which time a detective choked him. NT 5/20/13 at 156-57, 172-73, 178, 195, 261-65, 267-69; NT 5/21/13 at 6-9. He explained that he had been trying to make amends ever since falsely implicating Mr. Goodwin, and those efforts included reaching out to Mr. Goodwin's mother and then giving a statement to a defense investigator about how he had been choked and otherwise coerced into giving the statement to police. NT 5/20/13 at 231-35. Mr. Cunningham also testified to the reasons why he had not appeared for previous court dates. NT 5/20/13 at 199-204. He testified that he did not recall giving police the answer recorded in his written statement about his purported fear of people learning that he had spoken to them. *Id.* at 193, 225. He also denied telling the prosecutor that Mr. Respes had been threatened in relation to this case. *Id.* at 227-228.

Mr. Respes testified that he was telling police what they wanted him to say when he implicated Mr. Goodwin as the shooter, but he was not sure of his identification. NT 5/21/13 at

101-04, 160-61, 165-72.  He also acknowledged that in his preliminary hearing testimony he said his prior identification of Mr. Goodwin was based only on seeing a beard.  *Id.* at 124-36.  He acknowledged being fearful that he would be charged with conspiracy to a murder he was not involved in, but he testified that he was not afraid of testifying for the Commonwealth.  *Id.* at 117-24, 140-41, 178-79.  In response to questions from the prosecutor, he testified that he did not recall being called a snitch after the preliminary hearing, and he said he had obtained the District Attorney Office's help in relocating his mother so that she could get out of the projects; although he moved in with his girlfriend, that was not part of the relocation program.  *Id*. at 138-46.  He specifically denied being threatened about this case.  *Id.* at 146-47.

Faced with these reasoned recantations, the prosecutor elicited an abundance of irrelevant and prejudicial testimony to bolster her argument that Mr. Cunningham and Mr. Respes recanted out of fear, and trial counsel unreasonably failed to object each time.

### a.  Evidence and argument about spectators in the courtroom

The prosecutor questioned witnesses about who was present in the courtroom to support Mr. Goodwin.  The prosecutor asked Lisa Hall how many people in the courtroom were present in support of Mr. Goodwin.  Ms. Hall replied, "Just about every last one of them."  NT 5/21/13 at 267.  The prosecutor also prompted Mr. Respes to identify certain relatives and acquaintances of Mr. Goodwin who were present in the courtroom for the trial:

Q      Do you know the defendant's brother, Ishmael Goodwin?

A      Yes.

Q      Does he have a nickname?

A      Ish.

27

Q       Okay. Do they call him Gunna Ish or just Ish?

A       Ish. I call him Ish.

Q       Okay.  He never threatened you?

A       No.

Q       Never said that if his brother does time, you're going to get killed?

A       No.

Q       Do you see Ish in the courtroom?

A       Yes, he's right there.

Q       What color shirt is he wearing?

A       Blue.

Q       The second row of people in that light blue shirt right there?

A       Yes.

Q       That's the defendant's brother?

A       Yes.

Q       Okay.  Do you see other people in the neighborhood from Wilson?

A       Yes.

NT 5/21/13 at 146-47.  She then showed Mr. Respes a series of photographs of people from the neighborhood and asked him whether those persons were in the courtroom.  *Id.* at 147-151.  For instance, she displayed the photograph marked as Commonwealth Exhibit 26 and asked Mr. Respes a number of questions, including the following:

Q       And how about this guy in the back?

A       That's Smelly.

Q       He goes by the nickname Smelly?

28

A      Yes.

Q      Is he here today?

A      Yes.

Q      Where is he at?

A      He's in the back row.

Q      Okay.  What color shirt is he wearing?

A      Gray.

Q      Is he in a polo?

A      Yes.

*Id.* at 151.  Trial counsel made no objection to this line of questioning.  Despite that Mr. Respes testified on cross-examination that he was not intimidated by anyone in the neighborhood or anyone present in the courtroom for the trial, *id.* at 177, the prosecutor argued in closing that Mr. Goodwin's supporters packed the courtroom during the witness testimony in order to intimidate the witnesses, NT 5/28/13 at 57-58 (arguing that, when the witnesses testified, they were "looking at all the defendant's friends who, interestingly enough, aren't even here today, all of them that were here on the days that the witnesses testified.").  Again trial counsel did not object.

**b.  Evidence that witnesses have been killed in other cases**

The prosecutor questioned Detective Gaul about crimes of retaliation that had no relation to Mr. Goodwin's case.  First, she asked if it was true that witnesses do not show up for court because "the fear is real," and the detective responded in the affirmative, stating that sometimes witnesses are the victims of retaliation.  NT 5/22/13 at 144-45.  The prosecutor then asked the following:

29

Q        In the course of your career in the Homicide Division, unfortunately, are
         there times where someone is killed for being a witness?

A        I've had multiple witnesses killed as a result of testifying.  I've had a
         witness killed after he left [Courtroom] 306, a preliminary hearing room.
         He was killed within a day.  And it's a frustrating sad situation.

NT 5/22/13 at 145.  Trial counsel did not object.

### c.  Hearsay evidence regarding threats

After Mr. Respes testified, the District Attorney's Office's Victim/Witness Coordinator,

Tobi Downing, testified to her interactions with Mr. Respes after the preliminary hearing in this

case.  Ms. Downing testified that Mr. Respes at first declined relocation services but later came

back and expressed that he was fearful.  Ultimately, his mother accepted assistance in moving

out of the neighborhood and Mr. Respes was provided with a hotel stay.  NT 5/21/13 at 200-08.

During cross-examination, trial counsel asked Ms. Downing about the content of a memo

from the prosecutor that constituted Mr. Respes' referral to the witness relocation program.  *Id.*

at 210-11.  The judge clarified that trial counsel was asking "for the specific allegations that he

said in the way in which he was intimidated," and she permitted Ms. Downing to read from the

memo.  Ms. Downing began reading:  "The defendant had multiple friends in the courtroom

today, all of whom were clearly there to intimidate any witnesses.  They were so menacingly

staring at the witness and the detectives -- ."  *Id.* at 211-12.  She was then cut off by the judge,

and Ms. Downing clarified that the referral memo were the words of the prosecutor, not those of

Mr. Respes himself.  Trial counsel did not object or make any other motions to cure the harm

from this prejudicial hearsay testimony.  *See Crawford v. Washington*, 541 U.S. 36, 59 (2004).

### d.  Trial counsel was ineffective

30

Trial counsel could have had no reasonable basis for failing to object and seek a mistrial in light of the evidence and argument discussed above, individually and cumulatively.

Detective Gaul's general testimony about witness intimidation had no connection to this case, and Ms. Downing's reading from the prosecutor's memo was inadmissible hearsay.  It is unsurprising that a number of Mr. Goodwin's relatives and friends were in the courtroom to support him during his homicide trial.  The prosecutor's questions and argument about who was present in the courtroom turned the act of attending a public trial—a right twice guaranteed by the Constitution—into a concerted effort to intimidate witnesses, and did so without any factual basis.  *See generally Waller v. Georgia*, 467 U.S. 39, 44-45 (1984) (a criminal defendant has a Sixth Amendment right to a public trial, and the public and the press have a First Amendment right to attend a criminal trial).  *See also In re Oliver*, 333 U.S. 257, 271 n.25 (1948) ("The [Sixth Amendment] requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.").  Notably, the prosecutor never requested that the court intervene during trial by clearing the courtroom or giving an instruction to spectators about alleged threats.

Trial counsel could have had no reasonable strategy for failing to object to this irrelevant, inadmissible, and extremely prejudicial testimony and argument.  Together, this evidence and argument significantly bolstered the Commonwealth's case.  Had defense counsel lodged proper objections to the hearsay testimony from Ms. Downing, Detective Gaul's testimony about witnesses getting killed, and the improper arguments from the prosecutor, there is a reasonable

probability that the outcome of Mr. Goodwin's trial would have been different.  Confidence in

the jury's verdict is undermined by these unsupported allegations about witness intimidation.

### 2. *Martinez v. Ryan* excuses the default of the ineffective assistance claim regarding spectators in the courtroom

Mr. Goodwin's ineffective assistance allegations related to the improper questions and

argument about spectators in the courtroom were not raised in state court; however, the

procedural default of this issue is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012).  Under

*Martinez*, a procedural default is excused when three conditions are met:

> (a) the default was caused by ineffective assistance of post-
> conviction counsel or the absence of counsel (b) in the initial-
> review collateral proceeding (*i.e.*, the first collateral proceeding in
> which the claim could be heard) and (c) the underlying claim of
> trial counsel ineffectiveness is 'substantial,' meaning 'the claim
> has some merit,' analogous to the substantiality requirement for a
> certificate of appealability.

*Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014) (citation omitted).  All three conditions are

satisfied here.

PCRA proceedings were Mr. Goodwin's first opportunity to present ineffective

assistance of trial counsel claims.  *See Commonwealth v. Grant*, 813 A.2d 726, 738-39 (Pa.

2002).  After Mr. Goodwin filed his *pro se* PCRA petition, counsel was appointed and filed a no-

merit letter with regard to the claims in the *pro se* petition.  PCRA counsel did not seek to amend

the petition to add any claims, and his motion to withdraw as counsel was granted.

PCRA counsel could have had no reasonable basis for failing to plead trial counsel's

ineffectiveness for not challenging the prosecutor's questions and argument about the spectators

in courtroom—a claim that was apparent from the record and that implicates essential

32

constitutional rights.  PCRA counsel's no-merit letter demonstrates that he unreasonably failed to pursue claims that the Superior Court later recognized had arguable merit.  *See, e.g.*, No-Merit Letter, Aug. 11, 2016, at 4 n.1 (incorrectly stating that the contents of Raheem Zachary's statement "were never elicited"); *id.* at 5 (incorrectly stating that the hearsay testimony regarding the decedent's state of mind was admissible).  Given these errors, it is impossible to conclude that PCRA counsel exercised reasonable professional judgment when he failed to amend the petition with this additional claim—which at the very least had arguable merit.

Finally, this is a substantial claim.  To establish substantiality, a petitioner need only demonstrate that reasonable jurists could debate his trial counsel ineffectiveness claim, or whether the claim is adequate to deserve encouragement to proceed further.  *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 377 (3d Cir. 2018) (citation omitted).  "The substantiality inquiry does not require full consideration of the factual or legal bases adduced in support of the claim[]."  *Id.* (internal quotation marks and citation omitted).  This constitutional claim is debatable among reasonable jurists, as trial counsel permitted the prosecutor to use the exercise of the right to a public trial against Mr. Goodwin in a criminal case.  The procedural default should be excused, permitting this Court to consider the merits of Mr. Goodwin's underlying ineffective assistance of trial counsel claim.

### 3.  The State Court's Decision

During PCRA proceedings, Mr. Goodwin repeatedly alleged prejudice from counsel's failure to object to Ms. Downing's reading of inadmissible hearsay from the prosecutor's memo. *See* Br. of Appellant, Aug. 25, 2017, at 17, 36, 41-42.  Nonetheless, the Superior Court did not

33

address that aspect of the claim.[12]  Likewise, the PCRA court did not address the hearsay in the prosecutor's memo.  *See* PCRA Ct. Op., Oct. 24, 2016, at 7 n.1 (noting only that "[t]he memorandum itself was never submitted as evidence, though Downing testified that the memo contained a request to interview Respes' and a brief summary of the threats and intimidation he faced").  Accordingly, this Court applies *de novo* review with regard to this aspect of the ineffective assistance of counsel claim.

In his PCRA proceedings, Mr. Goodwin also challenged counsel's failure to object to Detective Gaul's testimony about witnesses getting killed.  *See* Br. of Appellant, Aug. 25, 2017, at 50.  Again, the state court did not address those ineffective assistance allegations, making this Court's review *de novo*.

### F.  Trial counsel was ineffective for failing to impeach Detective Thomas Gaul with evidence that contradicted Detective Gaul's claim that Kamac's name "never came up" as the suspected shooter.[13]

Mr. Goodwin was deprived of his right to the effective assistance of counsel when trial counsel failed to impeach Detective Thomas Gaul with evidence that directly contradicted Gaul's claim that he was unaware of any statements that police might have received about Kamac as the suspected shooter in the killing of Dwayne Isaacs.

---

[12] The Superior Court only addressed Ms. Downing's testimony about her meetings with Mr. Respes.  Super. Ct. Op. at 11.  With regard to that testimony, it held that Ms. Downing's testimony was not hearsay and, in any event, Mr. Respes was available for cross-examination by the defense.  *Id.*

[13] This claim was raised as Ground 4 of the *pro se* petition and Claim 3 of the amended petition.

34

### 1.  The Constitutional Violation

In pretrial discovery, trial counsel received a signed statement that the decedent's girlfriend, Yvette Morris, gave to Detectives Gaul and Pitts on the day of the decedent's death. In that statement, Ms. Morris told the detectives that the decedent had been having problems with Kamac and that "rumors on the street are that [K]amac shot Dwayne."  Morris Statement (Ex. A to Am. Pet'n) at 2.

At trial, counsel sought to demonstrate to the jury that police did not properly investigate Kamac as the likely shooter.  *See* Super. Ct. Op. at 3 ("The defense challenged the adequacy of the investigation into Decedent's murder and asserted that there was a rush to judgment to implicate [Mr. Goodwin].").  During his cross-examination of Detective Gaul, counsel inquired about Kamac, who was mentioned in Mr. Cunningham's statement:

Q      Do you know of any significance of Kamac to this case?

A      I believe Kamac was related to one of the parties in this case.  I could be wrong, but I believe he was related to one of the parties in this case.

Q      Okay.  Was he investigated?

A      As far as being involved?

Q      Being involved in the shooting of Mr. Isaacs.

A      *He might have been attempted to be located or at some point some detective might have tried to locate him and talk with him, but as far as him being a shooter, is that what you mean?*

Q      *Yeah.*

A      *No, sir, that never came up.*

Q      So nobody investigated him as being the shooter?

35

> A    Well, the shooting was investigated.  I don't want to say nobody
>       investigated him as a shooter. The whole shooting was
>       investigated, and a person of interest was identified.

NT 5/22/19 at 112-13 (emphasis added).  In response to trial counsel's question about whether it

was important to look into Kamac, Detective Gaul went on to say the following:

> Like I said, the investigation is through a process and through
> steps.  There are persons of interest that come up.  The one thing
> that was consistent with this investigation was that Christopher
> Goodwin, also known as Gunna, was responsible for the shooting.
>
> Now, as far as what steps were taken as far as who was cleared and
> other names that come up, I wouldn't know that.

*Id.* at 114.  Trial counsel did not use Ms. Morris's statement to impeach Detective Gaul's

testimony, and his omission had no reasonable basis.  While the content of Mr. Morris' statement

was not admissible for its truth, it was admissible to impeach Detective Gaul.  That would have

supported the defense theory that police ignored information that Kamac was the shooter and

inappropriately focused all their attention on Mr. Goodwin.  Detective Gaul's signature as a

witness to Ms. Morris' statement contradicted his testimony that Kamac's name "never came up"

as the shooter and supported the defense theory that the investigation into this case was flawed.

The prosecutor then took advantage of counsel's omission and argued to the jury in summation

that "[n]o one" in the case "said that Kamac did it."  NT 5/28/13 at 54, 59.

But for trial counsel's error, there is a reasonable probability that the outcome of Mr.

Goodwin's trial would have been different.  Mr. Goodwin's defense was centered on Kamac's

motive to shoot the decedent and the police's failure to properly investigate Kamac as the likely

shooter.  Evidence that people in the neighborhood were implicating Kamac as the shooter would

have supported the defense theory and given the jury even more reason to doubt the statements

that Mr. Cunningham and Mr. Respes gave to police.  Counsel's failure undermines confidence in the jury's verdict.

### 2. The State Court's Decision

Mr. Goodwin raised this claim during PCRA proceedings.  The Superior Court affirmed the denial of this claim, ruling that Ms. Morris' statement was hearsay rather than admissible exculpatory evidence.  Super Ct. Op. at 19 and n.25.  It also held that Mr. Goodwin was not prejudiced from trial counsel's failure to cross-examine Detective Gaul with evidence of the rumors about Kamac because "trial counsel cross-examined the detective about Kamac's stronger motive to kill Decedent."  *Id.* at 19.

The Superior Court's decision does not bar habeas relief because it is based on an unreasonable application of *Strickland*.  Trial counsel did cross-examine Detective Gaul about Kamac's motive, but the detective was able to deny any basis for investigating Kamac as the shooter.  There is a reasonable probability that documentary evidence—specifically, Ms. Morris' statement bearing Detective Gaul's own signature—would have effectively impeached the detective's testimony that Kamac never came up as a suspect and would have altered the outcome of Mr. Goodwin's trial.

37

### G.  Trial counsel was ineffective for failing to object to the prosecutor's closing argument that unconstitutionally shifted the burden of proof to the defense and that included the prosecutor's personal opinion that the alibi witness was lying.[14]

Mr. Goodwin was deprived of his right to the effective assistance of counsel and due process under the Sixth and Fourteenth Amendments when trial counsel failed to object to the prosecutor's closing argument, where the prosecutor shifted the burden of proof by castigating the defense for failing to call additional alibi witnesses and improperly expressed her personal belief about the credibility of Mr. Goodwin's alibi witness.  NT 5/28/13 at 84.

#### 1.  The Constitutional Violation

It is a bedrock principle of due process that the prosecution bears the burden to prove its case beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  "[T]he burden of proof . . . is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted."  *Davis v. United States*, 160 U.S. 469, 487 (1895); *Patterson v. New York*, 432 U.S. 197, 215 (1977) (established law is that "a State must prove every ingredient of an offense beyond a reasonable doubt, and . . . may not shift the burden of proof to the defendant. . . .").  These fundamental principles were violated by the prosecutor's closing argument at Mr. Goodwin's trial, which "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

_____

[14] This was raised as Ground 9 of the *pro se* petition and Claim 5 of the amended petition.

During trial, the defense presented the alibi testimony of Anara Brown, who testified that Mr. Goodwin was with her at an outdoor social gathering when the shooting occurred.  NT 5/22/13 at 241-53.  On cross-examination, the prosecutor asked Ms. Brown to name some of the other people who were nearby at the time.  Ms. Brown named three people: Natika "Tika" Hawkins and persons she knew from the neighborhood as "Dooler" and "Black."  *Id.* at 277-80.

During closing argument, the prosecutor began her comments about the alibi testimony by saying, "I want to address *the fact* that the defense called a lying alibi witness."  NT 5/28/13 at 79 (emphasis added).  She told the jury that it should be insulted that the defense presented Ms. Brown's testimony, and that the defense only did so out of desperation.  *Id.* at 85.  Rather than calling on the jury to asses credibility, these were clear expression of the prosecutor's personal opinion.

The prosecutor then criticized the defense for not presenting alibi testimony from the three individuals Brown named: "[W]here is Natika if she was really out there?  Where is this Dooler if he was really out there?  Where is this Black?  Everybody knows each other.  You can get these people in.  They're not here because it's not true."  NT 5/28/13 at 84.  She continued, arguing that the defense only presented one alibi witness because Brown was the only person willing to lie for Mr. Goodwin.  *Id.* at 84-85.  This argument improperly shifted the burden of proving innocence to Mr. Goodwin, violating his due process rights.  Furthermore, the prosecutor argued, without any evidentiary basis, that the three individuals Anara Brown named were readily accessible to defense counsel.

39

Trial counsel could have had no reasonable basis for failing to object and seek a limiting instruction regarding this improper shifting of the burden of proof.  He likewise could have had no reasonable basis for failing to object to the improper insertion of the prosecutor's personal opinion.

Although the court instructed the jury that Mr. Goodwin was not required to produce any evidence, because of trial counsel's failures the court never corrected the impression left by the prosecutor's argument: in essence, that the jury should find Mr. Goodwin guilty if it believed that Anara Brown lied.  Of course, due process requires that the Commonwealth prove its case beyond a reasonable doubt, and regardless of whether the jury believed that Ms. Brown lied, the jury could easily have found that the prosecution failed to meet that burden—particularly given the failure of any witness to implicate Mr. Goodwin from the witness stand.  Counsel's failures undermine confidence in the outcome of Mr. Goodwin's trial

### 2.  The State Court's Decision

Mr. Goodwin raised his ineffective assistance of counsel claim during PCRA proceedings.  On appeal from the denial of his PCRA petition, the Superior Court first acknowledged the settled law that it is improper for a prosecutor to express a personal belief as to the credibility of witnesses, but a prosecutor may comment on the credibility of witnesses and respond to defense arguments "with logical force and vigor."  Super. Ct. Op. at 20 (citing *Commonwealth v. Chmiel*, 889 A.2d 501, 544 (Pa. 2005)).  It then concluded that what Mr. Goodwin characterized as expressions of the prosecutor's personal opinion "were simply her argument regarding the credibility of certain witnesses and the credibility of Appellant's alibi defense."  *Id.*  It also held that this was a logical and vigorous response to trial counsel making

40

out Detective Gaul and Verrecchio to be liars.  *Id.*  Finally, it agreed with the lower court's finding that the prosecutor's comments about Natika Hawkins, Dooler, and Black were "a logical attack on alibi witness [Anara] Brown's credibility, not an impermissible shifting of the burden of proof."  *Id.*

The state court did not address prejudice, so this Court's determination of that prong is *de novo*.  The state court's decision about deficient performance is entitled to AEDPA deference but it does not bar habeas relief because the decision was based on unreasonable determinations of the facts in the state court record.  The prosecutor addressed "*the fact* that the defense called a lying alibi witness."  The only fair reading of that phrase is that the prosecutor was expressing her personal opinion about Ms. Brown's credibility.  The Superior Court's contrary determination is unreasonable.

The Superior Court's determination that the prosecutor did not shift the burden of proof is also unreasonable.  The prosecutor argued the defense could have presented additional alibi witnesses if the alibi testimony was true.  This is not simply an argument that Ms. Brown was untruthful—it is a call on the defense to produce evidence that it has no burden to produce.  The state court's reading of this record is unreasonable.

**H. Trial counsel was ineffective for failing to investigate and present available evidence about Detective James Pitts' misconduct in this case, and Mr. Goodwin's due process rights were violated.**[15]

Mr. Goodwin was deprived of his right to the effective assistance of counsel when trial counsel failed to investigate and present evidence of Detective James Pitts threatening and attacking witness in other cases, just as Andre Cunningham testified that Detective Pitts assaulted him in this case. This evidence of Detective Pitts' misconduct also supports a stand-alone due process violation. Additionally, the Commonwealth violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose this evidence to the defense.

### 1. The Ineffective Assistance and Due Process Violations.

Andre Cunningham testified that a black homicide detective with something on the back of his neck choked him and coerced him into giving the statement that he later gave to two other detectives. NT 5/20/13 at 267-69; NT 5/21/13 at 6-8. He had also given this information to a defense investigator nearly a year before Mr. Goodwin's trial. NT 5/20/13 at 231-35. Although Mr. Cunningham did not recall the name of the detective who choked him, Detective Gaul later testified that Detective Pitts is a black detective with an abnormality on the back of his neck, and that Detective Pitts had contact with Mr. Cunningham. NT 5/22/13 at 85-86. When asked whether Detective Pitts choked Mr. Cunningham, Detective Gaul testified that Detective Pitts is a well-respected detective, and on this basis Gaul speculated that Pitts did not choke Mr.

---

[15] The claim was raised as Grounds 1(C) and 12 of Mr. Goodwin's *pro se* petition and Claim 6 of the amended petition. Mr. Goodwin withdraws the portion of this claim that asserted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959).

Cunningham.  Detective Gaul also testified that it is not uncommon for witnesses to make false allegations of misconduct against police.  *Id.* at 86-91.  He said that Mr. Cunningham did not complain to Internal Affairs, and that "[t]his is the first time that he makes some kind of accusation against Detective Pitts on something that happened almost two years ago.  So I think that belies [Mr. Cunningham's allegation.]"  *Id.* at 91.  *See also id.* at 152 (Detective Verrecchio testifying that he did not see anyone threaten or choke Mr. Cunningham).

Trial counsel presented no evidence to corroborate Mr. Cunningham's allegation against Detective Pitts or to refute Detective Gaul's testimony that assaulting a witness was out of character for Detective Pitts.  Had counsel conducted an investigation, he would have discovered available evidence that Detective Pitts had engaged in misconduct with respect to other witnesses.  This evidence includes information from *Commonwealth v. Amin Speakes* and *Commonwealth v. Unique Drayton*—homicide cases that resulted in a not guilty verdict and a dismissal, respectively, due in part to misconduct by Detective Pitts.  In November 2010, a Philadelphia County Court of Common Pleas judge suppressed a confession that Detective Pitts elicited from Unique Drayton after holding that Pitts illegally held Drayton in custody for 41 hours; the prosecution was later dismissed.  In 2012, a jury acquitted Amin Speakes of murder after seeing video evidence that he was far away from the scene of the murder to which Detective Pitts had elicited Speakes' confession.  The available evidence also includes instances in which Detective Pitts physically assaulted or threatened witnesses or defendants in order to

obtain incriminating evidence from them and the substantial sums of money that the City of

Philadelphia has paid to settle civil suits that were triggered by Detective Pitts' misconduct.[16]

Trial counsel performed deficiently by failing to investigate and present available

evidence of Detective Pitts' misconduct. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (It "is the

duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to

explore all avenues leading to facts relevant to the merits of the case. . . .") (quoting 1 ABA

Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)); *Strickland v. Washington*, 466 U.S.

668, 691 (1984) (defense counsel "has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary"); *Wiggins v. Smith*, 539

U.S. 510, 521-22 (2003) (same).  Counsel knew long before trial that Mr. Cunningham was

recanting from his inculpatory statement and making allegations that Detective Pitts had coerced

him into making a false statement.  He could have had no reasonable basis for failing to

investigate and present evidence to support the credibility of that recantation.

Mr. Goodwin was prejudiced by trial counsel's failures.  Had the jury known of Detective

Pitts' misconduct in other homicide cases, this would have undercut the veracity of Mr.

Cunningham's statement to police, and, by implication, the entire Commonwealth case.  It would

have supported the defense argument that the investigation was flawed and it would have

---

[16] Mr. Goodwin proffered the evidence about the Speakes and Drayton cases to the PCRA court
in support of his ineffective assistance claim, and he proffered additional evidence to the
Superior Court in support of a newly-discovered evidence and ineffective assistance of counsel
claim.  Br. of Appellant, Aug. 25, 2017, at 18-19 and Ex. E..  As discussed below, the Superior
Court ruled on the merits of the claim without permitting further factual development.

44

supported Mr. Cunningham's and Mr. Respes' testimony that the police coerced them into

providing false statements. *See Kyles v. Whitley*, 514 U.S. at 445–49 (the damage to the

prosecution's case from undisclosed evidence that would impeach eyewitnesses "would not have

been confined to evidence of the eyewitnesses . . . but the thoroughness and even the good faith

of the [police] investigation, as well").  Counsel's failures undermine confidence in the outcome

of Mr. Goodwin's trial.

Likewise, because the jury that convicted Mr. Goodwin did not know about Detective

Pitts' extensive history of misconduct, Mr. Goodwin's trial was fundamentally unfair, in

violation of his due process rights.  For the reasons discussed herein with regard to the

ineffective assistance claim, this due process violation had a substantial and injurious effect on

the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

### 2.  The State Court's Decision

Mr. Goodwin raised his ineffective assistance claim during PCRA proceedings.  The

Superior Court quoted and adopted the PCRA court's opinion denying this claim:

> [Appellant] fails to demonstrate that such evidence is relevant and
> admissible.  Detective Pitts did not interview Cunningham, he did
> not record Cunningham's statement, nor did he testify at trial,
> precluding introduction on an impeachment basis.  If such
> evidence were offered to show that Pitts did in fact choke [other
> defendants], it would be precluded as inadmissible hearsay.
> Moreover, the Petitioner cannot demonstrate prejudice.  Trial
> counsel effectively and reasonably raised the issue.  Not only did
> Cunningham testify that Detective Pitts choked him, but trial
> counsel elicited further evidence of Pitts' abuse while cross-
> examining Cunningham, Detective Gaul, and Detective
> Verrecchio.  Trial counsel's examination permitted the jury to infer
> that Detective Pitts may have coerced Cunningham, but they found
> the Petitioner guilty regardless.

45

Super. Ct. Op. at 6 (alterations in original); *id.* at 7 ("[W]e agree with the PCRA court's cogent analysis."). The Superior Court also determined that "the PCRA judge in this case also presided over trial and was able to make factual findings and credibility determinations based on the existing record that Cunningham did not encounter Detective Pitts. . . . Thus, we discern no basis upon which to disturb its ruling." *Id.* at 7.

The Superior Court addressed the after-discovered evidence on its merits, denying relief on the stand-alone due process claim for the same reasons it gave for denying the ineffective assistance of trial counsel claim: "[G]iven the PCRA court's factual findings and determinations of credibility based on the existing record, this additional evidence does not warrant relief."). Super. Ct. Op. at 7 n.18.

These rulings do not bar habeas relief because they are based on unreasonable determinations of the facts in the state court record. The Superior Court's reliance on a purported conclusion that Mr. Cunningham did not *encounter* Detective Pitts is unreasonable. The PCRA court made no such factual finding or credibility determination. *See* PCRA Ct. Op. at 21-22 (discussing the claims related to Detective Pitts). Indeed, it could not have done so, as Detective Gaul testified that Detective Pitts either "definitely" or "very likely" had contact with Cunningham. NT 5/22/13 at 85-86. Only one other witness—Detective Verrecchio—was asked about Mr. Cunningham's contact with Detective Pitts, and he could not say whether there was or was not any contact between the men. *Id.* at 177-78. Thus, the Superior Court's finding that the two men did not encounter one another is unreasonable based on the record. Because Mr. Goodwin has overcome 28 U.S.C. § 2254(d), this Court's review is *de novo.*

46

Moreover, the state court's ruling that the evidence would not have been admissible for its truth or to impeach Detective Pitts, who did not testify, does not preclude habeas relief.  Mr. Goodwin did not claim that evidence of Detective Pitts' misconduct in other cases would have been admissible to impeach Detective Pitts himself; rather he claimed that it was admissible to impeach Detective Gaul's testimony that Detective Pitts' character made him unlikely to assault a witness.  Br. of Appellant, Aug. 25, 2017, at 18-19.  This would have been admissible under Rule 406 of the Pennsylvania Rules of Evidence: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or there was an eyewitness."  Pa. R. Ev. 406. The Superior Court did not rule on this question of state evidentiary law that Mr. Goodwin raised.  *See* Br. of Appellant, Aug. 25, 2017, at 19.   Its ruling that this evidence would have been inadmissible for different purposes does not foreclose relief.

## I.   Mr. Goodwin is entitled to relief from his convictions because of the prejudicial effects of the cumulative errors in this case.[17]

Each of the claims discussed above is an independent basis for relief from Mr. Goodwin's convictions.  However, should the Court find that Mr. Goodwin is not entitled to relief based on any single claim for failing to show prejudice, he is entitled to relief because the cumulative effect of the errors discussed above rendered Mr. Goodwin's trial fundamentally unfair, violating his right to due process.

---

[17] The claim was raised as Ground 13 of the *pro se* petition and Claim 7 of the amended petition.

47

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)).

The cumulative prejudice from trial counsel's errors requires a grant of habeas relief. Each of the above errors, taken alone, supports a reasonable probability of a different result and warrants a grant of habeas relief; viewed cumulatively, however, they bring into sharp focus the fact that Mr. Goodwin was deprived of his constitutional right to the effective assistance of counsel and denied due process. The circumstances of this case demonstrate that the cumulative effect of the constitutional errors so undermined the fairness of the trial that Mr. Goodwin's convictions must be overturned.

Mr. Goodwin raised a cumulative error claim during PCRA proceedings. The Superior Court noted that several of the individual claims had arguable merit but were denied on prejudice grounds. Super. Ct. Op. at 21. Nonetheless, it denied the cumulative error claim, writing,

> [W]e conclude that the combined effect of these issues did not undermine the reliability of the jury's verdict. As noted above, Respes unequivocally identified Appellant as the shooter in his prior statement to the police and at the preliminary hearing. Although Respes recanted his identification of Appellant at trial, he continued to suggest that the shooter "looked like" Appellant. Thus, Appellant's claim of cumulative error fails.

*Id.*

48

This ruling does not bar habeas relief because it is based on an unreasonable application of *Strickland* and an unreasonable determination of the facts in the state court record. It was unreasonable for the Superior Court to conclude that Mr. Respes' preliminary hearing testimony was unequivocal. At the preliminary hearing, Mr. Respes identified Mr. Goodwin as the shooter but then clarified that he could only see the shooter's beard. *See* NT 5/21/13 at 131-36. Additionally, it is unreasonable under *Strickland* to rely on Mr. Respes' identification in his statement to police, as that statement was inconsistent with Mr. Cunningham's statement to police and was undermined by Respes' later recantation.

The Superior Court's cumulative prejudice analysis also cannot bar habeas relief because, as discussed above with respect to each individual claim, the Superior Court failed to address several aspects of Mr. Goodwin's claims, and its rulings with regard to the remaining claims were based on unreasonable applications of law and unreasonable determinations of fact. Because the cumulative effect of the errors in this case rendered his trial fundamentally unfair, his conviction is a violation of his right to due process.

## AN EVIDENTIARY HEARING IS WARRANTED

To the extent that the Commonwealth disputes any of the proffered facts discussed herein and in Mr. Goodwin's *pro se* and amended petitions, an evidentiary hearing is warranted. A hearing is warranted because Mr. Goodwin has alleged facts that, if proven, would entitle him to relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). There is no bar to evidentiary hearings where a habeas petitioner was diligent in his attempt to develop a factual basis for his claim in the state court proceeding. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010) (citing cases).

49

Further, as discussed above with regard to Claim E, under *Martinez v. Ryan* the ineffective assistance of post-conviction counsel can constitute cause and prejudice to overcome the procedural default of a substantial ineffective assistance of trial counsel claim.  This Court may grant a hearing to address whether Mr. Jackson overcomes any procedural default through proof of cause and prejudice.  *Holloway v. Horn*, 355 F.3d 707, 716 (3d Cir. 2004) ("it is within a District Court's authority to grant a hearing on a petitioner's ability to establish cause to excuse a procedural default, and therefore [28 U.S.C.] § 2254(e)(2) is inapplicable to those hearings.") (citing *Cristin v. Brennan*, 281 F.3d 404, 412-13 (3d Cir. 2002)).  This Court may also grant a hearing on the underlying ineffective assistance of trial counsel claim.  *See Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 378 n.14 (3d Cir. 2018) ("an evidentiary hearing may be necessary to determine whether trial counsel was ineffective"); *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 764 (3d Cir. 2018) ("In a case with a less-developed factual record, a petitioner could qualify for the *Martinez* exception and possibly an evidentiary hearing even if he did not yet have enough evidence to prove prejudice under *Strickland*.").  An evidentiary hearing is appropriate in this case.

## CONCLUSION

For the reasons stated above and in Mr. Goodwin's *pro se* and amended habeas petitions, Mr. Goodwin respectfully requests that a writ of habeas corpus be granted and the Commonwealth of Pennsylvania be required to retry or release Mr. Goodwin.

50

Respectfully submitted,

*Arianna J. Freeman*
ARIANNA J. FREEMAN
Managing Attorney, Non-Capital Habeas Unit
Federal Community Defender Office
 for the Eastern District of Pennsylvania
601 Walnut Street, Suite 540 West
Philadelphia, PA  19106
(215) 928-1100

*Counsel for Petitioner Christopher Goodwin*

51

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing to be served on the following person via this Court's Electronic Case Filing system:  Assistant District Attorney Laura Zipin.


*Arianna J. Freeman*
ARIANNA J. FREEMAN


Date:   October 7, 2019