**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, et al., | : | No. 18-5269 |
| Respondents. | : | |

### RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Christopher Goodwin is serving a life sentence in a Pennsylvania state prison for the 2011 murder of Dwayne Isaacs. <u>Commonwealth v. Goodwin</u>, Docket No. CP-51-CR-0012214-2011. He now seeks federal habeas relief under 28 U.S.C. § 2254. Because Goodwin's claims are meritless, no relief is due.

### FACTUAL AND PROCEDURAL HISTORY

Shortly after midnight on June 25, 2011, Dwayne "Shank" Isaacs was shot and killed at the Wilson Park public housing development in South Philadelphia, in a small circular park near 27th and Jackson Streets. Philadelphia Police Detective John Verrecchio was assigned to the case, assisted by Detective Thomas Gaul. Based on anonymous tips, the detectives learned that several eyewitnesses, including Andre Cunningham, Aaron Respes, and Raheem Zachary, had been at the park when the murder occurred. N.T. 05/20/2013 at 105; N.T. 05/21/2013 at 47–49; N.T. 05/22/2013 at 53–56.

In July 2011, Cunningham was brought to the Homicide Unit, where he waited for about eighteen hours before Detectives Verrecchio and Gaul were able to interview him. In his written statement, Cunningham said that he saw Aaron Respes and Raheem Zachary sitting on a bench inside the park just before the shooting. Christopher "Gunna" Goodwin climbed over a fence into the park, approached Respes and Zachary, and asked them if they had any Xanax. "Then as Shank was walking down the pathway of the circle, Gunna shot him in the head. Shank dropped hard, and Gunna kept shooting and walking off as he was shooting." Cunningham identified a photograph of Goodwin and signed his statement. N.T. 05/20/2013 at 161–63, 167–88; N.T. 05/22/2013 at 17–19.

Respes gave a written police statement the next day, telling detectives that he had been at the park and witnessed the shooting: "It was crazy. Shank was just, like, walking, and Gunna just shot him as Shank was walking in the path toward Jackson Street." Respes said he had known Goodwin, who went by "Gunna" or "Chris," for five years, and identified him in a photograph. He added: "I am nervous about everyone knowing I told you Gunna killed Shank. A lot of people know. Just everyone nervous about telling you guys." Respes initialed each page and signed the attestation of adoption. N.T. 05/21/2013 at 116; N.T. 05/22/2013 at 32–42.

Zachary, who was also interviewed by police, refused to give a written statement. A police activity log associated with Zachary's oral statement indicated, in part, that Zachary told detectives that he was in the park at the time of the shooting but did not see the shooter. N.T. 05/22/2013 at 148–49, 181; Commonwealth v. Goodwin, 2018 WL 3153588, at *15 n.23 (Pa. Super. June 28, 2016).

Investigators also received information that Dwayne Isaacs was involved in a confrontation with Leroy "Kamac" Brown shortly before Isaacs's death. Kamac's son, Lekkir "Le-Le" Brown, had allegedly shot at Dwayne Isaacs's nephew, Rahsul Isaacs, in June 2011. A week later, an intruder, rumored to be Rahsul, broke into Le-Le's home and shot him in the face. Lisa Hall, Isaacs's sister, told detectives that Kamac had threatened Isaacs the day before the murder and warned him to "watch his back." Isaacs's girlfriend, Yvette Morris, told detectives on the day of the murder that "rumors on the street" were that Kamac shot Isaacs. Kamac later spoke with Detective Verrecchio on the phone but would not agree to give a signed statement. N.T. 05/21/2013 at 260–70; N.T. 05/22/2013 at 153–54, 170, 175, 198–200; Am. Pet., Ex. A; Goodwin, 2018 WL 3153588, at *5.

In August 2011, Goodwin was charged with Isaacs's murder and taken into custody. A preliminary hearing was set for later that month, but was relisted for October after Cunningham and Respes failed to appear. Detectives Verrecchio and Gaul served Respes with a bench warrant and brought him to court for the rescheduled hearing, at which Respes again identified Goodwin as the shooter. Although on cross-examination Respes said that he had been 30 yards away and "could just see the [shooter's] beard," he also affirmed that he was "sure" that Goodwin shot Isaacs. Detective Gaul later testified that Respes was terrified at the preliminary hearing, which had been "packed" with Wilson Park

residents, some of whom called Respes a snitch in the hallway afterwards.  N.T. 10/25/2011 at 6–30, 34; N.T. 05/22/2013 at 44–48.

Immediately after the preliminary hearing, Respes met with Tobi Downing, a relocation coordinator in the Philadelphia District Attorney's Office ("DAO"), and signed a form declining relocation assistance. Two days later, however, Respes called Downing and expressed fear about his situation. The next day, Downing met with Respes and his mother. Respes's mother accepted assistance for permanent relocation out of Wilson Park, and Respes was put up in a hotel while his mother looked for her new home. N.T. 05/21/2013 at 141–46, 202–07.

In June 2012, Cunningham gave a statement to a defense investigator, in which he recanted his prior identification of Goodwin. Cunningham told the defense investigator that he had made up the story after an officer, presumed to be Detective John Pitts, choked Cunningham before he spoke to Detectives Verrecchio and Gaul. N.T. 05/20/2013 at 231–35.

In May 2013, shortly before trial, Cunningham met with the prosecutor at her office. Detective Verrecchio was also present during portions of the meeting. At some point during this meeting, Cunningham allowed the prosecutor access to his Facebook account and showed her photographs of various Wilson Park residents, including Goodwin, Le-Le, and Respes. Cunningham also pointed out some people who had threatened Respes in regard to his testimony. The prosecutor printed several of the photographs and introduced them at trial. 05/20/2013 at 205–24; 05/22/2013 at 154–57, 214–17.

At trial, the prosecutor argued that Goodwin shot and killed the victim in retaliation for Isaacs's nephew Rahsul allegedly shooting Kamac's son Le-Le during a home invasion. In support, the Commonwealth called the victim's sister, Lisa Hall, who testified that Dwayne told her about an argument he had with Kamac shortly before the murder. Dwayne told Hall that he was "leery about going out to the project[s] because of what [Kamac] had said to him and the young guys that [were] out there." N.T. 05/20/2013 at 44–48; 05/21/2013 at 263.

When Cunningham took the stand, he recanted his identification of Goodwin, testifying that he had not witnessed the shooting. Despite saying in his police statement that he was not under the

influence, had been treated well, and had not been threatened or promised anything, Cunningham
testified that he had been high during the interview and that the detectives had harassed him and
threatened charges. He also reasserted the allegation against Detective Pitts. Cunningham claimed not
to recall identifying Goodwin as the shooter, although he conceded that he had signed and initialed
the statement. N.T. 05/20/2013 at 155–95, 266–69; 05/21/2013 at 6–8.

The prosecutor questioned Cunningham about their pretrial meeting and the process by which
she had obtained the Facebook photographs. She asked Cunningham about statements he purportedly
made during that meeting, including comments about threats against Respes. When Cunningham
agreed that they had discussed the murder in her office, the prosecutor continued: "And you told me
everything that you saw, and what you told me was consistent with this statement; right?" Cunningham
disputed her account, denying that he had seen the shooting or willingly pulled up the Facebook
photos. N.T. 05/20/2013 at 206–10.

Respes testified that he was about 30 yards away from the circle when Isaacs was shot and "saw
Shank and somebody that looked to be Gunna" holding up a gun. Respes said that he had known
Goodwin for five years, saw him "[a]lmost every day" around the neighborhood, and was on decent
terms with him. When asked about his police statement, Respes testified that he told detectives that
he was unsure who the shooter was, but eventually "told them what they wanted me to say" after they
threatened to charge him with conspiracy to commit murder. Respes denied receiving any threats
related to his testimony or seeking relocation for himself, although he conceded that his mother had
received relocation assistance. The Commonwealth admitted Cunningham's and Respes's police
statements as substantive evidence. 05/21/2013 at 86–95, 101–04.

Lisa Hall, the victim's sister, testified that she had spoken with Isaacs hours before he was shot
and killed. Isaacs had told Hall about his recent argument with Kamac about Rahsul supposedly
shooting Kamac's son Le-Le during a break-in. When Isaacs asked Kamac how Le-Le was doing,
Kamac responded, "Why would you ask me how my son [is] doing? Your effing nephew did it." Hall
testified that Isaacs told her that he was "leery about going out to the project[s] because of what Leroy
had said to him and the young guys that was [sic] out there." N.T. 05/21/2013 at 260–70.

Goodwin presented alibi witness Anara Brown, who was Kamac's niece and Le-Le's cousin, and considered Goodwin to be like family. Brown testified that Goodwin was with her and ten other people at the time of the murder, although she was able to name only a few of the others. In her closing argument, the prosecutor contended that Brown was not a credible witness based on Brown's personal bias and the unexplained gaps in her account. 05/22/2013 at 238–49, 277–78; N.T. 05/28/2013 at 79–84.

Defense counsel's closing argument emphasized that Cunningham's and Respes's police statements should not be credited. Counsel also challenged the adequacy of the investigation, arguing that detectives rushed to implicate Goodwin despite Kamac being a more likely suspect. N.T. 05/28/2013 at 17–51.

On May 28, 2013, a jury sitting before the Honorable Barbara A. McDermott of the Philadelphia Court of Common Pleas convicted Goodwin of first-degree murder, carrying a firearm in Philadelphia, and possessing an instrument of crime. He was sentenced to a mandatory term of life in prison without parole. The Pennsylvania Superior Court affirmed Goodwin's judgment of sentence on July 14, 2014, and the Pennsylvania Supreme Court denied allowance of appeal on January 21, 2015.

On June 15, 2015, Goodwin filed a pro se petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S. § 9541 et seq, alleging that trial counsel was ineffective for a number of reasons. After court-appointed PCRA counsel filed a no-merit letter, the PCRA court dismissed Goodwin's petition on October 24, 2016. The Superior Court affirmed the dismissal on June 28, 2018, and the Pennsylvania Supreme Court denied allowance of appeal on January 8, 2019.

Meanwhile, on December 2, 2018, Goodwin filed a pro se federal habeas petition. Pro Se Pet. (ECF doc. 2). Court-appointed counsel filed an amended petition in May 2019, see Am. Pet. (ECF doc. 23), and a memorandum of law in October 2019, see Petr. Br. (ECF doc. 34). Goodwin argues that trial counsel was ineffective for failing to: (1) object to testimony that allegedly violated the Confrontation Clause; (2) object to Detective Verrecchio's testimony regarding Goodwin's drug use and information about a murder weapon; (3) object to Lisa Hall's hearsay testimony; (4) object to the prosecutor's questioning of Andre Cunningham; (5) object to evidence of witness intimidation; (6)

5

impeach Detective Gaul when he testified that Kamac was never a suspect; (7) object to the prosecutor's closing argument; and (8) investigate and present evidence about Detective Pitts's misconduct in other cases. He also argues that (9) he is entitled to relief because of the cumulative effect of these alleged errors.

**APPLICABLE LEGAL STANDARDS**

### I.  Deferential Merits Review

If the state courts have adjudicated a constitutional claim on the merits, a federal habeas court may not grant relief unless the state court decision: (1) was "contrary to, or involved an unreasonable application of," clearly established Supreme Court law; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented" in state court. 28 U.S.C. § 2254(d). Additionally, state-court factual findings are presumed correct, and a petitioner has the burden of rebutting this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision unreasonably applies the law if the state court correctly identifies the governing legal principle but applies it to the facts in an objectively unreasonable way. Id. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Harrington v. Richter, 562 U.S. 86, 102 (2011). Unless a state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," it is entitled to deference. Id. at 103.

Clearly established federal law refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003). These legal principles are found in "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." Williams, 529 U.S. at 412. When the Court's "cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonabl[y] appli[ed] clearly established

6

federal law." <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (per curiam) (quotation marks and citations omitted).

Even if a petitioner establishes that the state court's decision was unreasonable, "that showing alone would not entitle him to habeas corpus relief because he also must show that his confinement violates the Constitution, laws, or treaties of the United States." <u>Mitchell v. Superintendent Dallas SCI</u>, 902 F.3d 156, 164 (3d Cir. 2018) (citing 28 U.S.C. § 2254(a)). Federal habeas courts "hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." <u>Smith v. Phillips</u>, 455 U.S. 209, 221 (1982). State-law errors "cannot be repackaged as federal errors simply by citing the Due Process Clause," <u>Johnson v. Rosemeyer</u>, 117 F.3d 104, 110 (3d Cir. 1997), and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991). Moreover, a habeas petitioner who shows that his constitutional rights were violated is entitled to relief only if the error "had substantial and injurious effect" on the outcome of his trial. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (citation omitted).

## II.  Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a petitioner must show: (1) deficiency, meaning counsel's representation "fell below an objective standard of reasonableness"; and (2) prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 687, 694. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id.</u> at 690; <u>see also</u> <u>Harrington</u>, 562 U.S. at 105 ("the standard for judging counsel's representation is a most deferential one," even under de novo review). Additionally, an attorney "cannot be deemed ineffective for failing to raise a meritless claim." <u>Werts v. Vaughn</u>, 228 F.3d 178, 202 (3d Cir. 2000).

If the state courts have denied an ineffectiveness claim on the merits, a federal habeas court must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney

the benefit of the doubt." <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011)). Even if the state courts address only the deficiency prong of <u>Strickland</u>, the question on habeas review "is not whether a finding of no prejudice would have been incorrect, it is whether such a decision would have been unreasonable, which is 'a substantially higher threshold.'" <u>Tyson v. Superintendent Houtzdale SCI</u>, 976 F.3d 382, 396–97 (3d Cir. 2020) (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009)).

<u>ARGUMENT</u>

### I.  Confrontation Clause

Goodwin argues that trial counsel was ineffective for failing to object to evidence that allegedly violated Goodwin's Confrontation Clause rights. Petr. Br. at 3–10.

The Confrontation Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This guarantee generally bars the admission at trial of testimonial hearsay unless the declarant is present at trial and available for cross-examination, or the declarant is unavailable and the defendant had a prior opportunity for cross-examination. <u>Crawford v. Washington</u>, 541 U.S. 36, 51, 69 (2004); <u>Davis v. Washington</u>, 547 U.S. 813, 823 (2006). An out-of-court statement, therefore, is prohibited "only if it is admitted for its truth." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1152 (2016) (per curiam); <u>see also United States v. Christie</u>, 624 F.3d 558, 569 (3d Cir. 2010) (conclusion that testimony was properly introduced for non-hearsay purpose is "fatal" to Confrontation Clause claim because testimonial statements are not barred unless used to establish the truth of the matter asserted).

#### A.  Testimony about anonymous tips

At trial, Detective Gaul testified that his investigation was shaped in part by anonymous tips that helped police ascertain the shooter's identity and possible motive. N.T. 05/22/2013 at 50–52. When asked to elaborate about the information the police received, Detective Gaul responded: "Just anonymous tips coming into the Homicide Unit . . . people would call and say, Look, I know who did

that shooting out there. They wouldn't say how they know who did it, but they would supply a name or nickname. And all the consistent tips were Gunna. That's what we had at first." Id. at 69.

Detective Verrecchio echoed this point: "Information was being received. I know that people did not want to come forward with the information and be documented on it. The anonymous tips, I'm sure there was because I heard the name Gunna right away." Id. at 166. Gaul also testified that because everyone at Wilson Park knew each other, the case was never a "whodunit," id. at 13, 35, a point the prosecutor repeated in her closing argument, see N.T. 05/28/2013 at 52–55.

Following this testimony, the trial court cautioned the jury that testimony about anonymous tips could be considered only for a narrow purpose:

> **THE COURT:** Members of the jury . . . I'm telling you, this morning you heard a lot of testimony about information from anonymous sources and what things normally happen.
>
> * * *
>
> And I just want to let you know that you will get more specific instructions on that later because, generally speaking, what other people said isn't before you for the truth of the matter. That's why we have the witnesses come to court and testify. But right now, for instance, with the detectives, part of what's going on is there's a question about what they did or why they did something and not other things. So some of that comes in for that purpose only and not for the truth of the matters.
>
> So about the rumors, we have trials. We don't convict people on rumors. That's why we have trials and we have live witnesses. By live witnesses, I mean people that come in and testify in front of you.

N.T. 05/22/2013 at 173–74.

This point was reiterated in the court's closing charge to the jury:

> **THE COURT:** Now, you heard throughout the course of this trial testimony about rumors and anonymous tips to suggest that the defendant was the perpetrator in the murder of Mr. Isaacs.
>
> Now, as I told you when you heard that testimony, this evidence is not offered for the truth of the matter but is before you for a limited purpose, that is, for the purpose of explaining the investigative steps taken by the police. This evidence must not be considered by you in any way other than for the purpose for which I have stated it.
>
> In other words, you may not regard this evidence as tending to show that the defendant is a person of bad character or criminal tendencies or that, in fact, he is guilty of this crime because there were rumors in the neighborhood and/or anonymous tips.

N.T. 05/28/2013 at 111–12.

The Superior Court rejected Goodwin's claim that the testimony about anonymous tips violated the Confrontation Clause because "the information contained in the anonymous tips were not admitted for the truth of the matter contained in the tips," and therefore was not hearsay. Moreover, the court explained, "the trial court's careful instructions belie [Goodwin's] assertions that he suffered prejudice as a result from the remarks that the tips identified him as the shooter." Goodwin, 2018 WL 3153588, at *14. This was a reasonable determination that warrants deference. See Woods, 136 S. Ct. at 1152 (fairminded jurist could find that anonymous tip was not admitted for its truth, even though tip and its contents were repeatedly referenced); Blueford v. Arkansas, 566 U.S. 599, 606 (2012) (juries are presumed to follow their instructions).

### B.  Testimony about Raheem Zachary

Detective Gaul testified that Raheem Zachary, who did not appear at trial, had "supplied information" but "refused to go on paper." N.T. 05/22/2013 at 72–73. Detective Verrecchio later testified that Zachary had corroborated Cunningham's police statement when he told police "he was in the circle with him." Id. at 181. Goodwin argues that these references improperly bolstered Cunningham's statement, and also implied to the jury that Zachary had identified Goodwin as the shooter. Petr. Br. at 9.

The Superior Court rejected Goodwin's claim that trial counsel was ineffective for eliciting prejudicial hearsay about Zachary and then failing to object to that testimony. Detective Gaul's testimony, the court explained, was not hearsay because Gaul did not mention the contents of Zachary's oral statement to police. Although Detective Verrecchio did testify about a portion of Zachary's statement, Goodwin was not prejudiced: "Even assuming that trial counsel should have stricken or otherwise challenged the detective's testimony, the passing reference to Zachary's statement was not so inflammatory that the jury could not fairly decide [Goodwin's] guilt or innocence in this case." The court determined that Goodwin's "boilerplate contention that the jury could have concluded that Zachary implicated [Goodwin] is too speculative to warrant relief," noting that Zachary, rather than placing Goodwin at the murder scene, asserted that he did not even see the

shooter. Moreover, "although Detective Verrecchio's unsolicited testimony could be read to corroborate Cunningham's testimony, the jury also had Respes' prior statement identifying [Goodwin] as the shooter." Goodwin, 2018 WL 3153588, at *15, *15 n.23, *21.

Goodwin argues that it was unreasonable for the Superior Court to rely on Respes's statement because Respes recanted his identification at trial. Petr. Br. at 10. This contention is baseless. A prior inconsistent statement is not inherently unreliable. See California v. Green, 399 U.S. 149, 163 n.15 (1970) (suggesting that, although due process considerations "might prevent convictions where a reliable evidentiary basis is totally lacking," prior inconsistent statements do not automatically raise this concern); Commonwealth v. Brown, 52 A.3d 1139, 1171 (Pa. 2012) ("Prior inconsistent statements, which meet the requirements for admissibility under Pennsylvania law, must, therefore, be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction."); Ford v. Superintendent, SCI – Frackville, 2013 WL 5457801 (E.D. Pa. Sept. 19, 2013) (counsel was not ineffective for failing to object to conviction based on unsworn statements that were admissible under state law because no Supreme Court case prohibits a conviction that relies on prior inconsistent statements); Kelly v. Wenerowicz, 2016 WL 4386083 (E.D. Pa. Aug. 16, 2016) (Commonwealth's case properly rested on out-of-court statement by declarant who was cross-examined at preliminary hearing but unavailable at trial). See also Holland v. United States, 348 U.S. 121, 137 (1954) (circumstantial evidence "is intrinsically no different from testimonial evidence").

Moreover, there was abundant evidence corroborating the reliability of Respes's prior identification of Goodwin as the shooter. Respes had known Goodwin for years, saw him nearly every day, and had no prior dispute with him. Respes signed and adopted his police statement, verifying that his account was true and that no one had coerced him. He expressed reluctance to testify because he was afraid to have people find out that he had cooperated with police. After Respes failed to appear at the preliminary hearing, he had to be physically brought in to testify. Although he maintained at the hearing that he was "sure" Goodwin was the shooter, Respes was visibly terrified. In the courtroom hallway, he was accused of being a snitch, and Cunningham told detectives that Respes had received

11

a number of threats. Shortly after the preliminary hearing, Respes contacted the DAO to secure relocation assistance for himself and his mother. At trial, Respes did not recant his identification completely, instead saying that he was uncertain but had seen someone who looked like Goodwin. See N.T. 05/21/2013 at 86–95, 101–04, 202–07; N.T. 05/22/2013 at 32–42, 46–48, 154–57, 214–17.

The totality of these circumstances indicate that Respes's police statement was the true account of what occurred, and that he later changed his story due to a well-founded fear of retaliation. Respes's identification amply demonstrated Goodwin's guilt. See Tibbs v. Florida, 457 U.S. 31, 45 n.21 (1982) (if jury believed single eyewitness, evidence "was more than sufficient to satisfy due process"). The Superior Court's adjudication was reasonable and is entitled to deference. See Harrington, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.").

## II. Detective Verrecchio's Testimony About Xanax and the Murder Weapon

Goodwin argues that counsel was ineffective for failing to object to Detective Verrecchio's testimony that Goodwin used Xanax, and that police had obtained information about the murder weapon. Petr. Br. at 11–16.

### A. Comment regarding Goodwin's alleged Xanax usage

At trial, defense counsel questioned Detective Verrecchio about the quality of the investigation and the credibility of Cunningham's police statement. Verrecchio testified that there was "a lot of corroboration in the interview," including Goodwin's name and nickname, the park layout, and the location of the murder. N.T. 05/22/2013 at 177–83. As the cross-examination continued, Verrecchio stated that Goodwin's Xanax usage was another point of corroboration:

> **VERRECCHIO**: Gunna stopped first and was talking to two boys who were sitting on the bench. We've identified them as Raheem and Aaron. He was asking them if they had any

Xannies. We know he uses Xannies.

**COUNSEL**: Who do you know uses Xannies?

**VERRECCHIO**: Gunna, your client.

**COUNSEL**: Oh, did he tell you that?

**VERRECCHIO**: Yes.

**COUNSEL**: When did he tell you that?

**VERRECCHIO**: When he was arrested.

N.T. 05/22/2013 at 183. Counsel continued to question Verrecchio about Goodwin's alleged use of Xanax, emphasizing that the detective did not document Goodwin's statement in any reports. Id. at 183–84.

The trial court called a recess and convened a sidebar conference. Outside of the jury's presence, defense counsel indicated that he had spoken with Goodwin many times and was "almost positive" that Goodwin had not admitted to any drug use. Id. at 188–89. Detective Verrecchio explained that Goodwin had mentioned Xanax casually after Verrecchio told him why he was being questioned: "It was more like, I didn't kill nobody. I just do my Xannies. I ain't sweating this." Id. at 193. After further discussion, defense counsel requested that Verrecchio's testimony about Xanax be stricken. Id. at 194. The trial court granted the motion and issued the following jury instruction:

> **THE COURT:** [M]embers of the jury, before lunch, you may have heard a comment about the defendant allegedly made that he, in fact, uses Xannies.
>
> That comment is stricken from the record, so if anyone wrote it down, you have to strike it because you treat it as if it was never said.

Id. at 198.

Goodwin claims that counsel was ineffective because he failed to move for a mistrial after Verrecchio's Xanax testimony. Petr. Br. at 13. The Superior Court rejected this claim, explaining that, "in light of the trial court's striking the offending testimony and issuing a limiting instruction, we discern no basis to conclude that the trial court would have granted such a motion." Goodwin, 2018 WL 3153588, at *18. Moreover, Goodwin could not show prejudice because "even if the reference to [Goodwin's] use of 'Xannies' improperly bolstered Cunningham's statement identifying [Goodwin] as

the shooter, the jury was still entitled to credit Respes' prior statement." Id.

The Superior Court's application of Strickland was reasonable and its decision is entitled to deference. The jury was told to disregard Verrecchio's statement, and juries are presumed to follow their instructions. See Blueford, 566 U.S. at 606. Additionally, as explained above, Respes's statement alone supported a guilty verdict, and there is no reasonable probability that the trial outcome would have been different if counsel had moved for a mistrial.

### B.  Comment about a murder weapon

When defense counsel pressed Verrecchio about his decision not to seek a search warrant for Goodwin's home at the time of his arrest a month after the shooting, the detective made a brief comment about a weapon:

> COUNSEL: But let me ask you this. You wouldn't know whether there was a gun present or not unless you looked; right?
>
> In this case, this case, you wouldn't know whether the defendant is dumb enough to leave a gun someplace unless you look; right?
>
> VERRECCHIO: There was information that came to light about a weapon.

N.T. 05/22/2013 at 231. After a sidebar discussion, Verrecchio clarified to the jury that the murder weapon was never found and no efforts were made to locate it. Id. at 231, 235.

Goodwin argues that trial counsel was ineffective for failing to move to strike and move for a mistrial after Verrecchio testified that information "came to light about a weapon." Petr. Br. at 14. The Superior Court rejected this claim:

> With respect to [Goodwin's] challenge to Detective Verrecchio's testimony that he received information about "a weapon," the record establishes that Detective Verrecchio mistakenly believed that [Goodwin] had been charged with possessing a firearm between the murder of Decedent and the time of his arrest. However, [Goodwin] was charged with possession of a firearm well before the murder. Even assuming that trial counsel should have moved to strike Detective Verrecchio's testimony, [Goodwin] cannot establish prejudice as trial counsel subsequently elicited the detective's concession that a murder weapon in this case was not found. Thus, we discern no basis upon which to conclude that this passing reference resulted in prejudice.

<u>Goodwin</u>, 2018 WL 3153588, at *16 (footnote and citation omitted). Given that Detective Verreccio's brief comment was too vague for the jury to draw any particular inculpatory conclusions, and that any such misapprehension was immediately corrected, the Superior Court's decision was reasonable.

### III. Lisa Hall's Testimony

Goodwin argues that counsel was ineffective for failing to object to Lisa Hall's testimony about her phone conversation with the victim, as well as the prosecutor's argument based on that testimony. Petr. Br. at 16–21.

At trial, Hall testified that she had spoken on the phone with her brother, Dwayne Isaacs, hours before he was shot and killed. N.T. 05/21/2013 at 260. Hall explained that Kamac's son Le-Le had been shot in a home invasion the day before, and "rumor had it that Rahsul did it." <u>Id.</u> at 261.

> **PROSECUTOR**: Based upon that going on, when you talked to your brother on Saturday at 10:30, did you say anything to him?
>
> **HALL**: Yes.
>
> **PROSECUTOR**: What did you say?
>
> **HALL**: We just had a general conversation. I was asking him how he was doing, what was he doing. So he told me he was ready to go out to the projects. So I asked him then, I said, Why are you going out to the projects? I said, Let some of this stuff die down before you go out to the projects.
>
> * * *
>
> **PROSECUTOR**: What did he say?
>
> **HALL**: He told me that—they call Leroy Brown Kamac, and he told me that him and Kamac got into an argument because he had asked Kamac how was his son doing. And Kamac's response was, Why would you ask me how my son doing? Your effing nephew did it. And my brother said—he just flagged him and walked away.
>
> **PROSECUTOR**: So Dwayne knew that people thought Rahsul did it; right?
>
> **HALL**: Yes.
>
> **PROSECUTOR**: Did Dwayne ever express to you that he was afraid based upon that for himself?
>
> **HALL**: He told me that he was kind of leery about going out to the project[s] because of what Leroy had said to him and the young guys that was out there.

N.T. 05/21/2013 at 262–63.

15

The prosecutor's theory of the case was that Isaacs had been killed in retaliation for the break-in for which his nephew was rumored to be responsible. N.T. 05/20/2013 at 46–48. In her closing argument, the prosecutor referred to Hall's statements to support this theory, explaining that "what Dwayne told his sister Lisa was that not only was he afraid of Kamac, but the young boys in the neighborhood, because remember Le-Le is 20, a young boy. Rahsul, same thing, a young boy. The defendant. They are the young boys." N.T. 05/28/2013 at 55.

The Superior Court determined that, although the statements regarding Dwayne's fear might have been inadmissible hearsay, Goodwin failed to show that he was prejudiced by counsel's failure to object. First, the court noted that Dwayne's statements about Kamac "did not directly implicate [Goodwin] in any prior bad acts or wrongdoing." Moreover, the fact that Kamac had confronted Dwayne about Le-Le being shot "was undisputed and was essential to the defense's theory that Kamac had a greater motive" than Goodwin. "Under these circumstances," the court explained, "we cannot conclude that the error in admitting Decedent's statement resulted in a reasonable probability that the outcome at trial would have been different." Goodwin, 2018 WL 3153588, at *8.

This ruling was consistent with federal law and should be given deference in federal court. Whether it was stated on the stand or in closing argument, there is no reasonable likelihood that the trial outcome was affected by a passing mention that Dwayne was wary of some unspecified young men in the projects.

### IV. Direct Examination of Andre Cunningham

Goodwin argues that counsel was ineffective for failing to object to "the portion of the prosecutor's examination of Mr. Cunningham during which the prosecutor argued with the witness, effectively providing her own testimony regarding events that were not properly admissible." Petr. Br. at 21–25.

Cunningham met with the prosecutor at her office before trial. At some point during the meeting, Cunningham logged into Facebook, pulled up some photographs, and identified the subjects as various Wilson Park residents, some of whom had threatened Respes. The prosecutor printed copies

of those pictures, which were later marked as exhibits and published to the jury. Detective Verrecchio, who had been in and out of the prosecutor's office during this time, testified that Cunningham had been "very cooperative and very forthcoming" at the meeting. N.T. 05/22/2013 at 154–55.

When the prosecutor questioned Cunningham about the meeting at trial, however, he described a less cooperative interaction:

> **PROSECUTOR**: And when you were in my office, do you remember talking with me in front of Detective Verrecchio?
>
> **CUNNINGHAM**: Yeah. He was asking me why I didn't come to court and stuff.
>
> **PROSECUTOR**: And we also went over what happened the night of the murder; right?
>
> **CUNNINGHAM**: Yes.
>
> **PROSECUTOR**: And you told me everything that you saw, and what you told me was consistent with this statement; right?
>
> **CUNNINGHAM**: No. I told you that I was on Taney Terrace.
>
> **PROSECUTOR**: Are you telling me that in my office with Detective Verrecchio you didn't tell me how this defendant committed this murder?
>
> **CUNNINGHAM**: I told you I was on Taney Terrace.
>
> **PROSECUTOR**: You're not answering my question.
>
> **CUNNINGHAM**: You never said nothing about that. You said, What happened? And I told you I was on Taney Terrace. And then you started going into the statement and stuff, and that was about it.
>
> **PROSECUTOR**: Actually, I never showed you your statement when you were there.
>
> **CUNNINGHAM**: You didn't show me the statement. You started talking about it.
>
> **PROSECUTOR**: I asked you what happened, and you told me that the defendant, Gunna, committed the shooting and you saw it; right?
>
> **CUNNINGHAM**: I did not say that.
>
> **PROSECUTOR**: You didn't say that?
>
> **CUNNINGHAM**: No.
>
> **PROSECUTOR**: Well, you sat down, in fact, at my computer and started printing out Facebook pictures of everyone, didn't you?
>
> **CUNNINGHAM**: No. You went on my Facebook.
>
> **THE COURT**: She went on your Facebook?
>
> **CUNNINGHAM**: Yes. She asked me to log in. And I logged in for her, and she went on my Facebook.
>
> **THE COURT**: Was there a detective there?
>
> **CUNNINGHAM**: He was in and out. He was in and out.
>
> **THE COURT**: Okay. Go ahead.

* * *

**PROSECUTOR**: All right. Well, let me ask you this: You have a Facebook page?

**CUNNINGHAM**: Yes.

**PROSECUTOR**: Is there a password for your Facebook page?

**CUNNINGHAM**: Yes.

**PROSECUTOR**: And on last Thursday, after you repeated the whole murder that you witnessed, you said, I'll even show you some pictures of everyone on Facebook, and you showed them to me, didn't you?

**CUNNINGHAM**: No. I gave you my password. You went through it, and I was sitting in the chair. And that's when you offered to buy me soup.

**PROSECUTOR**: To buy you soup?

**CUNNINGHAM**: Yes.

**PROSECUTOR**: Are you saying that you only gave me Facebook pictures because I bought you soup?

**CUNNINGHAM**: No.

**PROSECUTOR**: You didn't eat all night overnight, did you?

**CUNNINGHAM**: I didn't eat since I was locked up.

**PROSECUTOR**: You told me that your stomach hurt and you didn't want to eat; right?

**CUNNINGHAM**: I told you I was cool. You kept offering to buy me soup. You said you was going to go get it.

**PROSECUTOR**: All right. Am I supposed to let you starve in my office?

**CUNNINGHAM**: No.

N.T. 05/20/2013 at 206–08.

On PCRA appeal, the Superior Court declined to decide whether the prosecutor's questioning was improper, instead rejecting the claim based on lack of prejudice:

> Even if trial counsel could have objected to the manner of the prosecutor's questioning of Cunningham, the exchange did not affect a fair consideration of Respes' prior statements identifying [Goodwin] as the shooter. Therefore, under the totality of the circumstances of this case, [Goodwin] has failed to demonstrate that there was a reasonable possibility that the jury would have found [Goodwin] not guilty had trial counsel objected to this exchange."

Goodwin, 2018 WL 3153588, at *12. This was a reasonable application of Strickland. Respes's identification to police was compelling evidence of Goodwin's guilt, and additional undermining of Cunningham's credibility would not have changed that. Because there was no reasonable probability that the outcome would have been different had counsel objected to this line of questioning, the Superior Court's adjudication is entitled to deference.

### V.  Witness Intimidation Evidence

Goodwin argues that counsel was ineffective for failing to object to testimony and argument related to threats against witnesses. Petr. Br. at 25–34.

In her opening statement, the prosecutor asserted that eyewitnesses Cunningham and Respes had provided truthful police statements in which they identified Goodwin as the shooter. Nonetheless, she explained, both men might testify otherwise at trial due to their fear of retaliation. N.T. 05/20/2013 at 48–53. To show the jury why Cunningham and Respes were fearful enough to change their stories on the stand, the prosecutor adduced a variety of evidence.

Detective Gaul testified that threats and retaliation against witnesses were a common problem, explaining that he had seen "multiple witnesses killed as a result of testifying." N.T. 05/22/2013 at 144–45. Gaul also testified that the preliminary hearing had been "packed" with Wilson Park residents, and that Respes "was literally shaking like a leaf." Id. at 46. He stated that after Respes testified at the preliminary hearing, Gaul and Respes were walking through the crowded courthouse hallway, where people were "yelling at [Respes], you know, snitch, things of that nature. And we're just trying to get him through the crowd and get him over the District Attorney's Office, but he was visibly shaken by what was going on." Id. at 48.

Tobi Downing testified that two days after Respes declined DAO relocation assistance services, he called Downing and "express[ed] that he was fearful." Respes's mother eventually accepted assistance in moving out of the neighborhood, and Respes received temporary assistance so he could stay in a hotel while his mother looked for long-term housing. On cross-examination, Downing briefly read aloud from the prosecutor's relocation referral memo, before the court cut her off. N.T. 05/21/2013 at 200–12.

Lisa Hall testified that almost everyone in the courtroom was there in support of Goodwin, N.T. 05/21/2013 at 267, and Respes identified some of Goodwin's friends and family who were present, id. at 146–51. The prosecutor then suggested in her closing argument that the mere presence of the Wilson Park residents served to intimidate the eyewitnesses. N.T. 05/28/2013 at 57–58.

In its charge to the jury, the trial court issued a cautionary instruction about witness intimidation evidence:

> **THE COURT:** You also heard evidence throughout the course of this trial about alleged intimidation and/or threats. I want to point out to you that the only specific evidence that you had in this case was that someone shouted out after the preliminary hearing as Mr. Respes was walking down the hall, called him a name, and I believe it was a snitch.
>
> Now, first of all, there's no evidence that that was done on the defendant's behalf or clearly it was not done by the defendant. But this evidence is before you for, once again, a limited purpose, and that is that the evidence of the calling out of the name and any other evidence concerning possible intimidation or about any of the witnesses in this case, this evidence is before you for a limited purpose, and that is for the purpose of helping you in assessing the credibility of Mr. Cunningham and Mr. Respes.
>
> It must not be considered by you in any way other than the purpose for which I stated. It's one factor that you use when you determine the credibility and weight of each of the witnesses.

N.T. 05/28/2013 at 112–13.

Goodwin argues that, "[h]ad defense counsel lodged proper objections to the hearsay testimony from Ms. Downing, Detective Gaul's testimony about witnesses getting killed, and the improper arguments from the prosecutor, there is a reasonable probability that the outcome of Mr. Goodwin's trial would have been different." Petr. Br. at 31–32. The Superior Court rejected this claim:

> Although a variety of threat evidence was presented at trial and referred to by the Commonwealth, the evidence was admitted to explain Cunningham's and Respes' recantations of their statements to the police. See Commonwealth v. Ragan, 645 A.2d 811, 824 (Pa. 1994) (indicating that where the purpose of introducing threat evidence is not to establish guilt, but to explain a prior inconsistent statement, it is a permissible use). Indeed, the trial court issued a cautionary instruction to this effect and clearly stated that the only purpose of the evidence of threats against Cunningham and Respes was for assessing the credibility of their trial testimony. N.T. Trial, 5/28/13, at 113; see Commonwealth v. Mason, 130 A.3d 601, 673 (Pa. 2015) (reiterating that "[j]uries are presumed to follow such instructions"). Thus, we discern no basis to disturb the PCRA court's ruling that the threats evidence was admissible and that trial counsel had no basis to object.

Goodwin, 2018 WL 3153588, at *9 (footnote omitted).

The evidence was admissible under state law, a determination that cannot be revisited in federal court. See Estelle, 502 U.S. at 67–68. The trial court provided an accurate cautionary instruction, and jurors are presumed to follow the law that they are given. Blueford, 566 U.S. at 606. In the absence of deficient performance or prejudice, it was reasonable for the Superior Court to reject Goodwin's claim that counsel ineffectively failed to object to the witness intimidation evidence.

## VI. Evidence Implicating Kamac

Goodwin argues that counsel was ineffective for failing to impeach Detective Gaul with evidence that contradicted Gaul's claim that Kamac's name "never came up" as a suspect. Petr. Br. at 34–37.

Dwayne Isaacs's nephew was rumored to have shot Kamac's son Le-Le the day before Isaacs was killed. Isaacs's girlfriend, Yvette Morris, told detectives on the day of the murder that "rumors on the street" were that Kamac had shot Isaacs. See Am. Pet., Ex. A; Goodwin, 2018 WL 3153588, at *5. At trial, counsel questioned Detective Gaul about Kamac's role in the murder and the investigation:

> COUNSEL: Do you know of any significance of Kamac to this case?
>
> GAUL: I believe Kamac was related to one of the parties in this case. I could be wrong, but I believe he was related to one of the parties in this case.
>
> COUNSEL: Okay. Was he investigated?
>
> GAUL: As far as being involved?
>
> COUNSEL: Being involved in the shooting of Mr. Isaacs.
>
> GAUL: He might have been attempted to be located or at some point some detective might have tried to locate him and talk with him, but as far as him being a shooter, is that what you mean?
>
> COUNSEL: Yeah.
>
> GAUL: No, sir, that never came up.
>
> COUNSEL: So nobody investigated him as being the shooter?
>
> GAUL: Well, the shooting was investigated. I don't want to say nobody investigated him as a shooter. The whole shooting was investigated, and a person of interest was identified.
>
> COUNSEL: Well, did you have information that the sister of Mr. Isaacs had indicated that Mr. Isaacs told him he had an altercation with Mr. Brown shortly before he was killed? Did you know that?
>
> GAUL: That could have been within the investigation. I'm not sure. Now, there was two Mr. Isaacs. You're referring to the one that shot, alleged, that was the rumor in the neighborhood.
>
> COUNSEL: I'm talking about Mr. Dwayne Isaacs having an altercation with Kamac shortly before he was killed. Do you think that might be important to look into?
>
> GAUL: Like I said, the investigation is through a process and through steps. There are persons of interest that come up. The one thing that was consistent with this investigation was that Christopher Goodwin, also known as Gunna, was responsible for the shooting.
>
> Now, as far as what steps were taken as far as who was cleared and other names that come up, I wouldn't know that.

N.T. 05/22/2013 at 113–14. Counsel continued to press Gaul about evidence that pointed to Kamac, suggesting that Kamac's motive was stronger than Goodwin's and that he should have been investigated more thoroughly. Id. at 115–16. Counsel also cross-examined Detective Verrecchio about

Kamac. Verrechio testified that he had attempted to locate Kamac because "his name had come up as part of the investigation" on the night of the murder. Verrecchio had phone conversations with Kamac, but they never spoke in person. Id. at 198–200.

Goodwin argues that, had trial counsel used Morris's statement to impeach Detective Gaul, "the defense theory that police ignored information that Kamac was the shooter and inappropriately focused all their attention on Mr. Goodwin" would have been strengthened. Petr. Br. at 36. The Superior Court rejected this claim, finding that Morris's statement was inadmissible and that Goodwin "fail[ed] to establish any prejudice resulting from trial counsel's failure to confront Detective Gaul with evidence that there were rumors that Kamac shot Decedent, where trial counsel cross-examined the detective about Kamac's stronger motive to kill Decedent." Goodwin, 2018 WL 3153588, at *19.

There is no reasonable likelihood that confronting Detective Gaul with Morris's statement would have changed the trial outcome. Gaul testified that he "wouldn't know" what steps had been taken to investigate and clear every potential suspect. A statement that briefly mentioned a rumor about Kamac would hardly discredit all of Detective Gaul's testimony. Moreover, the jury already heard Verrecchio testify that Kamac's name had come up on the night of the murder. Given the lack of deficient performance or prejudice, it was reasonable for the state courts to reject this claim.

VII.    **Prosecution's Closing Argument**

Goodwin argues that counsel was ineffective for failing to object to the prosecutor's closing argument, which he alleges shifted the burden of proof and improperly expressed personal views about the credibility of Goodwin's alibi witness. Petr. Br. at 38–41.

A prosecutor's comments violate the federal Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Id. (quotation marks and citation omitted). "[B]ecause the Darden standard is a very general one, [this] leav[es] courts more leeway . . . in reaching

outcomes in case-by-case determinations[.]" <u>Parker v. Matthews</u>, 567 U.S. 37, 45 (2012) (quotation marks and citation omitted).

At trial, counsel called alibi witness Anara Brown, who testified that Goodwin was with her and several other people when the shooting occurred. N.T. 05/22/2013 at 241–53. On cross-examination and in her closing argument, the prosecutor attempted to cast doubts on Brown's credibility:

> **PROSECUTOR**: I want to address the fact that the defense called a lying alibi witnesses [sic]. As it's been said many, many times, the defense has absolutely no burden of proof. They can sit there and do nothing but question our witnesses. They have no burden of proof. It's all on me.
>
> But the second he decides to call a witness and put on evidence, you get to evaluate that evidence just like any other evidence.
>
> Think about who they put on the stand for alibi. Le-Le's cousin, Anara Brown. Le-Le's cousin, Anara Brown, who was also home during the home invasion, who admits that although the defendant isn't blood, he's like family. She's in this up to her ears.
>
> Yeah, she might get on that stand and be like, oh, well, why would I want to know who did this? Come on. You're saying that you're home for a home invasion in the house where you live where you're supposed to feel safe, and people come in there and they shoot your cousin, and you're not going to want to know who did it?
>
> From the second she got up there, she was lying. You better believe she wanted to know who came into her house, and everyone assumed it was Rahsul.
>
> * * *
>
> Come on. She wasn't being honest from the second she got up there. She was lying for the defendant because the defendant avenged her cousin being shot.
>
> * * *
>
> But one thing is for sure. [Goodwin] was not with her at the time that the murder happened. There is no way that that is true. Look at what she did. If you had proof that someone who is accused of murder was with you at the time and there were other people out there, you're just going to sit on that for all that time? There is no way you would sit on that.
>
> * * *
>
> Defense counsel mentioned someone stuttering on the stand. Only one person stuttered on that stand, and that was Anara Brown when I asked her, Name those ten people that were out there with you. She couldn't do it. She couldn't name them. She was caught off guard. She names her best friend, Natika Hawkins. She names the defendant, someone by the nickname Dooler, and someone by the nickname Black. Well, that's four people.
>
> She can't name them because no one else was out there and she was caught off guard and she was lying. That is not the way someone who is [a] legit alibi behaves. And she seems intelligent. She knows that all these things are important, and if they were true, then come in here and show us.

> Once he decides to put that on the stand, you can evaluate that because where is Natika if she was really out there? Where is this Dooler if he was really out there? Where is this Black? Everybody knows each other. You can get these people in. They're not here because it's not true.

N.T. 05/28/2013 at 79–84.

These statements were not improper, much less so prejudicial as to infect the trial with unfairness. As the Superior Court noted, although a prosecutor may not express her personal belief about a witness's credibility, she is permitted to comment on that credibility, and may also "respond to defense arguments with logical force and vigor." Goodwin, 2018 WL 3153588, at *20 (quoting Commonwealth v. Chmiel, 889 A.2d 501, 544 (Pa. 2005)). Here, the prosecutor's challenged comments "were simply her argument regarding the credibility of certain witnesses and the credibility of [Goodwin's] alibi defense." Id. Moreover, because "trial counsel had made Detectives Gaul and Verrecchio out to be liars, . . . the Commonwealth's argument concerning credibility is a logical and vigorous response." Id. (citing N.T. 05/28/2013 at 23, 25–26, 32–33, 41, 44–45, 79–81). The court also found that "[t]he prosecutor's comment that [Goodwin's] associates Natika Hawkins, Dooler, and Black were not at trial is a logical attack on alibi witness [Anara] Brown's credibility, not an impermissible shifting of the burden of proof." Id. (quoting 10/24/2018 PCRA Ct. Op. at 18).

The Superior Court's determination was reasonable. "[T]here is nothing improper about a prosecutor 'attempt[ing] to focus the jury's attention on holes in the defense's theory.' . . . 'Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or improperly suggests that the defendant has the burden of producing evidence.'" United States v. Lore, 430 F.3d 190, 213 (3d Cir. 2005) (quoting United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996)); see also United States v. Rivas, 493 F.3d 131, 139 (3d Cir. 2007) ("attacks on the opposing advocate's arguments and tactics are acceptable, and indeed . . . attacking and exposing flaws in one's opponent's arguments is a major purpose of closing argument").

Although Goodwin seizes on the prosecutor's use of the word "fact," this single semantic choice does not somehow undermine an entire permissible closing argument. See Fahy v. Horn, 516 F.3d

169, 204 (3d Cir. 2008) ("While the prosecutor's conclusory use of the word 'lies' was unfortunate, it did not infect the proceedings with unfairness.").

Additionally, the trial court instructed the jurors that the attorneys' statements in closing arguments were not evidence, and that the credibility of each witness was solely for their determination. N.T. 05/28/2013 at 7, 99, 105. "A jury is presumed to follow its instructions." Blueford, 566 U.S. at 606. Because the prosecutor's comments were not improper, trial counsel could not be ineffective for failing to object. Werts, 228 F.3d at 202; see also Tyson, 976 F.3d at 396–97 (where state court denied ineffectiveness claim on performance grounds without assessing prejudice, "[t]he question is not whether a finding of no prejudice would have been incorrect, it is whether such a decision would have been unreasonable, which is 'a substantially higher threshold'") (quoting Knowles, 556 U.S. at 123).

## VIII.   Evidence of Detective Pitts's Conduct in Other Cases

Goodwin argues that counsel was ineffective for failing to investigate and present available evidence about Detective Pitts's actions in other cases, and also asserts that this evidence supports a stand-alone due process violation. Petr. Br. at 42–47.

In his police statement, Andre Cunningham said that he had witnessed the murder and that Goodwin was the shooter. Later, however, Cunningham gave a statement to a defense investigator in which he recanted the identification, claiming that he cooperated with police only after being threatened and assaulted by a detective presumed to be James Pitts. At trial, Cunningham testified that he had been high during his police interview, had not been truthful, and did not recall giving some of the answers. He also reasserted his allegation against Detective Pitts. Defense counsel cross-examined Cunningham about Detective Pitts's alleged misconduct, but did not introduce any evidence of other cases with similar allegations.

The state courts rejected Goodwin's claim that counsel was ineffective for failing to present this additional evidence, finding that such evidence would not have been admissible:

> [Goodwin] alleges that trial counsel failed to introduce corroborating evidence tending to
> prove that Detective James Pitts threatened and choked Cunningham in order to elicit a

statement. Cunningham testified that Pitts choked him in both direct and cross-examination. [Goodwin] claims that two homicide cases . . . were dismissed because witnesses were choked by Detective Pitts. [Goodwin] argues that trial counsel was unaware of these cases, and had he brought them up, [Goodwin] would have been acquitted.

[Goodwin] fails to demonstrate that such evidence is relevant and admissible. Detective Pitts did not interview Cunningham, he did not record Cunningham's statement, nor did he testify at trial, precluding introduction on an impeachment basis. If such evidence were offered to show that Pitts did in fact choke [other defendants], it would be precluded as inadmissible hearsay. Moreover, [Goodwin] cannot demonstrate prejudice. Trial counsel effectively and reasonably raised the issue. Not only did Cunningham testify that Detective Pitts choked him, but trial counsel elicited further evidence of Pitts' abuse while cross-examining Cunningham, Detective Gaul, and Detective Verrecchio. Trial counsel's examination permitted the jury to infer that Detective Pitts may have coerced Cunningham, but they found the [Goodwin] guilty regardless.

10/24/2016 PCRA Ct. Op. at 22.

The Superior Court "agree[d] with the PCRA court's cogent analysis," noting that "the PCRA judge in this case also presided over trial and was able to make factual findings and credibility determinations based on the existing record that Cunningham did not encounter Detective Pitts." Goodwin, 2018 WL 3153588, at *7. The state courts' interpretation of state evidentiary law cannot be disturbed on habeas review. See Estelle, 502 U.S. at 67–68; Johnson, 117 F.3d at 110. Because such evidence would not have been admissible, counsel cannot be deemed ineffective for not making a futile attempt to introduce it. Werts, 228 F.3d at 202.

Moreover, there is no reasonable likelihood that evidence of Pitts's conduct in other cases would have changed the outcome. Even if the jury completely discredited Cunningham's police statement, substantial evidence suggested that Respes's identification was credible and compelling enough to convince the jury of Goodwin's guilt. See supra, claim I.B. Detective Pitts was not assigned to Goodwin's case and did not conduct Cunningham's interview. Inadmissible evidence about his behavior in completely unrelated cases would not have caused the jury to reject Respes's identification. Absent deficiency or prejudice, the Superior Court was reasonable to reject this claim.

## IX. Cumulative Prejudice

Finally, Goodwin argues that he is entitled to relief based on the cumulative effect of the alleged errors in this case. Petr. Br. at 47–49.

Although cumulative errors can provide grounds for habeas relief, it is well settled that "a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." Collins v. Sec'y of Pa. Dept. of Corr., 742 F.3d 528, 542 (3d Cir. 2014) (quoting Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008)). Here, the Superior Court concluded that, because Goodwin failed to establish prejudice on his individual issues, "the combined effect of these issues did not undermine the reliability of the jury's verdict." Goodwin, 2018 WL 3153588, at *21. The court continued: "As noted above, Respes unequivocally identified [Goodwin] as the shooter in his prior statement to police and at the preliminary hearing. Although Respes recanted his identification of [Goodwin] at trial, he continued to suggest that the shooter 'looked like' Goodwin. Thus, [Goodwin's] claim of cumulative error fails." Id. This reasonable determination is entitled to deference.

## CONCLUSION

Respondents respectfully request that the petition for a writ of habeas corpus be dismissed with prejudice and without a hearing.

Respectfully submitted,

/s/ Laura Zipin
LAURA ZIPIN
Assistant District Attorney

/s/ Max C. Kaufman
MAX C. KAUFMAN
Supervisor, Federal Litigation Unit

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | CIVIL ACTION |
|     Petitioner, | : | |
| | : | |
|     v. | : | |
| | : | |
| JOHN E. WETZEL, et al., | : | No. 18-5269 |
|     Respondents. | : | |

## <u>CERTIFICATE OF SERVICE</u>

    I, Laura Zipin, certify that on February 2, 2021, a copy of this filing was served via the Court's ECF system on counsel for Petitioner:

        Arianna J. Freeman
        Managing Attorney, Non-Capital Habeas Unit
        Federal Community Defender Office for the Eastern District of PA
        601 Walnut Street, Suite 540 West
        Philadelphia, PA 19106
        (215) 928-1100

                                  <u>/s/ Laura Zipin</u>
                                    Laura Zipin
                                    Assistant District Attorney
                                    Federal Litigation Unit
                                    Philadelphia District Attorney's Office
                                    Three South Penn Square
                                    Philadelphia, PA 19107
                                    (215) 686-5748