IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, *et al.*, | : | NO. 18-5269 |
| Respondents. | : | |


RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS


Petitioner, Christopher Goodwin, is a Pennsylvania state prisoner currently serving a sentence of life imprisonment for first-degree murder and related charges. Before this Court are his *pro se* petition for writ of habeas corpus (ECF 2), his counseled amended petition for writ of habeas corpus (ECF 23), and his second amendment and supplement to his petition (ECF 67). Across these filings he raises a total of ten claims. After careful review of the record, Respondents conclude that Mr. Goodwin is entitled to habeas relief on one of his claims. Supplemented Claim H alleges that the Commonwealth violated *Brady v. Maryland* and its progeny by failing to disclose evidence of Detective James Pitts's misconduct. An investigating grand jury has recently concluded that "Detective Pitts habitually used coercive interrogations techniques when interviewing suspects and witnesses in the Homicide Unit

of the Philadelphia Police Department, and lied under oath to conceal his criminal acts." *See* Attachment A ¶ 131. The existence of complaints of misconduct against Detective Pitts has been known by the Philadelphia Police Department since as early as 2002. *See* Attachment B ¶ 116. In this case, the Commonwealth's proof rested on two statements given to detectives that were recanted at trial, and one of the recanting witnesses accused Pitts of intimidating and choking him during his interrogation. Thus, had Goodwin's attorney known that Pitts had sustained findings of misconduct, it is reasonably probable that the outcome of the trial would have been different. Respondents agree that the Commonwealth violated its *Brady* obligations by withholding information it possessed regarding Pitts's misconduct.[1] Because this claim has merit, Mr. Goodwin is entitled to habeas relief in the form of an order granting his release unless retried within 180 days.

---

[1] In the interests of judicial economy, Respondents only address the *Brady* violations regarding Pitts's misconduct alleged in Claim H. Mr. Goodwin is entitled to complete relief on this portion of this claim alone, and the disposition of this claim will moot the remainder of Mr. Goodwin's claims. Should the Court wish to hear from Respondents regarding Petitioner's remaining claims, Respondents respectfully request the opportunity to supplement this response.

# I.      FACTUAL AND PROCEDURAL HISTORY

## A. Introduction

Dwayne Isaacs was shot and killed just after midnight on June 26, 2011 at a park in the Wilson Park housing project in Philadelphia. N.T. 20/5/13 at 152.

The Commonwealth's theory at trial was that the murder of Mr. Isaacs was a revenge killing. The day before the victim's murder, Lekirr Brown had been shot in the head during a home invasion. Rumors around the Wilson Park housing project were that Rahsul Isaacs, the victim's nephew, was the perpetrator. Mr. Goodwin was friends with Lekirr Brown, and since Rahsul Isaacs had fled the area, Mr. Goodwin allegedly killed Rahsul's uncle to avenge his friend. N.T. 5/20/13 at 46–48.

The Commonwealth's prosecution was supported by two pretrial witness statements, one signed by Andre Cunningham and one signed by Aaron Respes. There were no forensics or other evidence connecting Mr. Goodwin to the crime. In the statements, Mr. Cunningham and Mr. Respes identified Mr. Goodwin as the shooter. Both witnesses recanted their statements at trial, each testifying that detectives coerced their signatures with threats and/or physical violence. Detectives Thomas Gaul and John Verrecchio testified that neither they nor a third detective, Detective James

Pitts, engaged in any threatening or violent behavior. The prosecution acknowledged in both opening and closing statements that the jury's decision, therefore, came down to a credibility battle between the witnesses' trial testimony and the detectives' description of how the witness statements were obtained. N.T. 5/20/13 at 57; N.T. 5/28/13 at 54, 58, 85–86.

The defense argued that the prosecution's motive evidence was weak because Mr. Goodwin was only connected to Lekirr Brown as a friend, and in fact, the day of the murder Lekirr Brown's father, Leroy "Kamac" Brown, had angrily confronted the victim about the victim's nephew being involved in his son's shooting. A few hours prior to the murder, the victim had spoken to his sister and told her that he was leery of going out that night because of what Mr. Brown had said to him. The defense's closing focused heavily on pointing the finger at "bad, bad Leroy Brown." N.T. 5/28/13 at 24, 35, 45, 50. The defense also presented an alibi witness, Anara Brown, who testified that Mr. Goodwin was with her a few blocks from where the victim was killed when the shooting occurred. When shots rang out, Ms. Brown and Mr. Goodwin were sitting next to each other on a friend's front steps on Jackson Street. N.T. 5/21/13 at 263; N.T. 5/22/13 at 241, 248–49; N.T. 5/28/13 at 18, 24.

**B.  The testimony of Andre Cunningham, the first recanting witness**

Andre Cunningham testified at trial that he was a few blocks away from where the shooting occurred when six or seven shots rang out. When he heard the shots, he ran and saw Mr. Goodwin sitting on a set of front steps on Jackson Street with the alibi witness, Anara Brown. N.T. 5/20/13 at 153–55, 246.

Mr. Cunningham testified that, one evening several weeks after the shooting, on July 20, police picked him up and took him to homicide where he was placed in a locked interview room for approximately 18 hours. Mr. Cunningham testified that various detectives came in and out of the room, including Detective Gaul, and threatened that if he did not give them a statement identifying Mr. Goodwin as the perpetrator, they would not let him leave and they would charge him (that is, Mr. Cunningham) with murder. He testified that he repeatedly told police that he had not seen the shooting. Mr. Cunningham also testified that a Black detective meeting Detective Pitts's description,[2] slammed books down next to his head to

---

[2] Mr. Cunningham described the detective as a "dark-skinned guy who got this thing on the back of his head." N.T. 5/20/13 at 233. Detective Gaul later testified that Detective Pitts meets this description. N.T. 5/22/13 at 85 (Detective Gaul agreed that Detective Pitts is a "Black detective" with "a little abnormality behind the back of his neck"). The prosecution did not dispute that Mr. Goodwin came into contact with Detective Pitts.

wake him up, intimidated him by aggressively pulling his chair close to Mr. Cunningham's, told him to stop playing when Mr. Cunningham denied seeing the murder, and choked him. According to Mr. Cunningham, Detective Pitts was the only detective in the room when this conduct occurred. After 18 hours in custody overnight, Mr. Cunningham signed a statement taken by Detectives Gaul and Verrecchio. N.T. 5/20/13 at 157, 171, 178, 179, 265; N.T. 5/21/13 at 7–8, 12.

In the statement, read to the jury, Mr. Cunningham stated that he had been in a local speakeasy the night of the shooting and had seen Mr. Goodwin there. When he left the speakeasy, he saw Mr. Goodwin ahead of him on the street. He saw Mr. Goodwin hop a fence and walk into the park, and, after asking Aaron Respes and another man if they had any Xanax, Mr. Goodwin shot Dwayne Isaacs multiple times as Mr. Isaacs walked past. The statement indicated that Mr. Cunningham identified a photograph of Mr. Goodwin. N.T. 5/22/13 at 18–19.

Mr. Cunningham testified at trial that, once he was out of police custody, he felt remorse for "basically l[ying] on an innocent man." N.T. 5/20/2013 at 233. He went to Mr. Goodwin's mother prior to trial to see what he could do to make amends, and ultimately, he gave a statement to a

defense investigator regarding the above-described police misconduct. N.T. 5/20/13 at 195, 233, 238; N.T. 5/21/13 at 15–16.

### C.  The testimony of Aaron Respes, the second recanting witness

Aaron Respes testified that he was walking by the park in the Wilson Park housing project when he heard a gunshot. He looked over his shoulder for a second and saw someone who "looked to be" Mr. Goodwin shooting the victim. N.T. 5/21/13 at 86. He explained that the shooter looked like Mr. Goodwin in that the shooter was a black male with a beard.[3] N.T. 5/21/13 at 103-104. He said he could not be sure Mr. Goodwin was the shooter because he was too far away. N.T. 5/21/13 at 86, 103, 160.

Mr. Respes testified that he was picked up for questioning by detectives on July 21, 2011 and was held in a locked interview room for approximately twelve hours. Mr. Respes testified that he asked to leave, and he was told that he could not. Mr. Respes testified that he told detectives that he could not be sure who the shooter was, but they would periodically come in and out of the interview room and say that, if he did not sign a statement identifying Mr. Goodwin, they would charge *him* with murder and take him to jail, and he would never see his mother again. Mr. Respes testified

---

[3] Both Mr. Goodwin and the alternative suspect, Leroy "Kamac" Brown, were black men with beards. *See infra* pp. 4 (discussing Brown).

that Detective Gaul was the primary detective who conducted this questioning. N.T. 5/21/13 at 93, 98, 100, 101, 102, 168, 170.

In the written statement taken by Detective Gaul and another detective, which was read to the jury, Mr. Respes told police that the victim was walking by, and Mr. Goodwin shot him. After the first shot, Mr. Respes ran away and he heard more shots as he ran. Mr. Respes did not describe anyone other than the shooter and the victim in the park during the shooting. Mr. Respes identified a photograph of Mr. Goodwin. N.T. 5/22/13 at 37–39.

Mr. Respes testified at the preliminary hearing. At that hearing, he initially identified Mr. Goodwin as the shooter. On cross-examination, however, he testified that he could not be sure that Mr. Goodwin was the shooter because he was only able to see that the shooter, like Mr. Goodwin, had a beard. N.T. 5/21/13 at 132, 134.

At trial, Mr. Respes testified that he was nervous to testify at the preliminary hearing because police had forced him to identify someone he was not sure about. He testified that prior to the preliminary hearing, the police told him that if he did not testify consistently with his statement, they would lock him up.  N.T. 5/21/13 at 179, 180.

**D.  Detective Thomas Gaul's Testimony**

Detective Thomas Gaul testified that he was not the assigned detective; Detective Verrecchio was. However, Detective Gaul took both Mr. Cunningham's and Mr. Respes' statements; Detective Verrecchio only participated in taking Mr. Cunningham's statement. N.T. 5/22/13 at 6, 152.

Detective Gaul testified "it was never, like, a question as to whodunit. It was just a matter of [Mr. Cunningham] having the courage to help us and put his information on paper and sign it, which is, in a lot of cases, is the problem." N.T. 5/22/13 at 13. Detective Gaul testified that Mr. Cunningham never denied seeing the shooting; the only discussion during his interrogation was whether Mr. Cunningham was willing to sign a statement inculpating Mr. Goodwin. N.T. 5/22/13 at 100.

Detective Gaul testified that even though he wanted to get a written statement from Mr. Cunningham, he did not threaten him or tell him that he could not go home until he gave a statement. N.T. 5/22/13 at 14, 15. Detective Gaul testified that he seeks to build a positive "rapport" with witnesses in order to encourage them to sign a written statement. N.T. 5/22/13 at 33–34, 81–82.

Detective Gaul acknowledged that Detective Pitts had contact with Mr. Cunningham during his interrogation because he was on the same squad

9

and was working that day. N.T. 5/22/13 at 85. Detective Gaul testified that Detective Pitts would never have choked Mr. Cunningham, however, because "I know Detective Pitts. Detective Pitts is a well-respected detective within our squad" and a "very experienced detective" and therefore he would not do such a thing. N.T. 5/22/13 at 86. He continued that Detective Pitts "understands just as much as anybody being sympathetic towards what a person is going through." N.T. 5/22/13 at 86.

As to Mr. Respes's statement, Detective Gaul testified that Mr. Respes never told him that he was not sure about his identification. Detective Gaul testified that he did not threaten to charge Mr. Respes with murder or otherwise coerce him to sign the statement. N.T. 5/22/13 at 34, 35, 36.

Detective Gaul testified that the two interrogations each took over 12 hours because "sometimes it takes a significant amount of time, and that's what happened in this case." N.T. 5/22/13 at 82–83.

Detective Gaul testified that both Mr. Cunningham and Mr. Respes recanted their police statements, not because they had been coerced into signing false statements, but because they were afraid of Mr. Goodwin and his supporters in court. N.T. 5/22/13 at 14, 43–44, 46.

### E.  Detective John Verrecchio's Testimony

Detective Verrecchio testified that he was the detective assigned to investigate Dwayne Isaacs's murder. He was present for Mr. Cunningham's statement but not for Mr. Respes's. He testified that detectives did not threaten Mr. Cunningham and that Mr. Cunningham never complained of anyone choking him. Detective Verrecchio testified that he did attempt to interview Leroy "Kamac" Brown but that Mr. Brown refused to give a written statement. N.T. 5/22/13 at 151–53.

### F.  Conviction, Sentencing and Appellate Proceedings

The jury found Mr. Goodwin guilty of first-degree murder and related firearms offenses. The court sentenced Mr. Goodwin to the mandatory penalty of life imprisonment. N.T. 5/28/13 at 151–52.

The only issues raised by Mr. Goodwin's appointed direct appeal counsel, David Rudenstein, were sufficiency and weight of the evidence. The Superior Court affirmed the convictions. *Commonwealth v. Goodwin*, 105 A.3d 789 (Pa. Super. Ct. 2014). The Supreme Court of Pennsylvania denied a petition for allowance of appeal. *Commonwealth v. Goodwin*, 108 A.3d 34 (Pa. 2015).

Mr. Goodwin filed a timely *pro se* PCRA petition alleging numerous claims of ineffective assistance of counsel. The *Brady* claim discussed below

11

was not raised in this PCRA petition. Appointed PCRA counsel, James F. Berardinelli, filed a "no merit" letter with the court asking to withdraw from the case. Judge McDermott issued an opinion denying the PCRA petition and allowing Berardinelli to withdraw. *Goodwin v. Wetzel, et al.*, Civil No. 18–5269, ECF Doc. 2 at 50–72. Mr. Goodwin took a timely *pro se* appeal to the Superior Court, and that court affirmed the denial of the PCRA petition. *Commonwealth v. Goodwin*, 2018 WL 3153588 (Pa. Super. Ct. June 28, 2018). Mr. Goodwin did not pursue a petition for allowance of appeal to the Supreme Court of Pennsylvania.

Mr. Goodwin filed a timely *pro se* petition for habeas corpus with this Court. ECF Doc. 2. The Federal Community Defender's Office was appointed to represent Mr. Goodwin on January 15, 2019. Mr. Goodwin filed an amended petition and a memorandum of law. ECF 23, 34. In his memorandum, Mr. Goodwin pursued nine claims for relief, labeled Claims A–I:

A. Trial counsel was ineffective for failing to object to, and for himself eliciting, inculpatory evidence that violated Mr. Goodwin's rights under the confrontation clause.

B. Trial counsel was ineffective for eliciting prejudicial testimony of Detective Verrecchio and for failing to properly object and seek a mistrial.

12

C.  Trial counsel was ineffective for failing to object to the inadmissible hearsay testimony from the decedent's sister, Lisa Hall, and the prosecutor's argument based on that testimony.

D.  Trial counsel was ineffective for failing to object to the prosecutor's improper and prejudicial examination of Andre Cunningham.

E.  Trial counsel was ineffective for failing to object to improper testimony and argument about alleged threats against witnesses.

F.  Trial counsel was ineffective for failing to impeach Detective Thomas Gaul with evidence that contradicted Detective Gaul's claim that Kamac's name "never came up" as the suspected shooter.

G.  Trial counsel was ineffective for failing to object to the prosecutor's closing argument that unconstitutionally shifted the burden of proof to the defense and that included the prosecutor's personal opinion that the alibi witness was lying.

H.  Trial counsel was ineffective for failing to investigate and present available evidence about Detective James Pitts's misconduct in this case, and Mr. Goodwin's due process rights were violated.

I.  Mr. Goodwin is entitled to relief from his conviction because of the prejudicial effects of the cumulative errors in this case.

Claim H argued that trial counsel was ineffective for failing to discover misconduct alleged against Detective Pitts in *Commonwealth v. Amin Speakes* and *Commonwealth v. Unique Drayton*. ECF 34 at 43. Those homicide cases resulted in a not guilty verdict and a dismissal, respectively, in part due to misconduct by Detective Pitts. Petitioner's memorandum of law withdrew "the portion of this claim that asserted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959)." ECF at 42, n. 15. This ineffectiveness claim had been raised in Mr. Goodwin's *pro se* PCRA

petition before the state courts. Thus, no *Brady* claim regarding Pitts's misconduct was raised before the state courts.

On February 2, 2021, the Commonwealth filed a response. ECF 53. In that response, the Commonwealth argued for all of the claims that either the state court's decision was not unreasonable or Mr. Goodwin had failed to establish prejudice.

On December 7, 2021, the Commonwealth provided documents in response to Petitioner's request for information related to Detective Pitts's misconduct. The Commonwealth provided Petitioner's counsel with a letter dated December 7, 2021, stating that Detective Pitts has been transferred to the Delaware Valley Intelligence Center pending the outcome of an internal police department investigation. Additionally, the Commonwealth provided 263 pages of documents concerning misconduct alleged against Detective Pitts. The Commonwealth had not previously disclosed any of these materials to Mr. Goodwin prior to his conviction becoming final.

Following these disclosures, on December 7, 2021 Mr. Goodwin filed a second amendment and supplement to his petition for writ of habeas corpus. ECF 67. In that supplement, Mr. Goodwin amended Claim H, alleging that "[t]he Commonwealth violated its due process duties under

*Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny by failing to disclose to Mr. Goodwin evidence of Detective Pitts' misconduct in three dozen other cases." ECF 67 at 11.

On February 28, 2022, the Honorable Mia R. Perez, Supervising Judge of the Thirty-First County Investigating Grand Jury, accepted the Grand Jury's Presentment ("Presentment") recommending that the District Attorney charge Detective Pitts with two counts of perjury (F3) and three counts of obstructing administration of law (M2) for an allegedly violent interrogation of Obina Onyiah in 2010 and false trial testimony regarding that interrogation in 2013. *See* Attachment A.

In the Presentment, the Grand Jury found "that Detective Pitts made false statements on October 28, 2002, during an official investigation by [Internal Affairs], and did so in an effort to cover-up the fact that he illegally assaulted his wife." Attachment A ¶ 129. The Grand Jury additionally "reject[ed] Lieutenant#1's opinion that Detective Pitts was a good detective and skilled interrogator." Attachment A ¶ 130. "Instead, the Grand Jury finds that while acting in his official capacity Detective Pitts habitually used coercive interrogations techniques when interviewing suspects and witnesses in the Homicide Unit of the Philadelphia Police Department, and

lied under oath to conceal his criminal acts." Attachment A ¶ 131.  The charges against Detective Pitts remain pending.

As detailed below, Respondents are obliged to concede that the Commonwealth violated its *Brady* obligations with regard to Pitts's misconduct, and thus Mr. Goodwin is entitled to habeas relief on claim H.

## II.    DISCUSSION

### A. The merits of Mr. Goodwin's claim is properly before this Court and should be reviewed *de novo*.

Mr. Goodwin's conviction resulted, in part, from the Commonwealth's *Brady* violations. Even though the prosecution knew prior to trial, based upon a statement Mr. Cunningham gave to a defense investigator, that Mr. Cunningham alleged being choked by a "black detective" (6/3/12 Cunningham Statement at 2), the Commonwealth did not disclose any information regarding any alleged misconduct committed by Detective Pitts. Moreover, it was made clear at trial that the detective at issue was Detective Pitts. At no time during trial or during the pendency of direct appeal, when a remand remained available, did the Commonwealth disclose any allegations of misconduct against Detective Pitts, even though there were substantiated allegations of misconduct against Detective Pitts going back as far as 2002.

Because Mr. Goodwin's failure to raise these claims before the state courts is due to the Commonwealth not honoring its *Brady* obligations, they abandon and affirmatively waive any procedural defenses that might otherwise prevent this Court from ruling on the merits of claim H. Respondents agree that relief is warranted on this claim and that a new trial should be granted.

**1)  Petitioner's claim is unexhausted.**

Habeas petitioners are required to "fairly present" claims to state courts in order to give the states a meaningful opportunity to pass upon and correct violations of federal constitutional rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995), *citing Picard v. Connor*, 404 U.S. 270, 275 (1971); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition"). This requirement both "expresses mutual respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions" and "properly acknowledges that state courts, no less than federal courts, are bound to safeguard the constitutional rights of state criminal defendants." *Landano v. Rafferty*, 897 F.2d 661, 668 (3d Cir. 1990).

Mr. Goodwin first discovered the basis for the *Brady* claim discussed here in December of 2021 when the Commonwealth disclosed 263 pages of documents to Mr. Goodwin's counsel regarding Detective Pitts. The grand jury did not unseal its presentment until February of 2022. Thus, Mr. Goodwin could raise these claims before the Pennsylvania Court of Common Pleas in a serial PCRA petition alleging governmental interference and/or newly discovered facts. *See* 42 Pa.C.S. § 9545(b)(1)(i) and (ii).

Therefore, Mr. Goodwin's *Brady* claims are unexhausted.

**2) Respondents affirmatively waive their exhaustion defense to the claim Respondents addresses below.**

Lack of exhaustion does not deprive a federal court of jurisdiction over a claim; rather, it is an affirmative defense for the government to raise, and consequently, one that it can waive. 28 U.S.C. § 2254(b)(3) (state may expressly waive exhaustion).[4] In light of the government's ability to waive this defense, it is incumbent upon prosecutors to seriously consider whether and to what extent the reliance on this procedural bar advances

---

[4] "A court is not at liberty … to bypass, override, or excuse a State's deliberate waiver" of affirmative defenses. *Wood v. Milyard*, 566 U.S. 463, 466 (2012) (reversing rejection of a claim as untimely where the state knowingly and intentionally waived the defense).

justice. Certainly, the principles of federalism, comity, and finality that animate procedural default are important considerations in that analysis. But they are not the only considerations. *See* Explanatory Comment 1, Pa. R. Prof. Conduct 3.8 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). Where, as here, a review of a challenged judgment discloses serious constitutional violations, the prosecutors are "obligat[ed] to see that [Petitioner] is accorded procedural justice[.]" *Id.*; *see also* AMERICAN BAR ASSOCIATION, *Criminal Justice Standards for the Prosecution Function*, Standard 3-8.5 (4th Ed. 2017) ("The prosecutor need not . . . invoke every possible defense to a collateral attack, and should consider potential negotiated dispositions or other remedies if the prosecutor and the prosecutor's office reasonably conclude that the interests of justice are thereby served.").

After thorough review, Respondents conclude that Mr. Goodwin's rights have been violated and Mr. Goodwin's failure to previously raise this *Brady* claim was due to the Commonwealth's failure to disclose the relevant *Brady* material until after the conclusion of his PCRA proceedings. Accordingly, in order to facilitate review and correction of the constitutional errors in this case, Respondents do not assert and

affirmatively waive any procedural bars that would otherwise bar consideration of the merits of Petitioner's claim H.[5]

**B. Petitioner is entitled to relief on his *Brady* claim involving Detective Pitts.**

Respondents agree and concede that Petitioner's claim H warrants habeas relief. In claim H, Mr. Goodwin argues that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose misconduct alleged against Detective Pitts. The Commonwealth is constrained to agree.

**1) The Commonwealth has a duty to disclose favorable evidence to the defense pursuant to *Brady v. Maryland*.**

The Commonwealth has an obligation to disclose to the defense information that is favorable to guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963). This obligation requires that the Commonwealth disclose information that is exculpatory as well as impeaching. *Smith v. Cain*, 565 U.S. 73 (2012).

---

[5] Because Petitioner's claims were not addressed by the state courts, the limitation on relief of 28 U.S.C. § 2254(d) is inapplicable; the claims addressed here should be reviewed de novo. *See, e.g., Cone v. Bell*, 556 U.S. 449, 472 (2009) (de novo review where state courts did not reach merits of claim); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (de novo review where state courts did not reach prejudice prong under *Strickland v. Washington*, 466 U.S. 668 (1984)); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (same).

Detective Pitts's Internal Affairs ("IA") file contains witness statements, and conclusions of the Philadelphia Police Department's ("PPD") own internal command structure finding that Detective Pitts abused his authority. *See* Attachment B, *Commonwealth v. Onyiah* Joint Stipulations of Fact ¶¶ 103–147 (describing in detail three sustained findings of misconduct contained in Detective Pitts's personnel file). After a thorough review of the discovery provided to Mr. Goodwin, none of these sustained findings of misconduct were provided to Mr. Goodwin prior to trial.

### 2) Detective Pitts's IA file contained three sustained findings of misconduct.

**The 2002 misconduct (IAD 02–1009)[6]**

On January 18, 2002, off-duty PPD Officer Michelle Dotson called 911 to report being assaulted by her then-husband Detective Pitts. Responding officers observed Officer Dotson kneeling on both knees, doubled over on the floor, holding her stomach, and complaining of abdominal pain. When asked what happened, she replied that Detective Pitts hit her. Detective Pitts also was present, and he stated that Officer Dotson punched him in the face.

---

[6] *Onyiah* Joint Stipulations of Fact ¶¶ 116–132.

While waiting for a supervisor to arrive, the first responding officer recounted that Detective Pitts "kept going into the bathroom and his room" despite the fact that the responding officer "told James Pitts several times to sit down on the couch." Officer Dotson was transported to a hospital by rescue where she was treated.[7]

One of the first responding officers was Officer Welsh. She stated that Detective Pitts kept going to the bathroom. She described seeing what appeared like a red mark on the right side of Detective Pitts's face, which initially she believed was swelling, but she later realized that both sides of his face looked the same and were not swollen. Officer Welsh was interviewed later. She was asked to observe Detective Pitts and asked what she saw. She replied:

> He has what appears to be a bruise under his left eye. Earlier I was not told that he was punched on the left side. As I stated before, Det. Pitts indicated to me that he was punched in the face and he raised his right hand to his right cheek, which indicated to me that he was punched on his right cheek.

Officer Barth arrived as Officer Welsh's backup. When he was interviewed he stated he did not recall seeing any injuries on Detective

---

[7] Officer Dotson later provided a HIPAA release for her medical records, which IA reviewed. The medical records described her complaint of being assaulted by her husband and having difficulty breathing. She was diagnosed with contusions to the ribs.

Pitts's face, but that he kept going to the bathroom, contrary to the instructions to remain in the living room. When shown a picture of Detective Pitts taken on the night of the incident, Officer Welsh stated that Detective Pitts did not have any visible injury when he saw him. Officer Welsh did not recall Detective Pitts saying that he was punched.

Sgt. Liberati was a responding supervisor. When Sgt. Liberati was interviewed by IA, he stated that he did not "thoroughly examine Det. Pitts, but upon glancing at him [he] did not notice any obvious injuries."

Lt. Powell was contacted and informed of an off-duty domestic incident, which necessitated the transport of an off-duty Detective. Lt. Powell responded to the scene and transported Detective Pitts to South Detectives. He told IA that he did not observe any injury to Detective Pitts.

Officer Dotson was interviewed by IA. She offered a detailed narrative describing Detective Pitts assaulting her. She stated the dispute began as a discussion about why she filed for support during their divorce. She described Detective Pitts having "problems that he was not able to overcome" and that he asked why she had to "take his money (filing for support) on top of divorcing him." She told IA:

> I told him that because of his problems I had to get the money by way of court order. I could not trust him to give me the money. The argument continued and I was tired of the highs and lows. I told him that I don't feel sorry for him anymore

> and then I could see the anger in his face. He came toward me
> in the kitchen. I felt that he may try to hit me and I back up to
> the wall and he kept coming at me. I told him, "I wish you
> would", meaning that I knew that he was going to hit me.
> Then he punched me in the left side.…

After calling 911, Officer Dotson described what happened:

> James was pacing around and he asked me to please say that
> somebody tried to rob me. He does not want to lose his job.
> He had a son. How can he do anything for his son if he doesn't
> have a job….

Officer Dotson denied hitting Detective Pitts. When asked about injuries

to Detective Pitts, she denied causing it, saying he might have done

something while he was out of sight. She described seeing Detective Pitts

at 34 S. 11th street later that night, when she sought a Protection from Abuse

Order. She noticed Detective Pitts's eyes were swollen and puffy.

Officer Dotson described a subsequent conversation with Detective Pitts

where she asked him why he put marks on his face and said that she caused

them. Detective Pitts told her that "he needed to buy time," "needed time

to think," but did not tell her how he got the marks on his face.

Detective Pitts was interviewed and described the incident as follows:

> Myself and my wife were involved in an argument and
> became heated. We got in each others (sic) faces. Before that
> she had thrown something in my direction but it did not hit
> me. We were in each others (sic) faces and she struck me in
> the face and I struck her in the stomach one time. She went to
> the floor. She was hurt. She called the police.

IA referred its investigation to DAO for possible criminal prosecution, and repeatedly requested a charging decision. After five months, IA informed the DAO that without a response, it would proceed with its administrative process. IA concluded that Detective Pitts assaulted Officer Dotson. IA did not sustain any findings against Officer Dotson based on Detective Pitts's complaint. In reaching that conclusion, IA wrote that one reason was Detective Pitts's admission to Officer Dotson that he had injured himself, marking his face in order to "buy time" and because he "needed to think"—effectively finding that Detective Pitts's statement to IA was not credible.

**The 2012 misconduct** *(CAP #12–041)*[8]

The second misconduct finding was sustained by Internal Affairs on July 23, 2012, almost a year before Mr. Goodwin's trial in May 2013. IA sustained findings against Detective Pitts of an "abuse of authority" and "damage to private property," while not sustaining a complaint of "physical abuse." IA concluded that, in 2012, Detective Pitts entered a residence looking to arrest an individual named Naim Cook on a material witness warrant issued during a homicide prosecution.

---

[8] *Onyiah* Joint Stipulations of Fact ¶¶ 103–115.

Detective Pitts told IA he heard doors slamming before the grandfather of the witness, an 84-year-old man, opened the front door. When Detective Pitts searched the home, he saw a rear door open and he determined the witness was not home. Detective Pitts then took the witness's 84-year-old grandfather, Leroy Cook into custody, directing uniformed officers to transport him to the Homicide in a wagon. Once at Homicide, Detective Pitts held the 84-year-old grandfather in custody.

Detective Pitts left work for the day without preparing any paperwork to seek approval to charge the 84-year-old grandfather with any crimes. After Detective Pitts left work, a supervising lieutenant learned the man was in custody and ordered him released.

Detective Pitts told IA that he arrested the 84-year-old for hindering apprehension or obstruction of justice, and that when he left work for the day, he intended to return to work in the evening and pursue charges against him.

IA concluded that the 84-year-old was "arrested, transported to Homicide Unit, questioned and detained for over six (6) hours based on virtually no articulable facts that would justify a 'Hindering Apprehension' or 'Obstruction of Justice' charge." IA further found that, "[b]ased on Detective Pitts's memory of the conversation, there is little evidence to

conclude Naim Cook had just escaped the home during the execution of the warrant."

After rejecting Detective Pitts's explanation, IA concluded:

> It is more likely that Detective Pitts was irritated at the elusiveness of Naim Cook from being founded [sic] and utilized the detention of Mr. Cook as a tool to illicit [sic] cooperation from Mr. Cook or Naim Cook to surrender. This is supported by Detective Pitts's admission that he left Mr. Leroy Cook detained at Homicide, left work, and intended to pursue charges against Mr. Cook that night when he returned to work.

IA found that Detective Pitts should not have arrested the man and that doing so was "unjustified, improper, and unprofessional."

**The 2013 misconduct (CAP 13–592)[9]**

On October 2, 2013, IA received a complaint against police, concerning "unknown PPD Detectives." The complaint originated from an individual named Zshani Al-Rasul, who was detained at the PPD Homicide unit for three days without legal justification. Al-Rasul was sought in the murder investigation, recorded as M13-102. According to Al-Rasul, she witnessed an incident that preceded the murder, and which from her perspective was not obviously connected to the subsequent homicide.[10]

---

[9] *Onyiah* Joint Stipulations of Fact ¶¶ 133–147

[10] The assigned investigator, Detective Reilly, later told IA that no information regarding this witness's statement was included in the

IA determined that Detective Pitts was one of the "unknown PPD Detectives" who was subject of the CAP.[11] It is difficult to pinpoint exactly when it became clear to IA that the CAP pertained to Detective Pitts. However, this likely became clear sometime between the first IA interview on November 5, 2013, when the complainant said the detective gave her his business card, and the second IA interview on May 30, 2014, when IA inquired about Detective Pitts's involvement.

IA sustained findings that Detective Pitts abused his authority, detained improperly, violated Directive 82 concerning Adult Detainees in Police Custody, and used improper procedure.

---

homicide file because Detective Reilly also believed that the incident witnessed by Al-Rasul had nothing to do with the subsequent homicide.

[11] The initial complaint against police named Detective Riddick and provided descriptions of two male detectives. There was no Detective Riddick assigned to homicide in 2013. Several homicide supervisors told IA that they did not have knowledge of anyone named Riddick being involved in the investigation. During the first interview conducted by IA, Al-Rasul said the Detective gave her his business card. Although she did not have the business card with her at the time of the interview, she stated she would provide it to the assigned IA investigator. That business card was provided to IA, and bore Detective Pitts's name. On September 12, 2014, during Detective Pitts's first interview with IA, he was confronted with Daily Attendance Records that showed he worked M12-102 on the day Al-Rasul was taken to homicide. Detective Pitts admitted that he and former-Detective Dove picked Al-Rasul up from her place of employment and transported her to Homicide.

IA concluded that Detective Pitts picked Al-Rasul up at her place of employment and transported her to the homicide unit. IA based this conclusion upon its finding that Detective Pitts provided Al-Rasul with his business card, which Al-Rasul provided to IA. Additionally, Detective Pitts admitted in a written statement to IA that he and Detective Dove brought Al-Rasul from her place of employment to the Homicide Unit.

IA concluded that Al-Rasul was detained inside an interview room at the Homicide Unit for approximately 47 hours, from June 1, 2013 at 9 a.m. through June 3, 2013 at 8 a.m. Al-Rasul stated that police repeatedly refused to allow her to make a telephone call to arrange childcare for her 11-year-old son who was home alone, or to call her employer to explain her absence. Al-Rasul stated that she was not provided anything to eat or drink while she was detained, except for a pretzel and soda, which the black male detective who brought her to homicide provided shortly before she was released.

Al-Rasul also told IA that while she was locked in an interrogation room, the black male detective who took her to homicide, told her to remove her jewelry and her work identification because she was going to jail.

On Sunday afternoon, Al-Rasul said, the black male detective requested the code to her cell phone, which she provided. The next morning (Monday), Al-Rasul said the black male detective returned and told her that he went through her text messages and it seemed like she was telling the truth, and told her she was going home. According to Al-Rasul, he offered her a ride home, and when she refused he gave her $20 and his business card and told her to take a train or car and get breakfast too.

Detective Pitts was interviewed by IA on September 12, 2014 and November 4, 2014. He was the last person interviewed by IA before the investigation concluded.

Detective Pitts agreed that interview room logs established that Al-Rasul was placed in Interview Room C from June 1, 2013 through June 3, 2013. Detective Pitts denied knowing that she was in the interview room, stating that when he last saw her she was sitting on a bench.

IA concluded that there were conflicting witness statements concerning Detective Pitts's involvement in Al-Rasul's continued detention after he brought her to homicide:

> Ms. Al Rasul stated that she was picked up at her place of employment by two unknown detectives, later identified as Det. Pitts and Det. Dove. She was transported to the Homicide Unit, where she was placed and kept in an interview room from 9:00 AM on 06-01-13 until 8:00 AM on 06-03-13. Ms. Al-Rasul described multiple contacts with the same black male

detective that picked her up. She also provided Det. Pitts's business card that was given to her by him upon her release.

Detective Pitts denied having any knowledge of who placed Ms. Al-Rasul in an interview room. He stated that the last time he saw Ms. Al-Rasul, she was sitting on a bench in the Homicide Unit and that he had no further contact with her.

IA sustained numerous findings that were inconsistent with Detective Pitts's version of events. IA implicitly found, therefore, that Detective Pitts was not credible.

The IA investigation of this incident memorializes a monetary settlement paid by the city. IA included a demand letter from Al-Rasul's attorney, dated June 14, 2013, and recorded in its findings that the City of Philadelphia settled with Al-Rasul for $110,000 in August of 2014. It is unclear if Al-Rasul formally filed suit.

**3) The Commonwealth violated *Brady* by not disclosing the misconduct contained in Detective Pitts's IA file.**

Detective Pitts's IA file contains witness statements and conclusions of the PPD's own internal command structure finding that Detective Pitts abused his authority. It also implicitly or explicitly concluded that the formal written interview Detective Pitts gave to IA was not credible. This satisfies the requirement of having "internal markers of credibility" and therefore should have been disclosed, regardless of the fact that the PBI

administrative process allowed Detective Pitts to avoid punishment in two of the three sustained findings.[12] *See U.S. v. Georgiou*, 777 F.3d 125, 143 (3d Cir. 2015).

The first sustained finding was an assault allegation. The complainant was Detective Pitts's then-wife (who was also a law enforcement officer), and Detective Pitts also filed a complaint against his wife. IA's findings with respect to its dismissal of Detective Pitts's complaint are relevant in that IA credited the statement Detective Pitts made to his wife that he hit himself in the face (rather than his wife hitting him, as he alleged in his complaint) to buy himself more time when officers arrived at their house following the 911 call made by his wife.

The second sustained finding regarding abuse of authority and damaging private property when Detective Pitts detained an 84-year-old

---

[12] When PPD headquarters receives sustained findings from IA, it may, depending on the nature of the sustained findings, issue 75-18s charging wrongdoing and imposing an adverse employment action. If the employee disputes the charges in the 75-18 or punishment, he or she may exercise their right to an administrative review hearing before a Police Board of Inquiry ("PBI") composed of other PPD employees. At that hearing, PPD carries a burden of proving the allegations in the 75-18. PPD lacks subpoena power to compel a witness to appear at the PBI hearing. As described above, Detective Pitts's IA history currently includes three "sustained" instances of misconduct. Detective Pitts avoided an adverse employment action on two of the sustained findings, findings 1 and 3, because Detective Pitts exercised his right to a PBI hearing, and the PPD did not carry its burden at that hearing.

man for over six hours without justification is relevant to Mr. Cunningham's testimony regarding the abuse he suffered at the hands of Detective Pitts.

Although the third IA investigation concluded in September of 2014 (after Mr. Goodwin's trial in May 2013), the Superior Court did not issue its opinion until July 14, 2014 and the Supreme Court of Pennsylvania did not deny Mr. Goodwin's petition for review until January 21, 2015.

Pa.R.P.C. 3.8(d) requires a prosecutor in a criminal case to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal."[13] *Brady* obligations still applied to this third IA investigation as a

_____

[13] ABA Model R.P.C. 3.8(g) addresses a prosecutor's post-conviction obligation to disclose *Brady* evidence by specifically stating that "[w]hen a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall: (1) promptly disclose that evidence to an appropriate court or authority, and (2) if the conviction was obtained in the prosecutor's jurisdiction, (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit.

remand for a post-sentencing hearing was still available at the time the IA investigation concluded; *see also Fields v. Wharrie*, 672 F.3d 505, 515 (7th Cir. 2012) (reasoning that "a prosecutor's *Brady* and *Giglio* obligations remain in full effect on direct appeal").

This third allegation involved the detention of a witness for 47 hours. IA sustained numerous findings that were inconsistent with Detective Pitts's version of events, implicitly finding him not credible. Although the PBI found Detective Pitts not guilty, it was, primarily, because there was no written policy for detaining witnesses.

### 4)  The undisclosed *Brady* evidence was material to Mr. Goodwin's conviction, and thus he is entitled to a new trial.

For purposes of a *Brady* analysis, the results of the three IA investigations should be considered cumulatively. *See Dennis*, 834 F.3d at 311 (assessing the materiality of *Brady* violations cumulatively). Had competent counsel known that Detective Pitts had been credibly accused by multiple people of misconduct and lying during official investigations about that misconduct, this would have altered defense preparation and cross-examination at trial. *See Dennis*, 834 F.3d at 311 ("[a]lterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*.").

While Detective Pitts did not testify at trial, Detective Gaul testified to his good character, stating, "I know Detective Pitts. Detective Pitts is a well-respected detective within our squad" and a "very experienced detective." N.T. 5/22/13 at 86. Detective Gaul testified, therefore, that Detective Pitts would never have choked anyone or committed misconduct because he "understands just as much as anybody being sympathetic towards what a person is going through." N.T. 5/22/13 at 86.

Had counsel known of Detective Pitts's IA file, he could have impeached Detective Gaul's assessment of Detective Pitts's character during cross-examination.[14] Had the jury known that there were other credible

---

[14] The Superior Court of Pennsylvania addressed Mr. Goodwin's *pro se* argument that trial counsel was ineffective for failing to investigate Detective Pitts and failing to uncover allegations of misconduct against him in *Commonwealth v. Amin Speakes* and *Commonwealth v. Unique Drayton*. The Superior Court did not address any *Brady* claim and it did not address any claim regarding the sustained IA findings discussed in this response because the IA findings had not yet been disclosed to defense counsel by the Commonwealth. In the Superior Court's analysis of the ineffectiveness issue, the court held that petitioner was due no relief because "the PCRA court properly determined that further evidence regarding Detective Pitts was not relevant or admissible at trial." *Commonwealth v. Goodwin*, 2018 WL 3153588 (Pa. Super. Ct. June 28, 2018). Detective Pitts's misconduct in other cases was relevant in a trial in which it was alleged that he choked a witness to obtain a statement, and it would have been admissible to impeach Detective Gaul's testimony regarding Detective Pitts's character. *See* Pa.R.E. 607(b) (which, unlike the Federal Rules of Evidence, specifically provides for the admissibility of impeachment evidence); *see also Commonwealth v. Brown*, 212 A.3d 1076, 1087 (Pa. Super. 2019) ("[e]vidence related to the credibility of a witness is always relevant"). However, because the Superior

allegations of misconduct against Detective Pitts, there is a reasonable probability that the jury would have disbelieved Detective Gaul's testimony that Detective Pitts was a trustworthy detective and believed Mr. Cunningham's testimony of Detective Pitts's physical abuse. Moreover, disclosure of Detective Pitts's IA file would have spurred competent counsel to undertake additional investigation regarding Detective Pitts's misconduct. At a minimum, competent counsel should have been able to uncover the two other cases of misconduct that Mr. Goodwin himself found and presented in his *pro se* PCRA petition.

Such an investigation would have allowed competent counsel to uncover the *Commonwealth v. Amin Speakes* and *Commonwealth v. Unique Drayton* cases raised in Mr. Goodwin's *pro se* PCRA petition and that was presented at Dwayne Thorpe's PCRA hearing. *See* Attachment C *Commonwealth v. Thorpe*, CP-51-CR-0011433-2008 (Pa. Com. Pl. Opinion June 7, 2018).

At Mr. Thorpe's PCRA hearing, Shaquille Rainey testified to an interrogation by Detective Pitts in October of 2009. *Id.* at 13. Mr. Rainey testified that he was 16 years old when he was brought to the Homicide

---

Court did not address a *Brady* claim and because it did not address a claim of any type regarding the undisclosed IA file at issue in this brief, no deference is due to the Superior Court's *Strickland* prejudice analysis.

Unit by Detective Pitts. *Id.* His requests to speak to his aunt were denied. *Id.* Detective Pitts threated Mr. Rainey that he would go to jail for the rest of his life for murder, "and when Mr. Rainey told Detective Pitts that he knew nothing about any killing and put his head in his hands, Detective Pitts struck his hands away from his face and pushed him numerous times." *Id.* After several hours of interrogation, Mr. Rainey signed a statement that falsely inculpated his cousin, Amin Speakes, in a homicide. *Id.* "Mr. Rainey indicated that he only signed the statement because he was scared and intimidated by Detective Pitts, who told Mr. Rainey that he would be released if he signed the statement." *Id.* at 13–14. Amin Speakes "was acquitted at trial after video evidence established that Mr. Speakes was inside a gas station in a different neighborhood of Philadelphia at the time of the murder and, therefore, the statement of Mr. Rainey taken by Detective Pitts was clearly false." *Id.* at 13 n.29.

At Mr. Thorpe's hearing, the parties also stipulated to the admission of notes of testimony from the prosecution of Unique Drayton, including Ms. Drayton's testimony from a suppression hearing which was held on October 22, 2010, prior to Mr. Goodwin's trial. *Id.* at 19. Ms. Drayton's testimony detailed her interrogation by Detective Pitts, which commenced on August 24, 2009 and lasted 39 hours. *Id.* Throughout the interrogation,

Detective Pitts accused Ms. Drayton of murder and threatened that she would spend the rest of her life in prison. Detective Pitts also became physically abusive, "including slapping Ms. Drayton's arms, slapping her face with rolled-up stacks of paper, and throwing her into the metal chair in the interview room." *Id.* Ms. Drayton testified that she ultimately signed a false statement "because there 'wasn't nothing else to do. I wasn't going nowhere. He wasn't letting me out of there. He already made that clear.'" *Id.* at 20. On November 8, 2020, the suppression court "found that much of Ms. Drayton's testimony was credible and found that much of Detective Pitts' testimony was not credible, as Detective Pitts was emphatic and definitive but frequently wrong in his recollection or recounting of events related to his duties in the investigation, and he made no note of anything Ms. Drayton said at any time other than the statements she made after being held for nearly 40 hours." *Id.* at 20 n.36. The court found that Detective Pitts "'made the decision to keep people in custody until he could find answers, whether he had probable cause or not,' and that Ms. Drayton's statement was 'not voluntarily made, but was the product of psychological coercion.'" *Id.* (quoting suppression court's findings of facts). Therefore, the suppression court granted the motion to suppress all of Ms. Drayton's statements to Detective Pitts. *Id.*

The allegations against Detective Pitts of psychological and physical abuse in the *Speakes* and *Drayton* cases mirror the allegations made by Mr. Cunningham at Mr. Goodwin's trial. Therefore, had the Commonwealth honored its *Brady* obligations, competent counsel could have uncovered the allegations in these additional cases, and therefore could have impeached Detective Gaul's testimony about Detective Pitts's good character with these cases as well. Moreover, counsel could have also elected to call Detective Pitts himself to question Detective Pitts about Mr. Cunningham's allegations and could have additionally impeached Detective Pitts's testimony with all of the misconduct allegations against him.

The undisclosed evidence, assessed cumulatively, establishes a reasonable probability that the outcome of the trial would have been different had the Commonwealth honored its *Brady* obligations, and therefore Mr. Goodwin is entitled to a new trial. *See Dennis*, 834 F.3d at 311–12 (a new trial is required when "[h]ad the *Brady* material been disclosed, there is a reasonable probability that the outcome of the trial would have been difference, and its suppression undermines confidence in the verdict.").

Thus, the correct analysis is not whether, excluding Mr. Cunningham's testimony, Mr. Respes's testimony was sufficient for the jury to convict. *See*

*Dennis*, 834 F.3d at 295 ("*Brady* materiality does not turn on a determination of the sufficiency of the evidence..."). Instead, the proper analysis requires "the court to consider the constitutional error in light of all the evidence to determine whether it 'put[s] the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 513 U.S. 419, 435 (1995)). Here, confidence in the verdict is undermined for all of the reasons already articulated. *See supra* pp. 34-39. Confidence in the verdict is additionally undermined because the jury was instructed by the court that: "If you conclude that one of the witnesses testified falsely and did so intentionally about any fact which is necessary to your decision in this case, then for that reason alone you may, if you wish, disregard everything that the witness said for this reason." N.T. 5/28/13 at 13. Thus, had the jury heard the evidence of Detective Pitts's misconduct, it could have concluded that Detective Gaul was being untruthful when he testified about Detective Pitts's good character and typical interrogation tactics. This would have allowed the jury to disregard Detective Gaul's entire testimony, testimony that also established that Mr. Respes's statement was voluntarily obtained. Thus, even though Mr. Cunningham was the only witness to allege abuse against Detective Pitts, the withheld evidence could have impacted the

jury's assessment of the voluntariness of Mr. Respes' recanted statement as well.

Moreover, Mr. Cunningham testified that he saw Mr. Goodwin a few blocks away from where the shooting occurred with Mr. Goodwin's alibi witness, and therefore he knew that Mr. Goodwin was innocent. Had the jury known that Detective Pitts had engaged in misconduct similar to that described by Mr. Cunningham, the jury may have been more likely to credit Mr. Cunningham's testimony and therefore find that Mr. Goodwin was not present at the scene of the crime.

In short, there is a reasonable probability that, had the *Brady* material regarding Detective Pitts's misconduct not been suppressed, the outcome of the trial would have been different, and thus Mr. Goodwin is entitled to a new trial.

## III.   CONCLUSION

For the reasons above, this Court should grant a conditional writ of habeas corpus and order that Mr. Goodwin be retried within 180 days or released from custody.

Respectfully submitted,


*/s/ Katherine Ernst*
Katherine Ernst, Esquire
Assistant District Attorney
Federal Litigation Unit

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **CHRISTOPHER GOODWIN,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL**, *et al.*, | : | **NO. 18-5269** |
| **Respondents.** | : | |


**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing response was served on May 4, 2022 on the

following counsel for Petitioner *via* this Court's CM/ECF electronic filing system:

> Arianna J. Freeman
> Federal Community Defenders Office
> 601 Walnut Street Suite 540W
> Philadelphia, PA 19106


Respectfully submitted,


*/s/ Katherine Ernst*
Katherine Ernst, Esquire
Assistant District Attorney
Federal Litigation Unit