**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER GOODWIN, | : | CIVIL ACTION |
|     Petitioner, | : | |
| | : | |
| v. | : | NO.    18-cv-5269 |
| | : | |
| JOHN E. WETZEL, et al., | : | |
|     Respondents. | : | |

<u>REPORT AND RECOMMENDATION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                    **June 15, 2022**

Before the Court is a counseled petition for writ of habeas corpus, filed pursuant to 28

U.S.C. § 2254, by Christopher Goodwin ("Petitioner"), an individual currently incarcerated at

the State Correctional Institution – Greene in Waynesburg, Pennsylvania.  This matter has been

referred to me for a Report and Recommendation.  For the following reasons, I respectfully

recommend that the petition be GRANTED and that the District Court order the Commonwealth

to provide Petitioner with a new trial or release him from custody within 180 days.


I.    **FACTUAL AND PROCEDURAL HISTORY**[1]

The Commonwealth has amply summarized the factual and procedural history in this

matter as follows:

    A.    **Introduction**

Dwayne Isaacs was shot and killed just after midnight on June 26,

---

[1]  The Court has received the State Court Record (SCR) in this matter, but the documents cited herein have not been numbered.  The Court has also consulted the Philadelphia County Court of Common Pleas criminal docket sheet in *Commonwealth v. Goodwin*, No. CP-51-CR-0012214-2011, *available at* https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0012214-2011&dnh=FgaKujzPZpv4nZ96kQvfiw%3D%3D (last visited June 14, 2022) [hereinafter, "Crim. Docket"].

2011 at a park in the Wilson Park housing project in Philadelphia.
N.T. 20/5/13 at 152.

The Commonwealth's theory at trial was that the murder of Mr.
Isaacs was a revenge killing. The day before the victim's murder,
Lekirr Brown had been shot in the head during a home invasion.
Rumors around the Wilson Park housing project were that Rahsul
Isaacs, the victim's nephew, was the perpetrator. Mr. Goodwin was
friends with Lekirr Brown, and since Rahsul Isaacs had fled the
area, Mr. Goodwin allegedly killed Rahsul's uncle to avenge his
friend. N.T. 5/20/13 at 46–48.

The Commonwealth's prosecution was supported by two pretrial
witness statements, one signed by Andre Cunningham and one
signed by Aaron Respes. There were no forensics or other
evidence connecting Mr. Goodwin to the crime. In the statements,
Mr. Cunningham and Mr. Respes identified Mr. Goodwin as the
shooter. Both witnesses recanted their statements at trial, each
testifying that detectives coerced their signatures with threats
and/or physical violence. Detectives Thomas Gaul and John
Verrecchio testified that neither they nor a third detective,
Detective James Pitts, engaged in any threatening or violent
behavior. The prosecution acknowledged in both opening and
closing statements that the jury's decision, therefore, came down to
a credibility battle between the witnesses' trial testimony and the
detectives' description of how the witness statements were
obtained. N.T. 5/20/13 at 57; N.T. 5/28/13 at 54, 58, 85–86.

The defense argued that the prosecution's motive evidence was
weak because Mr. Goodwin was only connected to Lekirr Brown
as a friend, and in fact, the day of the murder Lekirr Brown's
father, Leroy "Kamac" Brown, had angrily confronted the victim
about the victim's nephew being involved in his son's shooting. A
few hours prior to the murder, the victim had spoken to his sister
and told her that he was leery of going out that night because of
what Mr. Brown had said to him. The defense's closing focused
heavily on pointing the finger at "bad, bad Leroy Brown." N.T.
5/28/13 at 24, 35, 45, 50. The defense also presented an alibi
witness, Anara Brown, who testified that Mr. Goodwin was with
her a few blocks from where the victim was killed when the
shooting occurred. When shots rang out, Ms. Brown and Mr.
Goodwin were sitting next to each other on a friend's front steps
on Jackson Street. N.T. 5/21/13 at 263; N.T. 5/22/13 at 241, 248–
49; N.T. 5/28/13 at 18, 24.

**B.       The testimony of Andre Cunningham, the first
recanting witness**

Andre Cunningham testified at trial that he was a few blocks away from where the shooting occurred when six or seven shots rang out. When he heard the shots, he ran and saw Mr. Goodwin sitting on a set of front steps on Jackson Street with the alibi witness, Anara Brown. N.T. 5/20/13 at 153– 55, 246.

Mr. Cunningham testified that, one evening several weeks after the shooting, on July 20, police picked him up and took him to homicide where he was placed in a locked interview room for approximately 18 hours. Mr. Cunningham testified that various detectives came in and out of the room, including Detective Gaul, and threatened that if he did not give them a statement identifying Mr. Goodwin as the perpetrator, they would not let him leave and they would charge him (that is, Mr. Cunningham) with murder. He testified that he repeatedly told police that he had not seen the shooting. Mr. Cunningham also testified that a Black detective meeting Detective Pitts's description, slammed books down next to his head to wake him up, intimidated him by aggressively pulling his chair close to Mr. Cunningham's, told him to stop playing when Mr. Cunningham denied seeing the murder, and choked him. According to Mr. Cunningham, Detective Pitts was the only detective in the room when this conduct occurred. After 18 hours in custody overnight, Mr. Cunningham signed a statement taken by Detectives Gaul and Verrecchio. N.T. 5/20/13 at 157, 171, 178, 179, 265; N.T. 5/21/13 at 7–8, 12.

In the statement, read to the jury, Mr. Cunningham stated that he had been in a local speakeasy the night of the shooting and had seen Mr. Goodwin there. When he left the speakeasy, he saw Mr. Goodwin ahead of him on the street. He saw Mr. Goodwin hop a fence and walk into the park, and, after asking Aaron Respes and another man if they had any Xanax, Mr. Goodwin shot Dwayne Isaacs multiple times as Mr. Isaacs walked past. The statement indicated that Mr. Cunningham identified a photograph of Mr. Goodwin. N.T. 5/22/13 at 18–19.

Mr. Cunningham testified at trial that, once he was out of police custody, he felt remorse for "basically l[ying] on an innocent man." N.T. 5/20/2013 at 233. He went to Mr. Goodwin's mother prior to trial to see what he could do to make amends, and ultimately, he gave a statement to a defense investigator regarding the above-described police misconduct. N.T. 5/20/13 at 195, 233, 238; N.T. 5/21/13 at 15–16.

## C.     The testimony of Aaron Respes, the second recanting witness

Aaron Respes testified that he was walking by the park in the Wilson Park housing project when he heard a gunshot. He looked over his shoulder for a second and saw someone who "looked to be" Mr. Goodwin shooting the victim. N.T. 5/21/13 at 86. He explained that the shooter looked like Mr. Goodwin in that the shooter was a black male with a beard. 3 N.T. 5/21/13 at 103-104. He said he could not be sure Mr. Goodwin was the shooter because he was too far away. N.T. 5/21/13 at 86, 103, 160.

Mr. Respes testified that he was picked up for questioning by detectives on July 21, 2011 and was held in a locked interview room for approximately twelve hours. Mr. Respes testified that he asked to leave, and he was told that he could not. Mr. Respes testified that he told detectives that he could not be sure who the shooter was, but they would periodically come in and out of the interview room and say that, if he did not sign a statement identifying Mr. Goodwin, they would charge him with murder and take him to jail, and he would never see his mother again. Mr. Respes testified that Detective Gaul was the primary detective who conducted this questioning. N.T. 5/21/13 at 93, 98, 100, 101, 102, 168, 170.

In the written statement taken by Detective Gaul and another detective, which was read to the jury, Mr. Respes told police that the victim was walking by, and Mr. Goodwin shot him. After the first shot, Mr. Respes ran away and he heard more shots as he ran. Mr. Respes did not describe anyone other than the shooter and the victim in the park during the shooting. Mr. Respes identified a photograph of Mr. Goodwin. N.T. 5/22/13 at 37–39.

Mr. Respes testified at the preliminary hearing. At that hearing, he initially identified Mr. Goodwin as the shooter. On cross-examination, however, he testified that he could not be sure that Mr. Goodwin was the shooter because he was only able to see that the shooter, like Mr. Goodwin, had a beard. N.T. 5/21/13 at 132, 134.

At trial, Mr. Respes testified that he was nervous to testify at the preliminary hearing because police had forced him to identify someone he was not sure about. He testified that prior to the preliminary hearing, the police told him that if he did not testify consistently with his statement, they would lock him up. N.T. 5/21/13 at 179, 180.

### D.    Detective Thomas Gaul's Testimony

Detective Thomas Gaul testified that he was not the assigned

detective; Detective Verrecchio was. However, Detective Gaul took both Mr. Cunningham's and Mr. Respes' statements; Detective Verrecchio only participated in taking Mr. Cunningham's statement. N.T. 5/22/13 at 6, 152.

Detective Gaul testified "it was never, like, a question as to whodunit. It was just a matter of [Mr. Cunningham] having the courage to help us and put his information on paper and sign it, which is, in a lot of cases, is the problem." N.T. 5/22/13 at 13. Detective Gaul testified that Mr. Cunningham never denied seeing the shooting; the only discussion during his interrogation was whether Mr. Cunningham was willing to sign a statement inculpating Mr. Goodwin. N.T. 5/22/13 at 100.

Detective Gaul testified that even though he wanted to get a written statement from Mr. Cunningham, he did not threaten him or tell him that he could not go home until he gave a statement. N.T. 5/22/13 at 14, 15. Detective Gaul testified that he seeks to build a positive "rapport" with witnesses in order to encourage them to sign a written statement. N.T. 5/22/13 at 33–34, 81–82.

Detective Gaul acknowledged that Detective Pitts had contact with Mr. Cunningham during his interrogation because he was on the same squad and was working that day. N.T. 5/22/13 at 85. Detective Gaul testified that Detective Pitts would never have choked Mr. Cunningham, however, because "I know Detective Pitts. Detective Pitts is a well-respected detective within our squad" and a "very experienced detective" and therefore he would not do such a thing. N.T. 5/22/13 at 86.

He continued that Detective Pitts "understands just as much as anybody being sympathetic towards what a person is going through." N.T. 5/22/13 at 86. As to Mr. Respes's statement, Detective Gaul testified that Mr. Respes never told him that he was not sure about his identification. Detective Gaul testified that he did not threaten to charge Mr. Respes with murder or otherwise coerce him to sign the statement. N.T. 5/22/13 at 34, 35, 36.

Detective Gaul testified that the two interrogations each took over 12 hours because "sometimes it takes a significant amount of time, and that's what happened in this case." N.T. 5/22/13 at 82–83.

Detective Gaul testified that both Mr. Cunningham and Mr. Respes recanted their police statements, not because they had been coerced into signing false statements, but because they were afraid of Mr. Goodwin and his supporters in court. N.T. 5/22/13 at 14, 43–44, 46.

### E.     Detective John Verrecchio's Testimony

Detective Verrecchio testified that he was the detective assigned to investigate Dwayne Isaacs's murder. He was present for Mr. Cunningham's statement but not for Mr. Respes's. He testified that detectives did not threaten Mr. Cunningham and that Mr. Cunningham never complained of anyone choking him. Detective Verrecchio testified that he did attempt to interview Leroy "Kamac" Brown but that Mr. Brown refused to give a written statement. N.T. 5/22/13 at 151–53.

### F.     Conviction, Sentencing and Appellate Proceedings

The jury found Mr. Goodwin guilty of first-degree murder and related firearms offenses. The court sentenced Mr. Goodwin to the mandatory penalty of life imprisonment. N.T. 5/28/13 at 151–52.

The only issues raised by Mr. Goodwin's appointed direct appeal counsel, David Rudenstein, were sufficiency and weight of the evidence. The Superior Court affirmed the convictions. *Commonwealth v. Goodwin*, 105 A.3d 789 (Pa. Super. Ct. 2014). The Supreme Court of Pennsylvania denied a petition for allowance of appeal. *Commonwealth v. Goodwin*, 108 A.3d 34 (Pa. 2015).

Mr. Goodwin filed a timely *pro se* PCRA petition alleging numerous claims of ineffective assistance of counsel. The *Brady* claim discussed below was not raised in this PCRA petition. Appointed PCRA counsel, James F. Berardinelli, filed a "no merit" letter with the court asking to withdraw from the case. Judge McDermott issued an opinion denying the PCRA petition and allowing Berardinelli to withdraw. *Goodwin v. Wetzel, et al.*, Civil No. 18–5269, ECF Doc. 2 at 50–72. Mr. Goodwin took a timely *pro se* appeal to the Superior Court, and that court affirmed the denial of the PCRA petition. *Commonwealth v. Goodwin*, 2018 WL 3153588 (Pa. Super. Ct. June 28, 2018). Mr. Goodwin did not pursue a petition for allowance of appeal to the Supreme Court of Pennsylvania.

Mr. Goodwin filed a timely *pro se* petition for habeas corpus with this Court. ECF Doc. 2. The Federal Community Defender's Office was appointed to represent Mr. Goodwin on January 15, 2019. Mr. Goodwin filed an amended petition and a memorandum of law. ECF 23, 34. In his memorandum, Mr. Goodwin pursued nine claims for relief, labeled Claims A–I:

> A. Trial counsel was ineffective for failing to object to, and

6

for himself eliciting, inculpatory evidence that violated Mr. Goodwin's rights under the confrontation clause.

B. Trial counsel was ineffective for eliciting prejudicial testimony of Detective Verrecchio and for failing to properly object and seek a mistrial.

C. Trial counsel was ineffective for failing to object to the inadmissible hearsay testimony from the decedent's sister, Lisa Hall, and the prosecutor's argument based on that testimony.

D. Trial counsel was ineffective for failing to object to the prosecutor's improper and prejudicial examination of Andre Cunningham.

E. Trial counsel was ineffective for failing to object to improper testimony and argument about alleged threats against witnesses.

F. Trial counsel was ineffective for failing to impeach Detective Thomas Gaul with evidence that contradicted Detective Gaul's claim that Kamac's name "never came up" as the suspected shooter.

G. Trial counsel was ineffective for failing to object to the prosecutor's closing argument that unconstitutionally shifted the burden of proof to the defense and that included the prosecutor's personal opinion that the alibi witness was lying.

H. Trial counsel was ineffective for failing to investigate and present available evidence about Detective James Pitts's misconduct in this case, and Mr. Goodwin's due process rights were violated.

I. Mr. Goodwin is entitled to relief from his conviction because of the prejudicial effects of the cumulative errors in this case.

Claim H argued that trial counsel was ineffective for failing to discover misconduct alleged against Detective Pitts in *Commonwealth v. Amin Speakes* and *Commonwealth v. Unique Drayton*. ECF 34 at 43. Those homicide cases resulted in a not guilty verdict and a dismissal, respectively, in part due to misconduct by Detective Pitts. Petitioner's memorandum of law withdrew "the portion of this claim that asserted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360

U.S. 264 (1959)." ECF at 42, n. 15. This ineffectiveness claim had been raised in Mr. Goodwin's *pro se* PCRA petition before the state courts. Thus, no *Brady* claim regarding Pitts's misconduct was raised before the state courts.

On February 2, 2021, the Commonwealth filed a response. ECF 53. In that response, the Commonwealth argued for all of the claims that either the state court's decision was not unreasonable or Mr. Goodwin had failed to establish prejudice.

On December 7, 2021, the Commonwealth provided documents in response to Petitioner's request for information related to Detective Pitts's misconduct. The Commonwealth provided Petitioner's counsel with a letter dated December 7, 2021, stating that Detective Pitts has been transferred to the Delaware Valley Intelligence Center pending the outcome of an internal police department investigation. Additionally, the Commonwealth provided 263 pages of documents concerning misconduct alleged against Detective Pitts. The Commonwealth had not previously disclosed any of these materials to Mr. Goodwin prior to his conviction becoming final.

Following these disclosures, on December 7, 2021 Mr. Goodwin filed a second amendment and supplement to his petition for writ of habeas corpus. ECF 67. In that supplement, Mr. Goodwin amended Claim H, alleging that "[t]he Commonwealth violated its due process duties under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny by failing to disclose to Mr. Goodwin evidence of Detective Pitts' misconduct in three dozen other cases." ECF 67 at 11.

On February 28, 2022, the Honorable Mia R. Perez, Supervising Judge of the Thirty-First County Investigating Grand Jury, accepted the Grand Jury's Presentment ("Presentment") recommending that the District Attorney charge Detective Pitts with two counts of perjury (F3) and three counts of obstructing administration of law (M2) for an allegedly violent interrogation of Obina Onyiah in 2010 and false trial testimony regarding that interrogation in 2013. *See* Attachment A.

In the Presentment, the Grand Jury found "that Detective Pitts made false statements on October 28, 2002, during an official investigation by [Internal Affairs], and did so in an effort to cover-up the fact that he illegally assaulted his wife." Attachment A ¶ 129. The Grand Jury additionally "reject[ed] Lieutenant#1's opinion that Detective Pitts was a good detective and skilled interrogator." Attachment A ¶ 130. "Instead, the Grand Jury finds

> that while acting in his official capacity Detective Pitts habitually
> used coercive interrogations techniques when interviewing
> suspects and witnesses in the Homicide Unit of the Philadelphia
> Police Department, and lied under oath to conceal his criminal
> acts." Attachment A ¶ 131. The charges against Detective Pitts
> remain pending.

(Resp., ECF No. 73, at 3-16 (footnotes omitted)).

On April 6, 2022, Petitioner filed a third amendment and supplement to his petition for

writ of habeas corpus.  (3d Am. to Hab. Pet., ECF No. 72).  On May 4, 2022, the Commonwealth

filed its response.  (Resp., ECF No. 73).


## II.    LEGAL STANDARDS

### A.    Exhaustion and Procedural Default

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") grants to persons

in state or federal custody the right to file a petition in a federal court seeking the issuance of a

writ of habeas corpus.  *See* 28 U.S.C. § 2254.  Pursuant to AEDPA:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts
> of the State; or
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to
> protect the rights of applicant.

28 U.S.C. § 2254(b)(1).  The exhaustion requirement is rooted in considerations of comity, to

ensure that state courts have the initial opportunity to review federal constitutional challenges to

state convictions.  *See Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Rose v. Lundy*, 455 U.S.

509, 518 (1982); *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007); *Werts v. Vaughn*, 228

F.3d 178, 192 (3d Cir. 2000).

Respect for the state court system requires that the habeas petitioner demonstrate that the claims in question have been "fairly presented to the state courts." *Castille*, 489 U.S. at 351.  To "fairly present" a claim, a petition must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 225, 261 (3d Cir. 1999); *see also Nara v. Frank*, 488 F.3d 187, 197-98 (3d Cir. 2007) (recognizing that a claim is fairly presented when a petitioner presents the same factual and legal basis to the state courts).  A state prisoner exhausts state remedies by giving the "state courts one fully opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In Pennsylvania, one complete round includes presenting the federal claim through the Superior Court on direct or collateral review.  *See Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).  The habeas petition bears the burden of proving exhaustion of all state remedies.  *Boyd v. Waymart*, 579 F.3d 330, 367 (2009).

If a habeas petition contains unexhausted claims, the federal district court must ordinarily dismiss the petition without prejudice so that the petitioner can return to state court to exhaust his remedies.  *Slutzker v. Johnson*, 393 F.3d 373, 379 (3d Cir. 2004).  However, if state law would clearly foreclose review of the claims, the exhaustion requirement is technically satisfied because there is an absence of state corrective process.  *See Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002); *Lines v. Larkin*, 208 F.3d 153, 160 (3d Cir. 2000).  The failure to properly present claims to the state court generally results in a procedural default.  *Lines*, 208 F.3d at 159-60.  The doctrine of procedural default bars federal habeas relief when a state court relies upon, or would rely upon, "'a state law ground that is independent of the federal question and adequate to support the judgment'" to foreclose review of the federal claim.  *Nolan v. Wynder*, 363 F. App'x

10

868, 871 (3d Cir. 2010) (not precedential) (quoting *Beard v. Kindler*, 558 U.S. 53, 53 (2009));

*see also Taylor v. Horn*, 504 F.3d 416, 427-28 (3d Cir. 2007) (citing *Coleman v. Thompson*, 501

U.S. 722, 730 (1991)).

 The requirements of "independence" and "adequacy" are distinct. *Johnson v. Pinchak*,

392 F.3d 551, 557-59 (3d Cir. 2004).  State procedural grounds are not independent, and will not

bar federal habeas relief, if the state law ground is so "interwoven with federal law" that it cannot

be said to be independent of the merits of a petitioner's federal claims. *Coleman*, 501 U.S. at

739-40.  A state rule is "adequate" for procedural default purposes if it is "firmly established and

regularly followed." *Johnson v. Lee*, ___ U.S. ___, 136 S. Ct. 1802, 1804 (2016) (*per curiam*)

(citation omitted).  These requirements ensure that "federal review is not barred unless a habeas

petitioner had fair notice of the need to follow the state procedural rule," *Bronstein v. Horn*, 404

F.3d 700, 707 (3d Cir. 2005), and that "review is foreclosed by what may honestly be called

'rules' . . . of general applicability[,] rather than by whim or prejudice against a claim or

claimant." *Id.* at 708.

 Like the exhaustion requirement, the doctrine of procedural default is grounded in

principles of comity and federalism.  As the Supreme Court has explained:

> In the absence of the independent and adequate state ground doctrine
> in federal habeas, habeas petitioners would be able to avoid the
> exhaustion requirement by defaulting their federal claims in state
> court.  The independent and adequate state ground doctrine ensures
> that the States' interest in correcting their own mistakes is respected
> in all federal habeas cases.

*Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

 Federal habeas review is not available to a petitioner whose constitutional claims have

not been addressed on the merits by the state courts due to procedural default, unless such

petitioner can demonstrate: (1) cause for the default and actual prejudice as a result of the alleged

violation of federal law; or (2) that failure to consider the claims will result in a fundamental

miscarriage of justice.  *Id.* at 451; *Coleman*, 501 U.S. at 750.  To demonstrate cause and

prejudice, the petitioner must show some objective factor external to the defense that impeded

counsel's efforts to comply with some state procedural rule.  *Slutzker*, 393 F.3d at 381 (quoting

*Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  To demonstrate a fundamental miscarriage of

justice, a habeas petitioner must typically demonstrate actual innocence.  *Schlup v. Delo*, 513

U.S. 298, 324-26 (1995).

> **B.    Merits Review**

The AEDPA increased the deference federal courts must give to the factual findings and

legal determinations of the state courts.  *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002); *Werts v.*

*Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000).  Pursuant to 28 U.S.C. § 2254(d), as amended by the

AEDPA, a petition for habeas corpus may be granted only if: (1) the state court's adjudication of

the claim resulted in a decision contrary to, or involved an unreasonable application of, "clearly

established Federal law, as determined by the Supreme Court of United States;" or (2) the

adjudication resulted in a decision that was "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

Factual issues determined by a state court are presumed to be correct, and the petitioner bears the

burden of rebutting this presumption by clear and convincing evidence.  *Werts*, 228 F.3d at 196

(citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court has explained that, "[u]nder the 'contrary to' clause, a federal habeas

court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently than [the

Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S.

12

362, 412-13 (2000); *see also Hameen v. Delaware*, 212 F.3d 226, 235 (3d Cir. 2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413.  The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Hameen*, 212 F.3d at 235 (citing *Williams*, 529 U.S. at 388-89).  "[A]n unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable."  *Werts*, 228 F.3d at 196.

## III.    DISCUSSION

In its response, the Commonwealth agrees that because of its failure to disclose evidence of Detective Pitts's misconduct, Petitioner is entitled to full relief on his *Brady* claim (Claim H, as amended and supplemented) in the form of an order granting his release if not tried within 180 days.  (Resp., ECF No. 73, at 1-2).  Because such relief, if granted, moots the remainder of Petitioner's claims, including the remainder of Claim H, the Commonwealth addresses only Petitioner's *Brady* claim.  The Court agrees with the parties that Petitioner's *Brady* claim is meritorious and therefore also does not address his remaining claims.

### A.    The Commonwealth's Waiver of the Exhaustion Requirement

Petitioner was unable to assert this *Brady* claim on direct appeal or in his PCRA petition because the Commonwealth did not disclose the documents regarding Detective Pitts's misconduct until December 2021 and because the grand jury did not unseal its presentment until

February 2022.  (Resp., ECF No. 73, at 18).  Because "the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States," Petitioner could return to state court to file a subsequent PCRA petition asserting the claim beyond the normal one-year limitations period.  42 Pa. C.S. § 9545(b)(1)(i).  However, "in order to facilitate review and correction of the constitutional errors in this case," the Commonwealth has instead exercised its right to waive the exhaustion requirement.  (Resp., ECF No. 73, at 18-19; *see* 28 U.S.C. 2254(b)(3) (a state may, "through counsel, expressly waive[ ] the requirement"); *see also Wood v. Milyard*, 566 U.S. 463, 466 (2012) ("A court is not at liberty, we have cautioned, to bypass, override, or excuse a State's deliberate waiver of a limitations [or exhaustion] defense.")).  Accordingly, the Court will proceed to the merits of Petitioner's *Brady* claim.

> **B.**     ***Brady* Standard**

In *Brady*, the United States Supreme Court held that the Due Process Clause imposes upon the prosecution an affirmative duty to disclose evidence to the accused that is favorable to the defense and material to guilt or punishment.  373 U.S. at 87; *see also Kyles v. Whitley*, 514 U.S. 419, 432-43, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995) (reviewing the origins of the prosecution's "affirmative duty").  To mount a successful *Brady* claim, a petitioner must establish three essential elements: (1) the evidence must have exculpatory or impeachment value to the accused; (2) the evidence must be either willfully or inadvertently suppressed; and (3) the defendant was prejudiced because the evidence was "material."  *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).  "In other words, favorable evidence is subject to constitutionally

mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Bell v. Cone*, 556 U.S. 449, 470, 129 S. Ct. 1769, 173 L.Ed.2d 701 (2009) (citing *Kyles*, 514 U.S. at 435)**.**

C.   **The Undisclosed Evidence**

Detective Pitts's Internal Affairs (IA) file contains three sustained findings of misconduct, none of which were provided to Petitioner prior to trial.  These misconducts were initially detailed in a Joint Stipulations of Fact filed by the Commonwealth and the defendant in the unrelated case of *Commonwealth v. Onyiah*, No. CP-51-CR-0001632-2011 (Phila. Com. Pl. Ct. Apr. 23, 2021).  (*See Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 103-47).  Rather than re-summarize those facts here, the Court sets forth the summary from the Commonwealth's response in this matter:

> **The 2002 misconduct (IAD 02–1009)**
>
> On January 18, 2002, off-duty PPD [Philadelphia Police Department] Officer Michelle Dotson called 911 to report being assaulted by her then-husband Detective Pitts. Responding officers observed Officer Dotson kneeling on both knees, doubled over on the floor, holding her stomach, and complaining of abdominal pain. When asked what happened, she replied that Detective Pitts hit her. Detective Pitts also was present, and he stated that Officer Dotson punched him in the face.
>
> While waiting for a supervisor to arrive, the first responding officer recounted that Detective Pitts "kept going into the bathroom and his room" despite the fact that the responding officer "told James Pitts several times to sit down on the couch." Officer Dotson was transported to a hospital by rescue where she was treated.
>
> One of the first responding officers was Officer Welsh. She stated that Detective Pitts kept going to the bathroom. She described seeing what appeared like a red mark on the right side of Detective Pitts's face, which initially she believed was swelling, but she later realized that both sides of his face looked the same and were not swollen. Officer Welsh was interviewed later. She was asked to observe Detective Pitts and asked what she saw. She replied:

He has what appears to be a bruise under his left eye. Earlier I was not told that he was punched on the left side. As I stated before, Det. Pitts indicated to me that he was punched in the face and he raised his right hand to his right cheek, which indicated to me that he was punched on his right cheek.

Officer Barth arrived as Officer Welsh's backup. When he was interviewed he stated he did not recall seeing any injuries on Detective Pitts's face, but that he kept going to the bathroom, contrary to the instructions to remain in the living room. When shown a picture of Detective Pitts taken on the night of the incident, Officer Welsh stated that Detective Pitts did not have any visible injury when he saw him. Officer Welsh did not recall Detective Pitts saying that he was punched.

Sgt. Liberati was a responding supervisor. When Sgt. Liberati was interviewed by IA, he stated that he did not "thoroughly examine Det. Pitts, but upon glancing at him [he] did not notice any obvious injuries."

Lt. Powell was contacted and informed of an off-duty domestic incident, which necessitated the transport of an off-duty Detective. Lt. Powell responded to the scene and transported Detective Pitts to South Detectives. He told IA that he did not observe any injury to Detective Pitts.

Officer Dotson was interviewed by IA. She offered a detailed narrative describing Detective Pitts assaulting her. She stated the dispute began as a discussion about why she filed for support during their divorce. She described Detective Pitts having "problems that he was not able to overcome" and that he asked why she had to "take his money (filing for support) on top of divorcing him." She told IA:

> I told him that because of his problems I had to get the money by way of court order. I could not trust him to give me the money. The argument continued and I was tired of the highs and lows. I told him that I don't feel sorry for him anymore and then I could see the anger in his face. He came toward me in the kitchen. I felt that he may try to hit me and I back up to the wall and he kept coming at me. I told him, "I wish you would", meaning that I knew that he was going to hit me. Then he punched me in the left side.…

After calling 911, Officer Dotson described what happened:

> James was pacing around and he asked me to please say
> that somebody tried to rob me. He does not want to lose his
> job. He had a son. How can he do anything for his son if he
> doesn't have a job….

Officer Dotson denied hitting Detective Pitts. When asked about
injuries to Detective Pitts, she denied causing it, saying he might
have done something while he was out of sight. She described
seeing Detective Pitts at 34 S. 11th street later that night, when she
sought a Protection from Abuse Order. She noticed Detective
Pitts's eyes were swollen and puffy.

Officer Dotson described a subsequent conversation with Detective
Pitts where she asked him why he put marks on his face and said
that she caused them. Detective Pitts told her that "he needed to
buy time," "needed time to think," but did not tell her how he got
the marks on his face.

Detective Pitts was interviewed and described the incident as
follows:

> Myself and my wife were involved in an argument and
> became heated. We got in each others (sic) faces. Before
> that she had thrown something in my direction but it did
> not hit me. We were in each others (sic) faces and she
> struck me in the face and I struck her in the stomach one
> time. She went to the floor. She was hurt. She called the
> police.

IA referred its investigation to DAO [the District Attorney's
Office] for possible criminal prosecution, and repeatedly requested
a charging decision. After five months, IA informed the DAO that
without a response, it would proceed with its administrative
process. IA concluded that Detective Pitts assaulted Officer
Dotson. IA did not sustain any findings against Officer Dotson
based on Detective Pitts's complaint. In reaching that conclusion,
IA wrote that one reason was Detective Pitts's admission to Officer
Dotson that he had injured himself, marking his face in order to
"buy time" and because he "needed to think"—effectively finding
that Detective Pitts's statement to IA was not credible.

### The 2012 misconduct (CAP #12–041)

The second misconduct finding was sustained by Internal Affairs
on July 23, 2012, almost a year before Mr. Goodwin's trial in May
2013. IA sustained findings against Detective Pitts of an "abuse of
authority" and "damage to private property," while not sustaining a

17

complaint of "physical abuse." IA concluded that, in 2012, Detective Pitts entered a residence looking to arrest an individual named Naim Cook on a material witness warrant issued during a homicide prosecution.

Detective Pitts told IA he heard doors slamming before the grandfather of the witness, an 84-year-old man, opened the front door. When Detective Pitts searched the home, he saw a rear door open and he determined the witness was not home. Detective Pitts then took the witness's 84-year-old grandfather, Leroy Cook into custody, directing uniformed officers to transport him to the Homicide in a wagon. Once at Homicide, Detective Pitts held the 84-year-old grandfather in custody.

Detective Pitts left work for the day without preparing any paperwork to seek approval to charge the 84-year-old grandfather with any crimes. After Detective Pitts left work, a supervising lieutenant learned the man was in custody and ordered him released. Detective Pitts told IA that he arrested the 84-year-old for hindering apprehension or obstruction of justice, and that when he left work for the day, he intended to return to work in the evening and pursue charges against him.

IA concluded that the 84-year-old was "arrested, transported to Homicide Unit, questioned and detained for over six (6) hours based on virtually no articulable facts that would justify a 'Hindering Apprehension' or 'Obstruction of Justice' charge." IA further found that, "[b]ased on Detective Pitts's memory of the conversation, there is little evidence to conclude Naim Cook had just escaped the home during the execution of the warrant."

After rejecting Detective Pitts's explanation, IA concluded:

> It is more likely that Detective Pitts was irritated at the elusiveness of Naim Cook from being founded [sic] and utilized the detention of Mr. Cook as a tool to illicit [sic] cooperation from Mr. Cook or Naim Cook to surrender. This is supported by Detective Pitts's admission that he left Mr. Leroy Cook detained at Homicide, left work, and intended to pursue charges against Mr. Cook that night when he returned to work.

IA found that Detective Pitts should not have arrested the man and that doing so was "unjustified, improper, and unprofessional."

**The 2013 misconduct (CAP 13–592)**

18

On October 2, 2013, IA received a complaint against police, concerning "unknown PPD Detectives." The complaint originated from an individual named Zshani Al-Rasul, who was detained at the PPD Homicide unit for three days without legal justification. Al-Rasul was sought in the murder investigation, recorded as M13-102. According to Al-Rasul, she witnessed an incident that preceded the murder, and which from her perspective was not obviously connected to the subsequent homicide.

IA determined that Detective Pitts was one of the "unknown PPD Detectives" who was subject of the CAP. It is difficult to pinpoint exactly when it became clear to IA that the CAP pertained to Detective Pitts. However, this likely became clear sometime between the first IA interview on November 5, 2013, when the complainant said the detective gave her his business card, and the second IA interview on May 30, 2014, when IA inquired about Detective Pitts's involvement.

IA sustained findings that Detective Pitts abused his authority, detained improperly, violated Directive 82 concerning Adult Detainees in Police Custody, and used improper procedure.

IA concluded that Detective Pitts picked Al-Rasul up at her place of employment and transported her to the homicide unit. IA based this conclusion upon its finding that Detective Pitts provided Al-Rasul with his business card, which Al-Rasul provided to IA. Additionally, Detective Pitts admitted in a written statement to IA that he and Detective Dove brought Al-Rasul from her place of employment to the Homicide Unit.

IA concluded that Al-Rasul was detained inside an interview room at the Homicide Unit for approximately 47 hours, from June 1, 2013 at 9 a.m. through June 3, 2013 at 8 a.m. Al-Rasul stated that police repeatedly refused to allow her to make a telephone call to arrange childcare for her 11-year-old son who was home alone, or to call her employer to explain her absence. Al-Rasul stated that she was not provided anything to eat or drink while she was detained, except for a pretzel and soda, which the black male detective who brought her to homicide provided shortly before she was released.

Al-Rasul also told IA that while she was locked in an interrogation room, the black male detective who took her to homicide, told her to remove her jewelry and her work identification because she was going to jail.

On Sunday afternoon, Al-Rasul said, the black male detective requested the code to her cell phone, which she provided. The next morning (Monday), Al-Rasul said the black male detective returned and told her that he went through her text messages and it seemed like she was telling the truth, and told her she was going home. According to Al-Rasul, he offered her a ride home, and when she refused he gave her $20 and his business card and told her to take a train or car and get breakfast too.

Detective Pitts was interviewed by IA on September 12, 2014 and November 4, 2014. He was the last person interviewed by IA before the investigation concluded.

Detective Pitts agreed that interview room logs established that Al-Rasul was placed in Interview Room C from June 1, 2013 through June 3, 2013. Detective Pitts denied knowing that she was in the interview room, stating that when he last saw her she was sitting on a bench.

IA concluded that there were conflicting witness statements concerning Detective Pitts's involvement in Al-Rasul's continued detention after he brought her to homicide:

> Ms. Al-Rasul stated that she was picked up at her place of employment by two unknown detectives, later identified as Det. Pitts and Det. Dove. She was transported to the Homicide Unit, where she was placed and kept in an interview room from 9:00 AM on 06-01-13 until 8:00 AM on 06-03-13. Ms. Al-Rasul described multiple contacts with the same black male detective that picked her up. She also provided Det. Pitts's business card that was given to her by him upon her release.

> Detective Pitts denied having any knowledge of who placed Ms. Al-Rasul in an interview room. He stated that the last time he saw Ms. Al-Rasul, she was sitting on a bench in the Homicide Unit and that he had no further contact with her.

IA sustained numerous findings that were inconsistent with Detective Pitts's version of events. IA implicitly found, therefore, that Detective Pitts was not credible.

The IA investigation of this incident memorializes a monetary settlement paid by the city. IA included a demand letter from Al-Rasul's attorney, dated June 14, 2013, and recorded in its findings that the City of Philadelphia settled with Al-Rasul for $110,000 in August of 2014. It is unclear if Al-Rasul formally filed suit.

(Resp., ECF No. 73, at 21-31 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 103-47) (footnotes omitted)).

### D.   Application of *Brady*

The Court considers the existence of each of the three *Brady* factors noted above. *Strickler*, 527 U.S. at 281-82.

### 1.   Exculpatory or Impeachment Value of the Evidence

To substantiate a *Brady* claim, the evidence at issue must tend to exculpate the accused or provide him an opportunity for impeachment.  *Id.*  Here, each of Detective Pitts's misconducts relates to his credibility and/or Mr. Cunningham's allegations that Detective Pitts abused his authority in extracting a statement from him.  Regarding the first misconduct, IA found Detective Pitts's allegation that Officer Dotson had assaulted him not credible and did not sustain any findings against her, in part because Detective Pitts had admitted to her that he had marked his own face to "buy time" because he "needed to think" after she called the police.  (Resp., ECF No. 73, at 24 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 116-32)).

As to Detective Pitts's second misconduct, IA rejected his claim that he had intended to return to work to pursue charges against the 84-year-old grandfather held for six hours at the Homicide Unit, instead finding that there were essentially no facts to justify charging the man and that Detective Pitts had likely detained him because he was "irritated" at his inability to track down the grandson and hoped that the grandfather's detention would cause the grandson to surrender.  (*Id.* at 26-27 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 103-15)).  IA concluded that Detective Pitts's conduct in the matter had been "unjustified, improper, and unprofessional."  (*Id.* at 27 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 103-15)).

In the third misconduct, IA sustained findings that Detective Pitts had abused his authority, detained the witness improperly, violated policy regarding adult detainees and used improper procedure after he placed her in an interview room for 47 hours, provided her virtually no food or drink, and refused to permit her to make any telephone calls.  (*Id.* at 28-29 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 133-47)).  The City of Philadelphia also paid the woman $110,000 to resolve the matter.  (*Id.* at 31 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 133-47)).  In reaching its conclusions, IA necessarily credited her allegations that she had had multiple contacts with Detective Pitts, who also provided her his business card upon her release, over Detective Pitts's claims that he had left her sitting on a bench in the Homicide Unit and then had no further contact with her.  (*Id.* at 30-31 (citing *Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 133-47)).

If this evidence had been disclosed to Petitioner earlier, his counsel could have called Detective Pitts as a witness to testify in response to Mr. Cunningham's allegations that his statement had been coerced by PPD detectives, including Detective Pitts, and, assuming that Detective Pitts denied that had occurred, impeached him with the misconduct and credibility findings.  (*See* Resp., ECF No.73, at 6 (citing N.T. 5/20/13 at 157, 171, 178, 179, 265; N.T. 5/21/13 at 7–8, 12)).  Moreover, counsel could have confronted Detectives Gaul and Verrecchio with these findings in response to their denials that Detective Pitts had coerced the statement from Mr. Cunningham.  (*See id.* at 4, 11 (citing N.T. 5/20/13 at 57; N.T. 5/28/13 at 151-52; N.T. 5/28/13 at 54, 58, 85–86)).  Detective Gaul additionally testified that Detective Pitts would never have choked Mr. Cunningham and that he is "well-respected," "very experienced," understanding and "sympathetic."  (*See id.* at 10 (citing N.T. 5/22/13 at 86)).  All this testimony

would have been subject to impeachment via the adverse findings regarding Detective Pitts had they been timely disclosed to Petitioner and his counsel.

### 2.    Suppression of the Evidence

"Subsequent cases have construed *Brady* to require the disclosure by the prosecution not only of information actually known to the prosecutor, but of all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) (quoting *Brady*, 373 U.S. at 87). A finding that evidence was suppressed does not depend on "the good faith or the bad faith of the prosecution." *Id.* Suppression may occur whether the failure to disclose is willful or inadvertent. *Strickler*, 527 U.S. at 281-82.

There is no question that the evidence of Detective Pitts's misconducts was suppressed. This evidence was in the possession of the police, held in Detective Pitts's IA file. It is uncertain when exactly IA completed its investigation regarding the first misconduct, which occurred in January 2002, but it clearly did so well prior to Petitioner's May 2013 trial. (*See Onyiah* Jt. Stips. of Fact, ECF No. 73-2, at ¶¶ 116, 132 (referencing an "administrative process" of unclear duration after requesting a charging decision from the DAO for five months)). IA concluded its investigation regarding the second misconduct on July 23, 2012, also prior to Petitioner's trial. (*Id.* at ¶ 103). IA did not conclude its investigation regarding Detective Pitts's third misconduct until 2014, after Petitioner's trial, but his direct appeal remained pending at this time. (*Id.* at ¶ 141; *see also* Crim. Docket at 11 (referencing January 21, 2015 denial of petition for allowance of appeal to the Pennsylvania Supreme Court)). Significantly, "a prosecutor's *Brady* . . . obligations remain in full effect on direct appeal . . . because the defendant's

conviction has not yet become final, and his right to due process continues to demand judicial fairness." *Fields v. Wharrie*, 672 F.3d 505, 515 (7th Cir. 2012).

### 3.     Materiality

Evidence is material within the meaning of *Brady* where there is a reasonable probability that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bell*, 556 U.S. at 470; *accord Strickler*, 527 U.S. at 290.  In *Kyles*, the Supreme Court identified four key aspects of the materiality inquiry.  First, to show materiality, the defendant need not demonstrate by a preponderance of the evidence that disclosure of the withheld evidence would have resulted in acquittal.  *Kyles*, 514 U.S. at 434.  Second, the materiality determination "is not a sufficiency of evidence test."  *Id.*  The relevant inquiry is not whether the inculpatory evidence, discounted in light of the undisclosed evidence, would still have been enough to convict, but whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 435.  Third, if the withheld evidence is material, there is no need to conduct a harmless error analysis.  *Id.* at 435-36.  Finally, the withheld evidence must be considered collectively, not item-by-item.  *Id.* at 436.  Although a court must consider "the tendency and force of the undisclosed evidence item by item," it should evaluate the evidence's "cumulative effect for purposes of materiality."  *Id.* at 436 n. 10.

Here, the failure to disclose evidence of Detective Pitts's improper interrogation tactics and lack of credibility provides a reasonable basis to question the verdict rendered by the jury. As noted, defense counsel could have used the evidence to impeach not only Detective Pitts himself, but also Detectives Gaul and Verrecchio.  These latter two detectives testified that no threats or violence were used, including by Detective Pitts, in obtaining Mr. Cunningham's and

Mr. Respes's statements, and Detective Gaul further testified that Detective Pitts was well-regarded, competent, and caring and would not have choked Mr. Cunningham.  (*See* Resp., ECF No. 73 at 3-4 (citing N.T. 5/20/13 at 57; N.T. 5/22/13 at 86; N.T. 5/28/13 at 151-52; N.T. 5/28/13 at 54, 58, 85–86)).  If evidence of Detective Pitts's prior misconducts had been disclosed and presented at trial, the jury could have rejected the detectives' testimony and instead credited Mr. Cunningham's claim that his statement was extracted through physical abuse and other improper tactics.  It may also have been more likely to credit Mr. Cunningham's testimony confirming Petitioner's alibi, that he was sitting with Ms. Brown on the steps of a home in the neighborhood at the time of the shooting.  (*See id.* at 5 (citing N.T. 5/20/13 at 153-55, 246)).  Indeed, as the trial judge instructed the jury, if it found that any witness had testified intentionally and falsely regarding a material fact, it would have been at liberty to disregard all testimony from that witness.  (*See id.* at 40 (citing N.T. at 5/28/13 at 13)).  Thus, the jury would have been free, in addition, to disregard Detective Gaul's testimony that the inculpatory statement of Mr. Respes, who also recanted at trial, was provided voluntarily.  (*See id.* at 10 (citing N.T. 5/22/13 at 34-36)).  In short, if the contents of Detective Pitts's IA file had been disclosed, there is reason to believe that the jury would have found neither witness statement identifying Petitioner as the shooter credible in light of the allegations of coercion and that the result of the trial would have been different.[2]

---

[2]  The Commonwealth further maintains that "disclosure of Detective Pitts's IA file would have spurred competent counsel to undertake additional investigation regarding Detective Pitts's misconduct" and thereby uncover two other cases in which he was alleged to have engaged in similar conduct, *Commonwealth v. Speakes* and *Commonwealth v. Drayton*.  (Resp., ECF No. 73, at 36).  These two cases were located by Petitioner during the prosecution of his *pro se* PCRA petition and presented at the PCRA hearing in another unrelated case, *Commonwealth v. Thorpe*, No. CP-51-CR-0011433-2008 (Phila. Com. Pl. Ct.) (ECF No.73-3).  The Commonwealth posits that counsel would have discovered these cases because Petitioner, representing himself *pro se*, was able to do so.  (Resp., ECF No. 73-3, at 36).  However, it is

Because the Commonwealth suppressed material evidence having substantial impeachment value to Petitioner, I respectfully recommend that the District Court grant the *Brady* claim in his amended and supplemented habeas petition and order the Commonwealth to provide Petitioner with a new trial or release him from custody within 180 days.

IV.     **CONCLUSION**

For the foregoing reasons, I respectfully recommend that the District Court grant the request for a writ of habeas corpus on Petitioner's amended and supplemented Claim H asserting a violation of *Brady v. Maryland*.

Therefore, I make the following:

---

unknown how Petitioner located these unrelated cases, and it is questionable whether the Court can assume that counsel would have located them simply because Petitioner did, whether or not counsel had the benefit of Detective Pitts's IA files.  In any event, because the undisclosed evidence was material for the reasons stated in the body of this Report and Recommendation, it is not necessary to consider whether counsel would have uncovered the allegations made against Detective Pitts in *Drayton*, *Speakes* and/or *Thorpe*.

**RECOMMENDATION**

AND NOW this  15TH  day of June, 2022, I respectfully RECOMMEND that the petition for writ of habeas corpus be GRANTED with respect to Petitioner's claim that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose material evidence having substantial impeachment value to Petitioner.

I further recommend that within one-hundred and eighty (180) days of the District Judge's Order approving and adopting this Report and Recommendation, the Commonwealth give Petitioner a new trial, or release him from custody.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge